UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | | |
|---|---|---|
| COOS-CURRY ELECTRIC COOPERATIVE, INC., an Oregon cooperative, | ) ) ) | No. _CS-6113-HC_ |
| | ) | **NOTICE OF REMOVAL** |
| Plaintiff, | ) | **BY DEFENDANT** |
| | ) | |
| vs. | ) | |
| | ) | |
| LIGHTSPEED NETWORKS, Inc., An Oregon Corporation, | ) ) | |
| Defendant. | ) | |

**Francis Hansen & Martin, LLP**
1148 N.W. Hill Street • Bend, Oregon 97701-1914
(541) 389-5010

**TO:      The Judges and Clerks of the United States District Court for the District of Oregon.**

PLEASE TAKE NOTICE that Defendant Lightspeed Networks Inc. hereby removes to this Court pursuant to 28 U.S.C. §1441(b) the state court action described below.

1.     On April 12, 2005, an action was commenced in the Circuit Court for the State of Oregon, County of Curry, entitled <u>Coos-Curry Electric Cooperative v. Lightspeed Networks, Inc.</u>, case # CV 04 090169.

2.     Defendant was served a copy of said Complaint with a Summons on April 14th, 2005.  A copy of the Complaint and Summons served upon defendant is attached hereto as Exhibit A.

3.     Plaintiff alleges in its Complaint that defendant Lightspeed Networks offered plaintiff securities in Lightspeed Networks.  (Complaint, para. 9).

**1 – DEFENDANT'S NOTICE OF REMOVAL, 28 U.S.C. §1441(b)**

Plaintiff further alleges that defendant Lightspeed's offering of securities violated

"the Oregon Securities Law," citing Oregon Revised Statutes 59.005 et seq.

    4.      Defendant Lightspeed Networks, Inc. offered the securities which

are the subject of plaintiff's Compliant pursuant to 15 U.S.C. § 77r, and Reg. D,

Rule 506 promulgated by the United States Securities and Exchange Commission,

which <u>expressly preempt</u> any concurrent state securities regulation. The Form D

Notice of Sale of Securities filed by Lightspeed with the Securities and Exchange

Commission is attached hereto as Exhibit B.

    5.      This action is a civil action of which this Court has original

jurisdiction under 28 U.S.C. §1331, and is one which may be removed to this Court

by defendants pursuant to 28 U.S.C. §1441(b). Jurisdiction is proper in this Court

because the action arises under the exclusive jurisdiction provisions of the

Securities Act of 1933, 15 U.S.C. § 77r. The allegations of plaintiff's Complaint

under Oregon Revised Statutes Chapter 59 fall directly within the scope of federal

preemption under Regulation D.

    6.      This Notice of Removal is filed within 30 days of receipt of the

plaintiff's Summons and Complaint under 28 U.S.C. 1446.

    DATED this _28th_ day of April, 2005.

                        FRANCIS HANSEN & MARTIN, LLP

                        Martin E. Hansen, OSB #80052
                        Of Attorneys for Plaintiffs

**2 – DEFENDANT'S NOTICE OF REMOVAL, 28 U.S.C. §1441(b)**

# In the Circuit Court of the State of Oregon

APR 1 4 2005

For the County of _____ Curry _____

COOS-CURRY ELECTRIC COOPERATIVE, INC.,
_____ an Oregon cooperative, _____
_____ Plaintiff(s),

vs.

LIGHTSPEED NETWORKS, INC., an Oregon corporation,
_____
_____
_____
_____, Defendant(s).

Case No. _____ 05 C V 0237 _____
~~CV04090160~~

SUMMONS

To _____ LIGHTSPEED NETWORKS, INC.
_____ c/o GREGORY J STUMAN, REGISTERED AGENT
_____ FRANCIS HANSEN & MARTIN LLP
_____ 1148 NW HILL ST
_____ BEND OR 97701 _____ Defendant _____.

    You are hereby required to appear and defend the complaint filed against you in the above entitled action within thirty (30) days from the date of service of this summons upon you, and in case of your failure to do so, for want thereof, plaintiff(s) will apply to the court for the relief demanded in the complaint.

**NOTICE TO THE DEFENDANT: READ THESE PAPERS CAREFULLY!**

You must "appear" in this case or the other side will win automatically. To "appear" you must file with the court a legal paper called a "motion" or "answer." The "motion" or "answer" must be given to the court clerk or administrator within 30 days along with the required filing fee. It must be in proper form and have proof of service on the plaintiff's attorney or, if the plaintiff does not have an attorney, proof of service upon the plaintiff.

If you have any questions, you should see an attorney immediately. If you need help in finding an attorney, you may call the Oregon State Bar's Lawyer Referral Service at (503) 684-3763 or toll-free in Oregon at (800) 452-7636.

SIGNATURE OF ATTORNEY / AUTHOR FOR PLAINTIFF
Michael G. Hanlon                    OSB No. 79255
ATTORNEY'S / AUTHOR'S NAME (TYPED OR PRINTED)          BAR NO. (IF ANY)
1001 SW 5th Avenue, Suite 1300
ADDRESS
Portland, Oregon 97204          503-228-9787
CITY          STATE          ZIP          PHONE
(503) 224-4200          mgh@hanlonlaw.com
FAX (IF ANY)          ATTORNEY'S E-MAIL ADDRESS (IF ANY)

TRIAL ATTORNEY IF OTHER THAN ABOVE (TYPED OR PRINTED)          BAR NO.

STATE OF OREGON, County of _____ Multnomah _____ ) ss.

    I, the undersigned attorney of record for the plaintiff, certify that the foregoing is an exact and complete copy of the original summons in the above entitled action.

_____
ATTORNEY OF RECORD FOR PLAINTIFF(S)

TO THE OFFICER OR OTHER PERSON SERVING THIS SUMMONS: You are hereby directed to serve a true copy of this summons, together with a true copy of the complaint mentioned therein, upon the individual(s) or other legal entity(ies) to whom or which this summons is directed, and to make your proof of service on the reverse hereof or upon a separate similar document which you shall attach hereto.

_____
ATTORNEY(S)          NAME(S)

EXHIBIT          A

FORM No. 190 – SUMMONS
© 1985-2004 Stevens-Ness Law Publishing Co.
Portland, OR www.stevensness.com          ECBB

0F 53

NO PART OF ANY STEVENS-NESS FORM MAY BE REPRODUCED IN ANY FORM OR BY ANY ELECTRONIC OR MECHANICAL MEANS.

I HEREBY CERTIFY THAT THE FOREGOING
IS A COMPLETE AND EXACT COPY OF THE
ORIGINAL THEREOF

Attorney for

APR 1 4 2005

1

2

3

4          IN THE CIRCUIT COURT OF THE STATE OF OREGON

5                    FOR THE COUNTY OF CURRY

6                                    )    Case No.:   05 CV 0237
   COOS-CURRY ELECTRIC           )              ~~CV050400169~~
7  COOPERATIVE, an Oregon cooperative )
                                     )
8              Plaintiff,            )
                                     )    COMPLAINT
9              v.                    )    (Declaratory Judgment)
                                     )
10 LIGHTSPEED NETWORKS, INC., an     )
   Oregon corporation,              )
11                                  )
               Defendant            )
12

13                              1.

14     Plaintiff Coos-Curry Electric Cooperative, Inc. ("CCEC") is an Oregon cooperative

15 corporation duly authorized to transact business in the state of Oregon, with its principal place of

16 business in Curry County.

17                              2.

18     Defendant Lightspeed Networks, Inc. ("Lightspeed") is an Oregon corporation

19 transacting business in the state of Oregon.

20                              3.

21     This court has jurisdiction over the subject matter of this action under ORS 28.010,

22 28.020, and 28.030, as plaintiff requests the construction of the rights, status and legal relations

**Page - 1      COMPLAINT**

EXHIBIT _____A_____

2 OF 53

LAW OFFICES OF MICHAEL G. HANLON
A PROFESSIONAL CORPORATION
1001 SW FIFTH AVE., SUITE 1300
PORTLAND, OR 97204
TELEPHONE (503) 228-9787
FACSIMILE (503) 224-4200
mgh@hanlonlaw.com

C:\DATA\DOCS\21100~CCEC\PLD_COMPLAINT.DOC

1   of the parties under contracts and other loan instruments.

2                            4.

3       Plaintiff CCEC's wholly owned subsidiary, South Coast Satellite Cooperative, Inc.

4   ("SCSC"), was a member of Northwest Open Access Network Oregon ("NoaNet") beginning on

5   or about May 25, 2001.  A times material to this complaint, in addition to SCSC, NoaNet's

6   members included Central Electric Cooperative, Inc., Douglas Electric Cooperative, Inc., Hood

7   River Electric Cooperative, Umatilla Electric Cooperative, Inc., West Oregon Electric

8   Cooperative, Inc., and Tribal One Broadband Technologies, LLC ("Tribal One").  On or about

9   November 23, 2004, SCSC withdrew from NoaNet with notice to NoaNet's lender, National

10   Rural Utilities Cooperative Finance Corporation ("CFC").  On the same day, CCEC terminated

11   its guaranty agreement with CFC.

12                            5.

13       By loan agreement dated February 7, 2002 (a copy of which is attached as Exhibit 1),

14   CFC agreed to loan NoaNet an amount not to exceed $12,975,585.  On the same date, NoaNet's

15   members or related corporations executed loan guaranties for a portion of the debt due by

16   NoaNet to CFC in proportion to their interests in NoaNet.  CCEC's pro rata share of the loan was

17   5.03% and Tribal One's portion was 6.04%. Plaintiff CCEC's guaranty to CFC (a copy of which

18   is attached as Exhibit 2) was in an amount not to exceed $2,417,946, which sum included the

19   loan portion applicable to both CCEC and Tribal One.

20                            6.

21       The NoaNet loan from CFC was due on or about April 1, 2005.  Before the due date,

22   CCEC informed NoaNet and CFC that it was ready and willing to pay its guarantor's 5.03%

**Page - 2**     **COMPLAINT**



EXHIBIT _____ A _____

_____ 3 _____ OF _____ 53 _____

C:\DATA\DOCS\21100 - CCEC\PLD_COMPLAINT.DOC

LAW OFFICES OF MICHAEL G. HANLON
A PROFESSIONAL CORPORATION
1001 SW FIFTH AVE., SUITE 1300
PORTLAND, OR 97204
TELEPHONE (503) 228-9787
FACSIMILE (503) 224-4200
mgh@hanlonlaw.com

1    portion of the approximately $12.5 million outstanding loan in exchange for a satisfaction of its

2    obligations under the guaranty agreement.

3                                             7.

4          Thereafter, NoaNet and CCEC exchanged proposals concerning the manner in which

5    NoaNet's debt to CCEC (for the guarantor's payment of debtor NoaNet's obligation) would be

6    repaid. In early March, 2005, when the parties could not reach an agreement on repayment terms

7    and particularly whether debt or equity would be issued by NoaNet to CCEC, NoaNet initiated a

8    plan with NoaNet's remaining members to transfer all of NoaNet's assets in an effort to avoid its

9    debt to CCEC.

10                                            8.

11         On or about March 10, 2005, defendant Lightspeed was formed by one of NoaNet's

12   members.  Shortly thereafter, Lightspeed offered its securities to all of NoaNet's current

13   members as Lightspeed's members were intended to be identical to NoaNet's members.

14                                            9.

15         Between March 31, 2005 and April 4, 2005, Lightspeed offered its securities to CCEC

16   (copies of relevant portions of which are attached as Exhibit and 4).  Despite demand,

17   Lightspeed refused to give CCEC sufficient financial information (as required by the Oregon

18   Securities Law) to make an informed decision about the purchase of Lightspeed securities.  The

19   subscription amounts paid by the other NoaNet members to Lightspeed roughly equaled the sum

20   of their portion of the CFC debt together with a release of any right to repayment from NoaNet

21   for the guarantor's payment of NoaNet's debt.

22   / / /

**Page - 3      COMPLAINT**



EXHIBIT ___A___

___4___ OF ___53___

LAW OFFICES OF MICHAEL G. HANLON
A PROFESSIONAL CORPORATION
1001 SW FIFTH AVE., SUITE 1300
PORTLAND, OR  97204
TELEPHONE (503) 228-9787
FACSIMILE (503) 224-4200
mgh@hanlonlaw.com

10.

On or about April 4, 2005, Lightspeed made demand on CCEC and NoaNet's members and guarantors for NoaNet's payment under the CFC loan (a copy of which is attached as Exhibit 4). Lightspeed stated that it purchased the loan from CFC on March 25, 2005. Despite demand by CCEC, Lightspeed would not provide the documentation of that purchase. In the same April 4, 2005, letter, Lightspeed demanded that NoaNet transfer all of its assets to Lightspeed by April 6, 2005, two days later. Lightspeed also enclosed NoaNet corporate minutes to be executed by the NoaNet members.

11.

The assets of NoaNet at the time of the demand by Lightspeed were substantially in excess of $9 million. Lightspeed demanded that these assets be conveyed to it for the sum of $2.5 million. Despite demand by CCEC, Lightspeed would not provide an appraisal or other verification of the value of the NoaNet assets worth in excess of $9 million being transferred to Lightspeed for $2.5 million.

12.

According to Lightspeed, after the application of the value of the NoaNet assets transferred to it, this left a purported deficiency balance under the loan agreement of $10,031,016 to be paid by the guarantors. Had the full value of NoaNet's assets been applied to the CFC loan, CCEC's 5.03% portion of the remaining debt would have totaled less than $176,050.

13.

On April 9, 2005, Lightspeed made demand on CCEC (a copy of which is attached as Exhibit 5) for the immediate payment of the sum of $1,495,098.23 together with interest at the

**Page - 4      COMPLAINT**

EXHIBIT _____A_____

_5_ OF _53_

C:\DATA\DOCS\21100 - CCEC\PLD_COMPLAINT.DOC

LAW OFFICES OF MICHAEL G. HANLON
A PROFESSIONAL CORPORATION
1001 SW FIFTH AVE., SUITE 1300
PORTLAND, OR 97204
TELEPHONE (503) 228-9787
FACSIMILE (503) 224-4200
mgh@hanlonlaw.com

1    rate of $210.13 per diem.  Lightspeed stated that if this $1,495,098.23 million were not paid in

2    full by April 12, 2005, Lightspeed would file suit against CCEC for this entire amount.  Despite

3    demand by CCEC, Lightspeed refused to provide its calculations concerning this sum demanded

4    or any credits given to the total CFC loan amount.

5                                                         14.

6         The transfer of in excess of $9 million in NoaNet assets to Lightspeed for $2.5 million

7    constituted a fraudulent conveyance.  This transfer materially, adversely, affected CCEC's rights

8    against the primary obligor, NoaNet.   As a guarantor, CCEC was entitled to immediate

9    reimbursement of all sums paid on NoaNet's behalf to CFC.  CCEC's obligations under the

10   guaranty agreement were discharged by reason of the unconsented material alteration of CCEC's

11   risk of liability by the asset transfer.

12                              FIRST CLAIM FOR RELIEF
                                  (Declaratory Judgment)
13
                                             15.
14
          Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1
15
     through 14 above.
16
                                             16.
17
          A justiciable controversy exists between the parties concerning CCEC's rights and
18
     obligations with respect to the NoaNet loan from CFC and CCEC's guaranty agreement.
19
                                             17.
20
          CCEC is entitled to a declaration of its rights and obligations under these loan agreements
21
     as follows:
22

**Page - 5     COMPLAINT**

EXHIBIT ___*A*___

___6___ OF ___53___

LAW OFFICES OF MICHAEL G. HANLON
A PROFESSIONAL CORPORATION
1001 SW FIFTH AVE., SUITE 1300
PORTLAND, OR  97204
TELEPHONE (503) 228-9787
FACSIMILE (503) 224-4200
mgh@hanlonlaw.com

(a)    The transfer of NoaNet's assets worth in excess of $9 million to Lightspeed for $2.5 million constituted a fraudulent conveyance to avoid claims by NoaNet's creditor, CCEC.

(b)    The transfer of NoaNet's assets to Lightspeed without CCEC's consent was a material alteration of CCEC's risk of liability under the guaranty.  CCEC's payment obligation under the CFC guaranty agreement was discharged in its entirety by reason of this asset transfer.

(c)    The offer of securities by Lightspeed to CCEC was made in violation of the Oregon Securities Law, ORS 59.005, et seq.  Lightspeed failed to provide full and fair disclosure as required by law.

(d)    By reason of Lightspeed inequitable course of conduct and fraudulent asset transfer, CCEC shall not be required to make any payment to Lightspeed under the CFC guaranty.

(e)    Lightspeed shall not be entitled to pursue any right of recovery against CCEC under the CFC loan instruments and is enjoined from doing so.

(f)    In the alternative, the CFC loan shall be credited with the full value of all assets carried on NoaNet's most current balance sheet that were assigned by NoaNet to Lightspeed, an amount of not less than $9 million.  CCEC as guarantor shall pay 5.03% of the net amount of the loan amount remaining after the credit for the full value of all assets transferred to Lightspeed.

(g)    Under the terms of the CFC guaranty agreement, CCEC shall be entitled to recover its reasonable attorney fees and costs from Lightspeed.

Page - 6    COMPLAINT

EXHIBIT ___A___

___7___ OF ___53___

LAW OFFICES OF MICHAEL G. HANLON
A PROFESSIONAL CORPORATION
1001 SW FIFTH AVE., SUITE 1300
PORTLAND, OR 97204
TELEPHONE (503) 228-9787
FACSIMILE (503) 224-4200
mgh@hanlonlaw.com

C:\DATA\DOCS\21100 - CCEC\PLD_COMPLAINT.DOC

1    WHEREFORE, Plaintiff CCEC prays for judgment in its favor as follows:

2    (a)    For the declaration of its rights and obligations under the loan agreements as set

3    forth in paragraph 17 above.

4    (b)    For its costs and reasonable attorney fees.

5    (c)    For such other and further relief as this court deems just and equitable.

6    DATED this _12th_ day of April, 2005.

7

8

9    _[signature]_
Michael G. Hanlon
OSB No. 79255
10    1001 SW Fifth Ave, Suite 1300
Portland, OR  97201
11    Telephone No.: (503) 228-9787
Facsimile: (503) 224-4200
12    E-mail: mgh@hanlonlaw.com
Attorney for Plaintiff Coos-Curry Electric Cooperative, Inc.

13

14

15

16

17

18

19

20

21

22

Page - 7    **COMPLAINT**

EXHIBIT _A_

_8_ OF _53_

LAW OFFICES OF MICHAEL G. HANLON
A PROFESSIONAL CORPORATION
1001 SW FIFTH AVE., SUITE 1300
PORTLAND, OR  97204
TELEPHONE (503) 228-9787
FACSIMILE (503) 224-4200
mgh@hanlonlaw.com

C:\DATA\DOCS\21100 - CCEC\PLD_COMPLAINT.DOC

LOAN AGREEMENT

LOAN AGREEMENT (this "Agreement") dated as of February 7, 2002, between NORTHWEST OPEN ACCESS NETWORK OREGON ("Borrower"), a cooperative corporation organized and existing under the laws of the State of Oregon and NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION ("CFC"), a cooperative association incorporated under the laws of the District of Columbia.

RECITALS

WHEREAS, the Borrower has applied to CFC for a loan and agrees to use the proceeds thereof for the purpose set forth on Schedule 1 hereto, consistent with the Borrower's articles of incorporation, bylaws and applicable federal, state and local laws and regulations;

WHEREAS, CFC has approved a loan to the Borrower in the aggregate principal amount of the CFC Commitment, subject to the terms and conditions stated herein; and

WHEREAS, the Borrower has agreed to execute one or more secured promissory notes to evidence Borrower's indebtedness to CFC under this Agreement.

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants hereinafter contained, the parties hereto agree and bind themselves as follows:

ARTICLE I

DEFINITIONS

Section 1.    For purposes of this Agreement, the following capitalized terms shall have the following meanings (such definitions to be equally applicable to the singular and plural forms thereof). Capitalized terms that are not defined herein shall have the meanings as set forth in the Mortgage.

"Accounting Requirements" shall mean any system of accounts prescribed by a federal regulatory authority having jurisdiction over the Borrower or, in the absence thereof, the requirements of generally accepted accounting principles applicable to businesses similar to that of the Borrower.

"Advance" or "Advances" shall mean one or more advances of funds by CFC to Borrower under a Note and pursuant to the terms and conditions of this Agreement.

"Business Day" shall mean any day that both CFC and the depository it utilizes for funds transfers hereunder are open for business.

"Cash Margins" shall mean, in any given year, the Borrower's income before non-cash charges and after non-cash credits and principal on long term debt payable for the year.

"CFC Commitment" shall have the meaning as defined in Schedule 1.

CFC LOANAG
OR704-I-9001 (YERGINJ)
21883-6

"CFC Fixed Rate" shall mean the fixed rate as available for loans similarly classified pursuant to CFC's policies and procedures in effect at the time a conversion request is approved.

"CFC Fixed Rate Term" shall mean the specific period of time that a CFC Fixed Rate is in effect.

"CFC Variable Rate" shall mean the rate established by CFC for variable interest rate loans similarly classified pursuant to CFC's policies and procedures in effect in effect at the time a conversion request is approved.

"Conversion Request" shall mean a request from any duly authorized official of the Borrower, in form and substance satisfactory to CFC, that requests an interest rate conversion.

"Depreciation and Amortization Expense" shall mean an amount constituting the depreciation and amortization of the Borrower computed pursuant to Accounting Requirements.

"Distributions" shall have the meaning defined in Section 5.H.

"EBITDA" shall mean, for any period, the sum of pre-tax income or loss whichever the case may be, total interest expense, depreciation and amortization expense, and zero-cost equity capital contributions where pre-tax income or loss excludes any extraordinary gains, the write up of any asset and any investment income or losses as measured on a consolidated basis and cumulative basis from the beginning of the fiscal year.

"Equities and Margins" shall mean Borrower's equities and margins computed pursuant to Accounting Requirements.

"Equity" shall mean the aggregate of Borrower's Equities and Margins computed pursuant to Accounting Requirements.

"Guarantors" shall mean Central Electric Cooperative, Inc., Coos-Curry Electric Cooperative, Inc., Douglas Electric Cooperative, Inc., Hood River Electric Cooperative, Umatilla Electric Cooperative Association, and West Oregon Electric Cooperative, Inc.

"LCTC" shall mean the Loan Capital Term Certificate as described in Section 4.H. hereto.

"Long-Term Debt" shall mean any amount included in Total Long-Term Debt pursuant to Accounting Requirements.

"Maturity Date", with respect to each Note, shall mean the date set forth therein, provided, however, that if such date is not a Payment Date, then the Maturity Date shall be the Payment Date immediately preceding such date.

"Members" shall mean Central Electric Cooperative, Inc., Coos-Curry Electric Cooperative, Inc., Douglas Electric Cooperative, Inc., Hood River Electric Cooperative, Umatilla Electric Cooperative Association, West Oregon Electric Cooperative, Inc., and Tribal One Broadband Technologies, LLC.

CFC LOANAG
OR704-I-9001 (YERGINJ)
21883-6

Exhibit 1
Page 1 of 13

EXHIBIT 9 OF 53 A

"Mortgage" shall have the meaning as described in Schedule 1.

"Mortgaged Property" shall have the meaning as defined in the Mortgage.

"Non-Operating Margins--Interest" shall mean the amount of non-operating margins--interest of Borrower computed pursuant to Accounting Requirements.

"Note" or "Notes" shall mean one or more secured promissory notes executed by Borrower pursuant to this Agreement in the aggregate principal amount of the CFC Commitment.

"Operating Margins" shall mean the amount of net patronage capital and operating margins of the Borrower computed pursuant to Accounting Requirements.

"Patronage Capital or Operating Margins" shall mean the amount of net patronage capital or margins of the Borrower computed pursuant to Accounting Requirements.

"Payment Date" shall mean the last day of each of the months referred to in Schedule 1.

"Payment Notice" shall mean a notice furnished by CFC to Borrower that indicates the precise amount of each payment of principal and interest and the total amount of each payment.

"Principal" shall mean the amount of principal billed on account of Total Long-Term Debt of the Borrower as computed for purposes of the Accounting Requirements.

"Restricted Rentals" shall mean all rentals required to be paid under finance leases and charged to income, exclusive of any amounts paid under any such lease (whether or not designated therein as rental or additional rental) for maintenance or repairs, insurance, taxes, assessments, water rates or similar charges. For the purpose of this definition the term "finance lease" shall mean any lease having a rental term (including the term for which such lease may be renewed or extended at the option of the lessee) in excess of three (3) years and covering property having an initial cost in excess of $250,000 other than automobiles, trucks, trailers, other vehicles (including without limitation aircraft and ships), office, garage and warehouse space and office equipment (including without limitation computers).

"Revenue Contracts" shall mean all revenue contracts between Borrower and any of its members.

"Termination Date" shall mean a date thirty (30) months after the date hereof.

"Total Assets" shall mean an amount constituting the total assets of the Borrower computed pursuant to Accounting Requirements.

"Total Long-Term Debt" shall mean an amount constituting the long-term debt of the Borrower computed pursuant to Accounting Requirements.

CFC LOANAG
OR704-H-9001 (VERGINJ)
21883-6

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES

Section 2.    The Borrower represents and warrant to CFC as of the date of this Agreement that:

A.    **Good Standing.**  The Borrower is a corporation duly organized, validly existing and active on the records of the state of its incorporation, is duly qualified to do business and is in good standing in those states in which it is required to be qualified to conduct its business, and has the corporate power to enter into and perform this Agreement, to borrow hereunder and to give security as provided for herein.

B.    **Authority.**  Borrower has the corporate power and authority to enter into this Agreement, the Note and the Mortgage; to make the borrowing hereunder; to execute and deliver all documents and instruments required hereunder and to incur and perform the obligations provided for herein, in the Note and in the Mortgage, all of which have been duly authorized by all necessary and proper corporate and other action; and no consent or approval of any person, including, without limitation, stockholders and members of Borrower and any public authority or regulatory body, which has not been obtained is required as a condition to the validity or enforceability hereof or thereof.

C.    **No Conflicting Agreements.**  This execution, delivery of and performance by Borrower of this Agreement, the Note and the Mortgage, and the transactions contemplated hereby or thereby, will not: (i) violate any provision of law, any order, rule or regulation of any court or other agency of government, any award of any arbitrator, the articles of incorporation or by-laws of Borrower, or any indenture, contract, agreement, mortgage, deed of trust or other instrument to which Borrower is a party or by which it or any of its property is bound; or (ii) be in conflict with, result in a breach of or constitute (with due notice and/or lapse of time) a default under, any such award, indenture, contract, agreement, mortgage, deed of trust or other instrument, or result in the creation or imposition of any Lien (other than contemplated hereby) upon any of the property or assets of Borrower.

D.    **Taxes.**  Borrower has paid or caused to be paid all federal, state and local taxes to the extent that such taxes have become due. Borrower has filed or caused to be filed all federal, state and local tax returns that are required to be filed by Borrower.

E.    **Title to Properties.**  Borrower has good and marketable title to all of its real properties and owns all of its other properties and assets free and clear of any liens, except the lien of the Mortgage and Permitted Encumbrances.

F.    **Licenses and Permits.**  Borrower has duly obtained and now holds all licenses, permits, certifications, approvals and the like necessary to own and operate its property and business that are required by federal, state and local laws of the jurisdictions in which Borrower conducts its business and each remains valid and in full force and effect.

G.    **Litigation.**  There are no outstanding judgments, suits, claims, actions or proceedings pending, or to the knowledge of the Borrower, threatened against or affecting the

CFC LOANAG
OR704-H-9001 (VERGINJ)
21883-6

EXHIBIT A
__10__ OF __53__

Exhibit 1
Page 2 of 13

Borrower or its properties which, if adversely determined, would have a material adverse effect upon the financial condition or the business of the Borrower. The Borrower is not, to its knowledge, in default or violation with respect to any judgment, order, writ, injunction, decree, rule or regulation of any court, governmental agency or other instrumentality which would have a material adverse effect on the Borrower.

H.    Financial Statements.    The balance sheet of the Borrower as at the date identified in Schedule 1 hereto, and the statement of operations of the Borrower for the period ending on said date, heretofore furnished to CFC, are complete and correct. Said balance sheet fairly presents the financial condition of the Borrower as at said date and said statement of operations fairly reflects its operations for the period ending on said date. The Borrower has no contingent obligations or unusual forward or long-term commitments except as specifically stated in said balance sheet or herein. There has been no material adverse change in the financial condition or operations of the Borrower from that set forth in said financial statements except changes disclosed in writing to CFC prior to the date hereof.

I.    Borrower's Legal Status.    Schedule 1 hereto accurately sets forth: (a) The Borrower's exact legal name, (b) the Borrower's organizational type and jurisdiction of organization, (c) the Borrower's organizational identification number or accurate statement that the Borrower has none and (d) the Borrower's place of business or, if more than one, its chief executive office as well as the Borrower's mailing address if different.

J.    Location of Properties.    All property owned by the Borrower is located in the counties identified in Schedule 1.

K.    No Other Liens.    As to property which is presently included in the description of Mortgaged Property (as that term is defined in the Mortgage), the Borrower has not, without the prior written approval of CFC, signed any security agreement or mortgage or filed or permitted to be filed any financing statement with respect to assets owned by it, other than security agreements, mortgages and financing statements running in favor of CFC or except as disclosed in writing to CFC prior to the date hereof.

L.    Required Approvals.    No license, consent or approval of any governmental agency or authority is required to enable the Borrower to enter into this Agreement, any Note or the Mortgage, or to perform any of its obligations provided for in such documents, except as disclosed in Schedule 1, all of which Borrower has obtained prior to the date hereof.

ARTICLE III

LOAN

Section 3.1.    Advances.    CFC agrees to make, and the Borrower agrees to request, on the terms and conditions of this Agreement, Advances from time to time at the main office of CFC, or at such other place as may be mutually agreed upon, in an aggregate principal amount not to exceed the CFC Commitment.

CFC LOAN/AG
OR7041-9901 (VERGINJ)
21883-5

On the Termination Date, CFC may stop advancing funds and limit the CFC Commitment to the amount advanced prior to such date. The obligation of the Borrower to repay the Advances shall be evidenced by one or more Notes. The Borrower shall give CFC written notice of the date on which each Advance is to be made.

Section 3.2.    Interest Rate and Payment.    Notes shall be payable and bear interest as follows:

A.    Payments; Maturity.

(1)    Each Note shall have a Maturity Date as stated therein, provided, however, that if such date is not a Payment Date, then the Maturity Date shall be the Payment Date immediately preceding such date.

(2)    Interest shall be due and payable in accordance with CFC's regular quarterly billing cycles as may be in effect from time to time, provided, however, that upon thirty (30) days prior written notice to the Borrower, CFC may, at its option, require Borrower to make payments on a monthly, rather than quarterly, basis with respect to this repayment obligation. After receipt of such notice, borrower shall thereafter pay each installment, in the amounts invoiced by CFC, on or before the last day of each month. CFC shall send a payment notice to the Borrower at least five days prior to the due date of any interest payment. All amounts shall be payable at CFC's main office at Woodland Park, 2201 Cooperative Way, Herndon, Virginia 20171-3025 or at such other location as designated by CFC from time to time.

(3)    CFC will furnish to the Borrower a Payment Notice at least ten (10) days before each Payment Date, provided, however, that CFC's failure to send a Payment Notice shall not constitute a waiver by CFC or be deemed to relieve Borrower of its obligation to make payments as and when due as provided for herein.

(4)    No provision of this Agreement or of any Note shall require the payment, or permit the collection, of interest in excess of the highest rate permitted by applicable law.

B.    Application of Payments.    Each payment shall be applied first to any charges other than interest or principal then due on the related Note, second to interest accrued on the principal amount to the due date of such payment on such Note (or, at the election of the holder of the Note, to the date of such payment if the same is not paid on its due date), and the balance to the reduction of principal against the Note.

C.    Election of Interest Rate and Interest Rate Computation.    Prior to each Advance on a Note, the Borrower must select in writing either a CFC Fixed Rate or the CFC Variable Rate, as follows:

(1)    CFC Fixed Rate.    If the Borrower elects a CFC Fixed Rate for an Advance, then such rate shall be in effect for the CFC Fixed Rate Term selected by Borrower. CFC shall provide the Borrower with at least sixty (60) days prior written notice of the date on which a CFC Fixed Rate is no longer in effect. Pursuant to CFC's policies of general application for repricing, the Borrower may choose any of the interest rate options then available for similarly classified borrowers repricing from a CFC Fixed Rate. If Borrower does not select an interest rate in writing

CFC LOAN/AG
OR7041-9901 (VERGINJ)
21883-5

EXHIBIT A  11 OF 53<br>Exhibit 1<br>Page 3 of 13

when a CFC Fixed Rate is subject to repricing, then outstanding Advances shall reprice for the same CFC Fixed Rate Term as in effect immediately prior to the repricing, and shall bear interest at the then prevailing CFC Fixed Rate in effect for such term. CFC agrees that its term loan policies will include a fixed interest rate option until the Maturity Date. For any Advance, the Borrower may not select a CFC Fixed Rate with a CFC Fixed Rate Term that extends beyond the Maturity Date. Interest on Advances bearing interest at a CFC Fixed Rate shall be computed for the actual number of days elapsed on the basis of a year of 365 days.

(2)    CFC Variable Rate.  If the Borrower elects the CFC Variable Rate for an Advance, then such CFC Variable Rate shall apply until the Maturity Date, unless the Borrower elects to convert to a CFC Fixed Rate pursuant to the terms hereof. Interest on Advances bearing interest at the CFC Variable Rate shall be computed for the actual number of days elapsed on the basis of a year of 365 days.

Section 3.3.   Conversion of Interest Rates.

A.   CFC Variable Rate to a CFC Fixed Rate.  The Borrower may, at its option, at any time convert from the CFC Variable Rate to a CFC Fixed Rate by submitting to CFC a Conversion Request requesting that a CFC Fixed Rate apply to any outstanding Advance. The rate shall be equal to the rate of interest offered by CFC in effect on the date of the Conversion Request. The effective date of the new interest rate shall be a date determined by CFC pursuant to its policies of general application following receipt of the Conversion Request.

B.   CFC Fixed Rate to CFC Variable Rate.  The Borrower may, at its option, at any time convert a CFC Fixed Rate to the CFC Variable Rate by: (i) submitting a Conversion Request requesting that the CFC Variable Rate apply to any outstanding Advance; and (ii) paying to CFC promptly upon receipt of an invoice any applicable conversion fee calculated pursuant to CFC's long-term loan policies as established from time to time for similarly classified long-term loans. The effective date of the CFC Variable Rate shall be a date determined by CFC pursuant to its policies of general application following receipt of the Conversion Request.

C.   A CFC Fixed Rate to Another CFC Fixed Rate.  The Borrower may, at its option, at any time convert from a CFC Fixed Rate to another CFC Fixed Rate if the Borrower: (i) submits a Conversion Request requesting that a CFC Fixed Rate apply to any outstanding loan balance on an Advance and (ii) pays to CFC promptly upon receipt of an invoice any applicable conversion fee calculated pursuant to CFC's long-term loan policies as established from time to time for similarly classified long-term loans. The effective date of the new interest rate shall be a date determined by CFC pursuant to its policies of general application following receipt of the Conversion Request.

Section 3.4.   Prepayment.  The Borrower may at any time, on not less than thirty (30) days prior written notice to CFC, prepay any Advance, in whole or in part, together with the interest accrued to the date of prepayment and any prepayment premium prescribed by CFC pursuant to its policies of general application in effect from time to time.

CFC LOANAG
OR\704-1-9001 (VERGIN J)
21883-6



ARTICLE IV

CONDITIONS OF LENDING

Section 4.   The obligation of CFC to make any Advance hereunder is subject to satisfaction of the following conditions:

A.   Legal Matters.  All legal matters incident to the consummation of the transactions hereby contemplated shall be satisfactory to counsel for CFC and, as to all matters of local law, to such local counsel as counsel for CFC may retain.

B.   Documents.  CFC shall have been furnished with executed originals, satisfactory to CFC, of this Agreement, each Note and the Mortgage and certified copies, satisfactory to CFC, of all such corporate documents and proceedings of the Borrower authorizing the transactions hereby contemplated as CFC shall require. CFC shall have received an opinion of counsel for the Borrower addressing such legal matters as CFC shall reasonably require.

C.   Government Approvals.  The Borrower shall have furnished to CFC true and correct copies of all certificates, authorizations and consents necessary for the execution, delivery or performance by the Borrower of this Agreement, each Note and the Mortgage.

D.   Representations and Warranties.  The representations and warranties contained in Article II shall be true on the date of the making of each Advance hereunder with the same effect as though such representations and warranties had been made on such date; no Event of Default specified in Article VI and no event which, with the lapse of time or the notice and lapse of time specified in Article VI would become such an Event of Default, shall have occurred and be continuing or will have occurred after giving effect to the Advance on the books of the Borrower; there shall have occurred no material adverse change in the business or condition, financial or otherwise, of the Borrower; and nothing shall have occurred which in the opinion of CFC materially and adversely affects the Borrower's ability to meet its obligations hereunder.

E.   Mortgage Filing.  The Mortgage (and any amendments, supplements or restatements as CFC may require from time to time) shall have been duly recorded as a mortgage on real property and duly filed, recorded or indexed as a security interest in personal property wherever CFC shall have requested, all in accordance with applicable law, and the Borrower shall have paid all applicable taxes, recording and filing fees and caused satisfactory evidence thereof to be furnished to CFC.

F.   Requisitions.  Borrower shall have requested the Advance in writing by submitting its requisition to CFC in form and substance satisfactory to CFC.

G.   Other Information.  Borrower shall have furnished such other information as CFC may reasonably require, including but not limited to (i) information regarding the specific purpose for an Advance and the use thereof, and (ii) feasibility studies, cash flow projections, financial analyses and pro forma financial statements sufficient to demonstrate to CFC's reasonable satisfaction that after giving effect to the Advance requested, Borrower shall continue to meet all of its debt service obligations, and otherwise to perform and to comply with all other covenants

CFC LOANAG
OR\704-1-9001 (VERGIN J)
21883-6

and conditions set forth in this Agreement, including the financial covenants set forth in 13(a) of Schedule 1 attached hereto.

H.    **Loan Capital Term Certificate Purchase.** Borrower will purchase an LCTC, if required, in an amount calculated pursuant to CFC's policies of general application. The purchase price of the LCTC, if any, shall be calculated at the time of initial Advance on a Note pursuant to CFC's policies as established from time to time for loans similarly classified. Such purchase shall be paid for on a pro rata basis with each Advance pursuant to CFC's policies. CFC agrees to deliver the LCTC within ninety (90) days following the date on which the LCTC has been paid for in full.

I.    **Special Conditions.** Borrower shall have complied with any special conditions listed in Schedule 1.

J.    **Guaranties.** CFC shall receive guaranties, in form and substance satisfactory to CFC, issued by the entities and in the amounts identified in Schedule 1.

ARTICLE V

COVENANTS

Section 5.    Borrower covenants and agrees with CFC that until payment in full of all Notes and performance of all obligations of the Borrower hereunder:

A.    **Membership.** Borrower agrees that it will either (i) remain a member in good standing of CFC, (ii) continue to be owned, controlled or operated by one or more Class A, B, or C members of CFC, or (iii) as determined by CFC, continue to provide substantial benefit to one or more Class A, B, or C members of CFC.

B.    **Financial Covenants.** The Borrower, subject to events in the judgment of CFC to be beyond the control of the Borrower, shall so operate and manage its business as to achieve the Financial Covenants identified on Schedule 1 hereto.

C.    **Annual Certificates.** Within one hundred twenty (120) days after the close of each calendar year, commencing with the year following the year in which the initial Advance hereunder shall have been made, Borrower will deliver to CFC a written statement, in form and substance satisfactory to CFC, signed by Borrower's President or Chief Executive Officer, stating that during such year, and that to the best of said person's knowledge, the Borrower has fulfilled all of its obligations under this Agreement, each Note, and the Mortgage throughout such year or, if there has been a default in the fulfillment of any such obligations, specifying each such default known to said person and the nature and status thereof. Borrower shall deliver to CFC within one hundred twenty (120) days of CFC's written request, which shall be no more frequently than once every year, a certification, in form and substance satisfactory to CFC, regarding the condition of the Mortgaged Property prepared by a professional engineer satisfactory to CFC. Borrower shall also deliver to CFC such other information as CFC may reasonably request from time to time.

D.    **Notice.** Borrower agrees that it will not, directly or indirectly, without giving written notice to CFC thirty (30) days prior to the effective date of any change:

CFC LOAN AG
OR704 (0.900) (VERGIN.)
21883-6

(a)    Change of Location of Place of Business or Chief Executive Office. Change the location of Borrower's place of business or, if more than one, its chief executive office.

(b)    Change of Name. Change the name of Borrower.

(c)    Change of Mailing Address. Change the mailing address of Borrower.

(d)    Change of Organizational Identification Number. Change its organizational identification number if it has one.

E.    **Management Fees.** Borrower agrees that it will not pay any management fees or, if currently paying a management fee, pay any increase in management fees without the prior written consent of CFC.  CFC hereby consents to the fees provided in the Management and Operations Services Agreement between Northwest Open Access Network Washington and Borrower, made as of February 7, 2002, a copy of which has been provided to CFC.

F.    **Financial Books; Financial Reports; Right of Inspection.** The Borrower will at all times keep, and safely preserve, proper books, records and accounts in which full and true entries will be made of all of the dealings, business and affairs of the Borrower, in accordance with generally accepted accounting principles. When requested by CFC, the Borrower will prepare and furnish CFC from time to time, not later than the last day of each month, financial and statistical reports on its condition and operations for the previous month. Such reports shall be in such form and include such information as may be specified by CFC, including without limitation an analysis of Borrower's revenues, expenses and consumer accounts. Within one hundred twenty (120) days of the end of each calendar year during the term hereof, Borrower shall furnish to CFC a full and complete report of its financial condition and statement of its operations as of the end of such calendar year, in form and substance satisfactory to CFC. In addition, within one hundred twenty (120) days of the end of each Borrower's fiscal years during the term hereof, Borrower shall furnish to CFC a full and complete report of its financial condition and statement of its operations as of the end of such fiscal year, audited and certified by independent certified public accountants nationally recognized or otherwise satisfactory to CFC and accompanied by a report of such audit in form and substance satisfactory to CFC. CFC, through its representatives, shall at all times during reasonable business hours and upon prior notice have access to, and the right to inspect and make copies of, any or all books, records and accounts, and any or all invoices, contracts, leases, payrolls, canceled checks, statements and other documents and papers of every kind belonging to or in the possession of the Borrower or in any way pertaining to its property or business.  However, nothing in this Agreement shall constitute a waiver by Borrower of the attorney-client privilege.  Borrower shall also provide CFC with current quarterly financial statements and cashflows for the Borrower

G.    **Limitations on Mergers and Sale, Lease or Transfer of Capital Assets.** The Borrower shall not consolidate with, merge, or sell all or substantially all of its business or assets, to another entity without the prior written consent of CFC.

CFC LOAN AG
OR704 (-9001 (VERGIN.)
21883-6

EXHIBIT A
13 OF 53

Exhibit 1
Page 5 of 13

H.   Limitations on Dividends, Patronage Refunds and Other Distributions.

(1)   The Borrower may make Distributions in any calendar year if, after giving effect to the Distribution, the total Equity of the Borrower will be at least forty percent (40%) of its Total Assets.

(2)   If, after giving effect to the Distribution, the total Equity of the Borrower will be less than forty percent (40%) of its Total Assets, then the Borrower may nevertheless make Distributions of up to twenty-five percent (25%) of its prior fiscal year's Cash Margins and Borrower's post Distribution Net Worth is 25% or greater.

(3)   Notwithstanding anything to the contrary in subparagraphs (1) and (2) above, the Borrower shall not make any Distribution without the prior written consent of CFC if (a) a payment default or other Event of Default under this Agreement has occurred and is continuing, or (b) after giving effect to the Distribution, the Borrower's total current and accrued assets would be less than its total current and accrued liabilities, or (c) such Distribution would be in excess of the Distributions permitted by subparagraphs (1) or (2), above.

(4)   For purposes of this paragraph H., the term "Distribution" means any dividend, patronage refund, patronage capital retirement or cash distribution to its members, stockholders or consumers (including but not limited to any general cancellation or abatement of charges for electric energy or services furnished by the Borrower). The term "Distribution" shall not include (a) a distribution by the Borrower to the estate of a deceased patron, (b) repayment by the Borrower of a membership fee upon termination of a membership, or (c) any rebate to a patron resulting from a cost abatement received by the Borrower, such as a reduction of wholesale power cost previously incurred.

I.   Limitations on Loans, Investments and Other Obligations.

(a)   The Borrower shall not, without first obtaining the written approval of CFC: (i) purchase or make any commitment to purchase any stock, bonds, notes, debentures, or other securities or obligations of or beneficial interests in, (ii) make any other investment in, (iii) make any loan to, or (iv) guarantee, assume, or otherwise become liable for any obligation of any corporation, association, partnership, joint venture, trust, government or any agency or department thereof, or any other entity of any kind if the aggregate amount of all such purchases, investments, loans and guarantees exceeds the greater of three percent (3%) of Total Assets or twenty-five percent (25%) of Equities and Margins.

(b)   The following shall not be included in the limitation of purchases, investments, loans and guarantees in (a) above: (i) bonds, notes, debentures, stock, or other securities or obligations issued by or guaranteed by the United States government or any agency or instrumentality thereof; (ii) bonds, notes, debentures, stock, commercial paper, subordinated capital certificates, or any other security or obligation of institutions whose senior unsecured debt obligations are rated by at least two nationally recognized rating organizations in either of their two highest categories; (iii) investments incidental to loans made by CFC; and (iv) any deposit that is fully insured by the Federal Government.

CFC LOANAG
CR704-I-9001 (YERGIN.I)
21893-6



(c)   In no event may the Borrower take any action pursuant to subsection (a) when there is: (i) unpaid any due installment of principal and/or interest on a Note; or (ii) Borrower has failed to meet the financial ratio tests in Section 5.B. herein.

J.   Organizational Change.  Borrower agrees that it will not, directly or indirectly, without the prior written consent of CFC change its type of organization, jurisdiction of organization or other legal structure.

K.   Funds Requisition; Use of Proceeds.  Borrower agrees (1) that CFC may rely conclusively upon the interest rate option, interest rate term and other written instructions submitted to CFC in Borrower's written request for an Advance hereunder, (2) that such instructions shall constitute a covenant under this Agreement to repay the Advance in accordance with such instructions, the applicable Note, the Mortgage and this Agreement, (3) to request Advances only for the purposes set forth herein, and (4) to use the proceeds thereof only in accordance with the terms hereof.

L.   Issuance of Equity Interests.  Borrower shall not issue any voting stock or sell, transfer or issue any equity interest in the Borrower without the prior written consent of CFC, but Borrower may admit new members without CFC's consent provided Borrower provides CFC with prior notice of each new member and that such additional members do not cause Borrower to become ineligible to remain a CFC Associate Member."

M.   Special Covenants.  Borrower agrees to comply with any special affirmative covenant(s) identified in Schedule 1.

ARTICLE VI

EVENTS OF DEFAULT

Section 6.   The following shall be "Events of Default" under this Agreement:

A.   Payment.  Borrower shall fail to pay any amount due under the terms of a Note or this Agreement within five (5) Business Days of when the same is due and payable, whether by acceleration or otherwise;

B.   Representations and Warranties.  Any representation or warranty made by the Borrower herein, in the Mortgage or in any certificate or financial statement furnished to CFC hereunder shall prove to be false or misleading in any material respect;

C.   Other Covenants.  Failure of the Borrower to observe or perform any other covenant or agreement contained in this Loan Agreement, in a Note or the Mortgage, which shall continue for thirty (30) days after written notice thereof shall have been given to the Borrower by CFC;

CFC LOANAG
CR704-I-9001 (YERGIN.I)
21893-6

EXHIBIT
A
Exhibit 1
Page 6 of 13
14 OF 53

D.    **Corporate Existence.**  The Borrower shall forfeit or otherwise be deprived of its corporate charter, franchises, permits, easements, consents or licenses required to carry on any material portion of its business;

E.    **Other Obligations.**  Default by the Borrower in the payment of any obligation, whether direct or contingent, for borrowed money or in the performance or observance of the terms of any instrument pursuant to which such obligation was created or securing such obligation;

F.    **Bankruptcy.**  The Borrower or any guarantor of the Borrower's obligations hereunder shall file a petition in bankruptcy or be adjudicated bankrupt or insolvent, or shall make an assignment for the benefit of its creditors, or shall consent to the appointment of a receiver of itself or of its property, or shall institute proceedings for its reorganization, or proceedings instituted by others for its reorganization shall not be dismissed within sixty (60) days after the institution thereof;

G.    **Dissolution or Liquidation.**  Other than as provided in subsection F. above, the dissolution or liquidation of the Borrower or any guarantor of the Borrower's obligations hereunder, or failure by the Borrower or any such guarantor promptly to forestall or remove any execution, garnishment or attachment of such consequence as will impair its ability to continue its business or fulfill its obligations and such execution, garnishment or attachment shall not be vacated within sixty (60) days; or

H.    **Final Judgment.**  A final judgment in excess of $100,000 shall be entered against the Borrower and shall remain unsatisfied or without a stay for a period of sixty (60) days.

### ARTICLE VII

### REMEDIES

**Section 7.**    If any of the Events of Default listed in Section 6 hereof shall occur after the date of this Agreement and shall not have been remedied within the grace periods specified therein, then CFC may pursue all rights and remedies available to CFC that are contemplated by this Agreement, the Mortgage or any of the Notes in the manner, upon the conditions, and with the effect provided in this Agreement, the Mortgage or any of the Notes, including, but not limited to, a suit for specific performance, injunctive relief, damages or to declare all unpaid principal outstanding on the Note, all accrued and unpaid interest thereon, and all other Obligations to be immediately due and payable and the same shall thereupon become immediately due and payable without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived.  Nothing herein shall limit the right of CFC to pursue all rights and legal and equitable remedies available to a creditor following the occurrence of an Event of Default listed in Section 6 hereof. Each right, power and remedy of CFC shall be cumulative and concurrent, and recourse to one or more rights or remedies shall not constitute a waiver of any other right, power or remedy.

CFC LOAN/AG
OR704-I-0001 (VERGINJ)
21683-6

### ARTICLE VIII

### MISCELLANEOUS

**Section 8.1.**    **Notices.**  All notices, requests and other communications provided for herein including, without limitation, any modifications of, or waivers, requests or consents under, this Agreement, shall be given or made in writing (including, without limitation, by telecopy) and delivered or telecopied to the intended recipient at the "Address for Notices" specified below, or, as to any party, at such other address as shall be designated by such party in a notice to each other party.  Except as otherwise provided in this Agreement, all such communications shall be deemed to have been duly given when personally delivered or, in the case of a telecopied or mailed notice, upon receipt, in each case given or addressed as provided for herein. The Addresses for Notices of the respective parties are as follows:

CFC:

National Rural Utilities Cooperative Finance Corporation
2201 Cooperative Way
Herndon, Virginia 20171-3025
Attention: Senior Vice President - Member Services
Fax: (703) 709-6776

Borrower:

the address set forth in
Schedule 1 hereto

**Section 8.2.**    **Expenses.**  The Borrower will pay all costs and expenses of CFC, including reasonable fees of counsel, incurred in connection with the enforcement of this Agreement, the Note(s), the Mortgage and the other instruments provided for herein or with the preparation for such enforcement if CFC has reasonable grounds to believe that such enforcement may be necessary.

**Section 8.3.**    **Late Payments.**  If payment of any amount due hereunder is not received at CFC's office in Herndon, Virginia, or such other location as CFC may designate to the Borrower within five (5) Business Days after the due date thereof or such other time period as CFC may prescribe from time to time in its policies of general application in connection with any late payment charge (such unpaid amount being herein called the "delinquent amount", and the period beginning after such due date until payment of the delinquent amount being herein called the "late-payment period"), the Borrower will pay to CFC, in addition to all other amounts due under the terms of a Note, the Mortgage and this Agreement, any late-payment charge as may be fixed by CFC from time to time on the delinquent amount for the late-payment period.

**Section 8.4.**    **Filing Fees.**  To the extent permitted by law, the Borrower agrees to pay all expenses of CFC (including the fees and expenses of its counsel) in connection with the filing or recordation of the Mortgage, all financing statements and instruments as may be required by CFC in connection with this Agreement, including, without limitation, any supplements, amendments or restatements thereto, all documentary stamps, recordation and transfer taxes and other costs and
CFC LOAN/AG
OR704-I-0001 (VERGINJ)
21683-6



EXHIBIT ___A___

___15___ OF ___53___

Exhibit 1
Page 7 of 13

taxes incident to recordation of any document or instrument in connection herewith. Borrower agrees to save harmless and indemnify CFC from and against any liability resulting from the failure to pay any required documentary stamps, recordation and transfer taxes, recording costs, or any other expenses incurred by CFC in connection with this Agreement. The provisions of this subsection shall survive the execution and delivery of this Agreement and the payment of all other amounts due hereunder or due on a Note.

Section 8.5.  No Waiver.  No failure on the part of CFC to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof nor shall any single or partial exercise by CFC of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.

SECTION 8.6.  GOVERNING LAW; SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL.

(A)    THE PERFORMANCE AND CONSTRUCTION OF THIS AGREEMENT AND THE NOTES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE COMMONWEALTH OF VIRGINIA.

(B)    BORROWER HEREBY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF THE UNITED STATES COURTS LOCATED IN VIRGINIA AND OF ANY STATE COURT SO LOCATED FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. BORROWER IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE ESTABLISHING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(C)    THE BORROWER AND CFC HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 8.7.  Holiday Payments.  If any payment to be made by the Borrower hereunder shall become due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in computing any interest in respect of such payment.

Section 8.8.  Modifications.  No modification or waiver of any provision of this Agreement or a Note, and no consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in writing by the party granting such modification, waiver or consent.

Section 8.9.  Merger and Integration.  This Agreement (including the Recitals and all exhibits and schedules hereto), the instructions contained in the written funds requisition statement with respect to each Advance, and matters incorporated by reference herein together

CFC LOANING
OR7044-9001 (VERGINJ)
21863-6

contain the entire agreement of the parties hereto with respect to the matters covered and the transactions contemplated hereby.

Section 8.10.  Headings.  The headings and sub-headings contained in the titling of this Agreement are intended to be used for convenience only and do not constitute part of this Agreement.

Section 8.11.  Severability.  If any term, provision or condition, or any part thereof, of this Agreement, any Note or the Mortgage shall for any reason be found or held invalid or unenforceable by any governmental agency or court of competent jurisdiction, such invalidity or unenforceability shall not affect the remainder of such term, provision or condition nor any other term, provision or condition, and this Agreement, any Note, and the Mortgage shall survive and be construed as if such invalid or unenforceable term, provision or condition had not been contained therein.

Section 8.12.  Right of Setoff.  Upon the occurrence and during the continuance of any Event of Default, CFC is hereby authorized at any time and from time to time, without prior notice to the Borrower, to exercise rights of setoff or recoupment and apply any and all amounts held, or hereafter held, by CFC or owed to the Borrower or for the credit or account of the Borrower against any and all of the obligations of the Borrower now or hereafter existing hereunder or under any Note. CFC agrees to notify the Borrower promptly after any such setoff or recoupment and the application thereof, provided that the failure to give such notice shall not affect the validity of such setoff, recoupment or application. The rights of CFC under this section are in addition to any other rights and remedies (including other rights of setoff or recoupment) which CFC may have. Borrower waives all rights of setoff, deduction, recoupment or counterclaim.

Section 8.13.  Prior Loan Documents.  It is understood and agreed that with respect to all loan agreements previously entered into by and between CFC and Borrower, and all promissory notes thereto secured under the Mortgage (both hereinafter being referred to as "Prior Loan Documents") the Borrower shall be required, after the date hereof, to meet reporting and financial covenants as set forth in this Agreement rather than those set forth in the Prior Loan Documents. In the event of any conflict between any reporting and financial covenant set forth in a Prior Loan Document and any reporting and financial covenant in this Agreement, the requirements as set forth in this Agreement shall apply. Nothing in this section shall, however, eliminate or modify any special condition, special affirmative covenant or special negative covenant, if any, unless specifically agreed to in writing by CFC. Furthermore, the interest rate options available to Borrower as set forth in this Agreement shall supersede the interest rate options as set forth in any Prior Loan Documents.

Section 8.14.  Schedule 1.  Schedule 1 attached hereto is an integral part of this Agreement.

Section 8.15  Rescission Fee.  The Borrower may elect not to borrow all or any portion of the CFC Commitment in which event CFC shall release the Borrower from its obligation hereunder, provided the Borrower complies with such terms and conditions as CFC may impose for such release including, without limitation, payment of any rescission fee that CFC may from time to time prescribe, but not to exceed 50 basis points, pursuant to its policies of general application.

CFC LOANING
OR7044-9001 (VERGINJ)
21863-6

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

(SEAL)

NORTHWEST OPEN ACCESS NETWORK OREGON

By: _____

Title: _____

Attest: _____
          Secretary

(SEAL)

NATIONAL RURAL UTILITIES
COOPERATIVE FINANCE CORPORATION

By: _____
      Assistant Secretary-Treasurer

Attest: _____
          Assistant Secretary-Treasurer

CFC LOANAG
OR7044.9001 (VERGINJ)
21893-6

EXHIBIT A

17 OF 53

Exhibit 1
Page 9 of 13

## SCHEDULE 1

1.  The purpose of this Loan is: to fund construction costs, to provide approximately $2.1 million for working capital and operating capital, and to purchase LCTCs.

2.  The aggregate "CFC Commitment" is $12,975,585.00. Within this aggregate amount, Borrower may, at its discretion, execute one or more Notes, each Note representing a separate loan with CFC and containing a face amount and Maturity Date in accordance with the terms, conditions and provisions of this Agreement.

3.  The "Mortgage" shall mean the Mortgage and Security Agreement dated as of even date hereof between the Borrower and CFC, as it may have been or shall be supplemented, amended, consolidated, or restated from time to time.

4.  The "Payment Date" months are February, May, August, and November.

5.  The date of the Borrower's balance sheet referred to in Section 2.H. is : N/A.

6.  The Borrower's exact legal name is: Northwest Open Access Network Oregon.

7.  The Borrower's organizational type is: Cooperative Corporation.

8.  The Borrower is organized under the laws of the state of: Oregon.

9.  The Borrower's organizational identification number is: 018268-90

10. The principal place of business or, if more than one, the chief executive office of the Borrower referred to in Section 2.I. is 1645 Ninth Avenue, SE, PMB #387, Albany, Oregon 97321.

11. The property of the Borrower referred to in Section 2.J. is located in the counties of: N/A.

12. The special conditions referred to in Section 4.I. are:

    (a)   Documents.

    Prior to the initial Advance, Borrower must provide CFC with copies of the following documents in form and content satisfactory to CFC:

    i.    The management and services agreement between Borrower and Northwest Open Access Network (the "Management Agreement");
    ii.   The fiber optic cable transport lease agreement between Bonneville Power Administration ("BPA") and Borrower (the "BPA Lease");
    iii.  Service Agreements between Borrower and each of the Members (the "Member Service Agreements"); and
    iv.   Non-Member Participation Agreements between Borrower and the City of Monmouth, Oregon, and Frontier TeleNet, a municipal entity formed by

CFC LOANAG
OR7044.9001 (VERGINJ)
21893-6

intergovernmental agreement pursuant to Oregon Revised Statutes, Chapter 190 (the "Non-Member Participation Agreements).

(b)    Cash Contributions.

Prior to the initial Advance, a minimum cash contribution of $4,253,363 shall have been invested in Borrower either as common equity or a combination of common equity and non-refundable fee income. At least $2,704,000 of the $4,253,363 total amount shall be common equity.  Until such time as Borrower shall have at least $5,253,363 in total equity contributions and connection fee and participation fee income ("Total Cash Contributions"), total Advances to Borrower shall not exceed $9,675,585. Notwithstanding the foregoing, if Borrower does not have Total Cash Contributions of at least $5,253,363 by January 31, 2003, then total Advances shall never exceed $9,675,585.  Upon CFC's request, Borrower shall provide evidence, satisfactory in form and substance to CFC, verifying that the forgoing requirements have been met.

(c)    Advance Requests.

Advance requests for construction costs must be supported by invoices and/or construction contracts.  Advance requests for working capital shall be evidenced by a written requisition signed by an authorized officer of Borrower and cumulative advances for working capital shall not exceed $2,076,806.

(d)    Assignments.

Prior to the initial Advance, as additional collateral for this Loan, Borrower must provide CFC with the following executed collateral assignments in form and content satisfactory to CFC:

(i)     Collateral assignment of the BPA Lease;
(ii)    Collateral Assignment of the Management Agreement;
(iii)   Collateral Assignment of the Member Service Agreements; and
(iv)    Collateral Assignment of the Non-Member Participation Agreements.

13.    The special covenants referred to in Section 5.M. are:

(a) Financial Covenants.

The Borrower shall meet the following financial covenants on a quarterly basis:

| 2002 | 3/31/02 | 6/30/02 | 9/30/02 | 12/31/02 |
|---|---|---|---|---|
| Minimum Revenue (YTD) | n.a | n.a | n.a | n.a |
| Minimum EBITDA (YTD) | n.a | n.a | n.a | n.a |
| Minimum Ending Cash | $20,000 | $20,000 | $20,000 | $20,000 |

| 2003 | 3/31/03 | 6/30/03 | 9/30/03 | 12/31/03 |
|---|---|---|---|---|
| Minimum Revenue (YTD) | $473,800 | $1,105,600 | $2,000,700 | $3,159,000 |
| Minimum EBITDA (YTD) | n.a | n.a | n.a | n.a |
| Minimum Ending Cash | $50,000 | $50,000 | $50,000 | $50,000 |

| 2004 | 3/31/04 | 6/30/04 | 9/30/04 | 12/31/04 |
|---|---|---|---|---|
| Minimum Revenue (YTD) | $1,274,100 | $2,675,600 | $4,217,300 | $5,913,200 |
| Minimum Adjusted EBITDA (YTD) | $169,600 | $509,700 | $515,600 | $1,201,800 |
| Minimum Ending Cash | $50,000 | $50,000 | $50,000 | $50,000 |

Both the EBITDA and cash balance covenants may be cured by the infusion of additional common equity contributions.

(b)    Additional Indebtedness.

Except as provided herein, Borrower may not incur additional secured indebtedness without CFC's prior written approval. Notwithstanding the foregoing, Borrower may incur: (i) additional unsecured trade debt provided that, in the aggregate, the total of such debt does not exceed 5% of Borrower's total assets.

14.    The governmental authority referred to in Section 2.L. is: N/A.

15.    The guarantors referred to in Section 4.J. are:

| Guarantor | Guaranteed Principal Amount |
|---|---|
| Central Electric Cooperative, Inc. | $6,819,760 |
| Coos-Curry Electric Cooperative, Inc. | 2,417,945 |
| Douglas Electric Cooperative, Inc. | 1,281,501 |
| Hood River Electric Cooperative | 823,814 |
| Umatilla Electric Cooperative Association | 3,024,240 |
| West Oregon Electric Cooperative, Inc. | 1,842,212 |

CFC shall also be provided with certified copies, satisfactory to CFC, of all such corporate documents and proceedings of each Guarantor authorizing the transactions contemplated hereby as CFC or its counsel shall require.

Douglas Electric Cooperative, Inc., Umatilla Electric Cooperative Association, and West Oregon Electric Cooperative, Inc. shall each provide CFC with either (i) a written opinion of counsel, satisfactory in form and substance to CFC, that its guaranty is exempt from RUS guaranty and investment regulation, or (ii) evidence, satisfactory in form and substance to CFC, of RUS approval of the guaranty and/or equity investment in the Borrower.

16.    The address for notices to the Borrower referred to in Section 8.1 is Northwest Open Access Network Oregon, 3511 Norfolk Ct. SE, Olympia, Washington 98501-7021, Attention: President, Fax: (360) 352-3278.

17.    The Borrower selects the following number of Loans and the amount of each Loan:

| LOAN NUMBER | AMOUNT |
|---|---|
| OR704-9001 | $12,975,585.00 |

## SCHEDULE 1

1.    The purpose of this Loan is: to fund construction costs, to provide approximately $2.1 million for working capital and operating capital, and to purchase LCTCs.

2.    The aggregate "CFC Commitment" is $12,975,585.00. Within this aggregate amount, Borrower may, at its discretion, execute one or more Notes, each Note representing a separate loan with CFC and containing a face amount and Maturity Date in accordance with the terms, conditions and provisions of this Agreement.

3.    The "Mortgage" shall mean the Mortgage and Security Agreement dated as of even date hereof between the Borrower and CFC, as it may have been or shall be supplemented, amended, consolidated, or restated from time to time.

4.    The "Payment Date" months are February, May, August, and November.

5.    The date of the Borrower's balance sheet referred to in Section 2.H. is : N/A.

6.    The Borrower's exact legal name is: Northwest Open Access Network Oregon.

7.    The Borrower's organizational type is:  Cooperative Corporation

8.    The Borrower is organized under the laws of the state of:  Oregon.

9.    The Borrower's organizational identification number is: 018268-90

10.    The principal place of business or, if more than one, the chief executive office of the Borrower referred to in Section 2.I. is 1645 Ninth Avenue, SE, PMB #387, Albany, Oregon 97321.

11.    The property of the Borrower referred to in Section 2.J. is located in the counties of: N/A.

12.    The special conditions referred to in Section 4.I. are:

(a)    Documents.

Prior to the initial Advance, Borrower must provide CFC with copies of the following documents in form and content satisfactory to CFC:

i.    The management and services agreement between Borrower and Northwest Open Access Network (the "Management Agreement");
ii.    The fiber optic cable transport lease agreement between Bonneville Power Administration ("BPA") and Borrower (the "BPA Lease");
iii.    Service Agreements between Borrower and each of the Members (the "Member Service Agreements"); and
iv.    Non-Member Participation Agreements between Borrower and the City of Monmouth, Oregon, and Frontier TeleNet, a municipal entity formed by

CFC LOANAG
OR704-I-9001 (VERGINJ)
21883-6

CFC LOANAG
OR704-I-9001 (VERGINJ)
21883-6

EXHIBIT A

19 OF 53

Exhibit 1
Page 11 of 13

intergovernmental agreement pursuant to Oregon Revised Statutes, Chapter 190 (the "Non-Member Participation Agreements).

(b)    Cash Contributions.

Prior to the initial Advance, a minimum cash contribution of $3,000,000 shall have been invested in Borrower either as common equity or a combination of common equity and non-refundable fee income. At least $2,704,000 of the $3,000,000 total amount shall be common equity.  Until such time as Borrower shall have at least $4,503,363 in total equity contributions and connection fee and participation fee income ("Total Cash Contributions"), total Advances to Borrower shall not exceed $4,675,585 and until such time as Borrower shall have at least $5,503,363 in Total Cash Contributions total Advances to Borrower shall not exceed $9,675,585. Notwithstanding the foregoing, if Borrower does not have Total Cash Contributions of at least $4,503,363 by September 1, 2002, then the CFC Commitment shall be reduced by $5,000,000 and if Borrower does not have Total Cash Contributions of at least $5,503,363 by January 31, 2003, then the CFC Commitment shall be reduced an additional $3,300,000. Upon CFC's request, Borrower shall provide evidence, satisfactory in form and substance to CFC, verifying that the forgoing requirements have been met.

(c)    Advance Requests.

Advance requests for construction costs must be supported by invoices and/or construction contracts.  Advance requests for working capital shall be evidenced by a written requisition signed by an authorized officer of Borrower and cumulative advances for working capital shall not exceed $2,076,805.

(d)    Assignments.

Prior to the initial Advance, as additional collateral for this Loan, Borrower must provide CFC with the following executed collateral assignments in form and content satisfactory to CFC:

(i)     Collateral assignment of the BPA Lease;
(ii)    Collateral Assignment of the Management Agreement;
(iii)   Collateral Assignment of the Member Service Agreements; and
(iv)    Collateral Assignment of the Non-Member Participation Agreements.

13.    The special covenants referred to in Section 5.M. are:

(a) Financial Covenants.

The Borrower shall meet the following financial covenants on a quarterly basis:

| 2002 | 3/31/02 | 6/30/02 | 9/30/02 | 12/31/02 |
|---|---|---|---|---|
| Minimum Revenue (YTD) | n.a | n.a | n.a | n.a |

| | | | | |
|---|---|---|---|---|
| Minimum EBITDA (YTD) | n.a | n.a | n.a | n.a |
| Minimum Ending Cash | $20,000 | $20,000 | $20,000 | $20,000 |
| 2003 | 3/31/03 | 6/30/03 | 9/30/03 | 12/31/03 |
| Minimum Revenue (YTD) | $473,800 | $1,105,600 | $2,000,700 | $3,159,000 |
| Minimum EBITDA (YTD) | n.a | n.a | n.a | n.a |
| Minimum Ending Cash | $50,000 | $50,000 | $50,000 | $50,000 |
| 2004 | 3/31/04 | 6/30/04 | 9/30/04 | 12/31/04 |
| Minimum Revenue (YTD) | $1,274,100 | $2,675,600 | $4,217,300 | $5,913,200 |
| Minimum Adjusted EBITDA (YTD) | $169,600 | $509,700 | $515,800 | $1,201,800 |
| Minimum Ending Cash | $50,000 | $50,000 | $50,000 | $50,000 |

Both the EBITDA and cash balance covenants may be cured by the infusion of additional common equity contributions.

(b)    Additional Indebtedness.

Except as provided herein, Borrower may not incur additional secured indebtedness without CFC's prior written approval.  Notwithstanding the foregoing, Borrower may incur: (i) additional unsecured trade debt provided that, in the aggregate, the total of such debt does not exceed 5% of Borrower's total assets;

14.    The governmental authority referred to in Section 2.L. is: N/A.

15.    The guarantors referred to in Section 4.J. are:

| Guarantor | Guaranteed Principal Amount |
|---|---|
| Central Electric Cooperative, Inc. | $6,819,760 |
| Coos-Curry Electric Cooperative, Inc. | 2,417,946 |
| Douglas Electric Cooperative, Inc. | 1,291,501 |
| Hood River Electric Cooperative | 823,814 |
| Umatilla Electric Cooperative Association | 3,024,240 |
| West Oregon Electric Cooperative, Inc. | 1,842,212 |

CFC shall also be provided with certified copies, satisfactory to CFC, of all such corporate documents and proceedings of each Guarantor authorizing the transactions contemplated hereby as CFC or its counsel shall require.

Douglas Electric Cooperative, Inc., Umatilla Electric Cooperative Association, and West Oregon Electric Cooperative, Inc. shall each provide CFC with either (i) a written opinion of counsel, satisfactory in form and substance to CFC, that its guaranty is exempt from RUS guaranty and investment regulation, or (ii) evidence, satisfactory in form and substance to CFC, of RUS approval of the guaranty and/or equity investment in the Borrower.

16. The address for notices to the Borrower referred to in Section 8.1 is Northwest Open Access Network Oregon, 3511 Norfolk Ct. SE, Olympia, Washington 98501-7021, Attention: President, Fax: (360) 352-3278.

17. The Borrower selects the following number of Loans and the amount of each Loan:

| LOAN NUMBER | AMOUNT |
|---|---|
| OR704-9001 | $12,975,585.00 |

CFC LOAN4G
OR704-l-9001 (VERSAU)
21683-8

CONTINUING GUARANTY

For and in consideration of loans, advances, discounts, extensions of credit or other financial accommodations *made or to be made* by NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION, a corporation organized and existing under the laws of the District of Columbia ("CFC"), to, for the account of, or on behalf of NORTHWEST OPEN ACCESS NETWORK OREGON ("Borrower"), pursuant to a Loan agreement dated as of even date herewith, between the Borrower and CFC (the "Loan Agreement"), the undersigned ("Guarantor") hereby, subject to the *limitation stated below*, absolutely guarantees to CFC (i) the outstanding principal amount due from the Borrower to CFC, whether by acceleration or otherwise, under that certain promissory note from Borrower to CFC, as payee *thereof*, in original principal amount of *Twelve Million Nine Hundred* Seventy-five Thousand Five Hundred Eighty-five Dollars ($12,975,585.00.00), (ii) all accrued interest thereon, (iii) all other costs, fees or expenses of CFC for which the Borrower is obligated thereon (including *costs of collection* and reasonable *attorney's fees*), *and* (iv) all other indebtedness of Borrower to CFC and arising out of or in connection with the Loan Agreement, whether now existing or hereafter created or arising, direct or indirect, matured or unmatured, *and whether absolute or* contingent. The obligations referred to in items (i) through (iv) above are collectively referred to herein as the "Guaranteed Debt". Notwithstanding the foregoing, the Guaranteed Debt *shall in no event* exceed Two *Million*, Four Hundred *Seventeen* Thousand Nine Hundred Forty-six Dollars ($2,417,946.00).

The *obligations of Guarantor hereunder* are absolute and shall continue until payment in full to CFC of the Guaranteed Debt. No act by CFC to grant credit from time to time to Borrower, Guarantor or any other party, and no act or omission by *CFC with respect* to any *matter whatsoever* shall operate to release Guarantor from its obligations hereunder other than the execution and delivery by CFC to Guarantor of an express written release of this Guaranty.

If an event of default has occurred under the Loan Agreement and any applicable cure periods have expired, then CFC shall have the right to declare the *Guaranteed Debt* immediately due and *payable in full, without notice* to Borrower or Guarantor, regardless of whether CFC has accelerated all or any part of Borrower's indebtedness. Without limiting the generality of the foregoing, if the Borrower should at any time (i) *become insolvent*, *(ii) make* a general assignment *for the benefit of creditors*, (iii) petition for or be subject to a receivership proceeding, or (iv) be subject to a petition in bankruptcy or any insolvency or reorganization proceeding, whether voluntary or involuntary, then CFC *shall have the right* to declare the *Guaranteed Debt immediately* due and payable in full, without notice to Borrower or Guarantor, regardless of whether CFC has accelerated all or any part of Borrower's indebtedness, and CFC shall have the right to demand and to collect *from* Guarantor payment in full of the Guaranteed Debt, including all principal, interest, fees and charges, whether or not then due and payable by Borrower.

CFC GUARTY
OR704-1-9001 (VERGINJ)
21861-2

EXHIBIT A
22 OF 53
Exhibit 2
Page 1 of 2

Guarantor expressly waives the following:

a) notice that Borrower has incurred debt to or is in default to CFC;

b) CFC's acceptance of this Guaranty;

c) *presentment*, demand for payment, protest, notice of protest, notice of dishonor, notice of any election, acceptance, diligence in collection, notice of non-payment of any instrument evidencing any indebtedness *of the Borrower*, and to the extent permitted by law, all benefit of valuation, appraisal, exemptions and any and all other notices that would otherwise be required under the laws of the Commonwealth of Virginia;

d) any right to require CFC to institute and prosecute with due diligence to judgment and by execution suit against the Borrower, another guarantor or *any other person on* the *underlying debt of* the Borrower or for performance of the Borrower or any other guarantor under any agreement with CFC;

e) any right to require suit against the Borrower, another guarantor or any other person before enforcing this Guaranty, and with respect thereto, Guarantor specifically *agrees* that any *proceeding for collection* under this Guaranty may be brought against Guarantor before, after or simultaneously with any proceeding that may be brought against Borrower, another guarantor, or any other party *for nonpayment* of any *indebtedness to* CFC, notwithstanding any notices or demands to the contrary that Guarantor may transmit to CFC;

f) any right to have security applied before enforcing this Guaranty;

g) until the Borrower's *indebtedness* to CFC is paid in full, any right of subrogation to CFC's rights against the Borrower;

h) any right or *remedy* which Guarantor may now have or may hereafter acquire against the Borrower that would otherwise act to release Guarantor hereunder, including but not limited to any right of contribution, *indemnification*, *subrogation*, *reimbursement*, *exoneration or* participation, regardless of whether such right or remedy arises under equity, contract, in common law or otherwise to the extent it would otherwise release the Guarantor; and

i) any rights of setoff, deduction, recoupment or the defense of counterclaim against CFC.

Guarantor hereby agrees that, without notice of any kind to Guarantor and without altering the absolute obligation of Guarantor hereunder, *CFC may renew time of payment*, *extend time of payment*, *surrender*, release, exchange, substitute, deal with or take additional collateral security, take or release other guarantees, abstain from taking advantage of or realizing upon any collateral security or other guarantees, *discharge*, *compromise*, release or *settle any or all of Borrower's* indebtedness to CFC (regardless of whether such indebtedness

CFC GUARTY
OR704-1-9001 (VERGINJ)
21861-2

is part of the Guaranteed Debt), extend, grant indulgences, forbear against or otherwise modify any term, provision, covenant, obligation or condition with respect to any or all of the Borrower's indebtedness to CFC (regardless of whether such indebtedness is part of the Guaranteed Debt).

If Borrower shall be in default under the Loan Agreement, then Guaranteed Debt shall, for the purpose of this Guaranty, be deemed at CFC's election to have become immediately due and payable.

In the event Guarantor fails to pay its obligations hereunder in full upon demand, then CFC is hereby authorized at any time and from time to time, without prior notice to Guarantor, to exercise rights of setoff or recoupment and apply any and all amounts held, or hereafter held, by CFC or owed to Guarantor or for the credit or account of Guarantor against any and all of the obligations of Guarantor hereunder. CFC agrees to notify Guarantor promptly after any such setoff or recoupment and the application thereof, provided that the failure to give such notice shall not affect the validity of such setoff, recoupment or application. The rights of CFC under this section are in addition to any other rights and remedies (including other rights of setoff or recoupment) which CFC may have.

Guarantor further agrees to pay to CFC, in addition to payment of the Guaranteed Debt, any and all costs, expenses and reasonable attorneys' fees paid or incurred by CFC in collecting or endeavoring to collect the Guaranteed Debt from Guarantor, regardless of whether suit is brought.

Guarantor represents and warrants that, during the term of this Guaranty, (i) the aggregate amount of obligations guaranteed hereunder shall not exceed the maximum amount allowed under a mortgage, indenture, or agreement of any kind entered into by or affecting Guarantor, other than any Member Reimbursement Agreement entered by and among Guarantor, CFC and CoBank and dated as of September 26, 2001, if any, and (ii) Guarantor will not, without the written consent of CFC, make any loan, deposit, advance, investment or obligation which would cause the total aggregate indebtedness guaranteed hereunder to exceed said maximum allowable amount.

This Guaranty shall be binding upon Guarantor and its successors and assigns, and shall inure to the benefit of CFC and its successors and assigns. The terms "Guarantor" and "Borrower" and any provisions referring thereto as used herein shall be construed in the singular or plural as the context may require.

THE PERFORMANCE AND CONSTRUCTION OF THIS GUARANTY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE COMMONWEALTH OF VIRGINIA.

GUARANTOR HEREBY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF THE UNITED STATES COURTS LOCATED IN VIRGINIA AND OF ANY STATE COURT SO LOCATED FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR

CFC GUARTY
OR704-I-9001 (VERGINIA)
21861-2

RELATING TO THIS GUARANTY OR THE TRANSACTIONS CONTEMPLATED HEREBY. GUARANTOR IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE ESTABLISHING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

EACH OF GUARANTOR AND CFC HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTY.

No modification or waiver of any provision of this Guaranty shall in any event be effective unless the same shall be in writing signed by CFC.

If any term, provision or condition, or any part thereof, of this Guaranty shall for any reason be found or held invalid or unenforceable by any governmental agency or court of competent jurisdiction, such invalidity or unenforceability shall not affect the remainder of such term, provision or condition nor any other term, provision or condition, and this Guaranty shall survive and be construed as if such invalid or unenforceable term, provision or condition had not been contained therein.

IN WITNESS WHEREOF, this Guaranty has been executed and delivered to CFC by the undersigned Guarantor this _7th_ day of February, 2002.

COOS-CURRY ELECTRIC COOPERATIVE, INC.

(SEAL)

By: _____

Title: _General Manager_

Attest: _____
            (Secretary)

CFC GUARTY
OR704-I-9001 (VERGINIA)
21861-2

**From:** Martin Hansen [mailto:m    ᵭfrancishansen.com]
**Sent:** Thursday, March 31, 2005 4:53 PM
**To:** 'Gregory J. Stuman, Esq.'; Gonzalez, Al; steve.eldrige@ueinet.com; johng@hrec.coop; dsabala@douglaselectric.com; robert@vannattabros.com; galdridge@cedco.net; bshreve@cedco.net; wbuehler@cooscurryelectric.com
**Cc:** meh@francishansenmartin.com; kkennedy@orcacomm.com; lorenzen@corey-byler.com; v_and_a@earthlink.net; pnilsen@douglascountylaw.com; justin@tonkon.com; al@tonkon.com
**Subject:** RE: New Lightspeed Subscription Agreements

Dear Mr. Buehler,

Our office represents Central Electric Cooperative.  We are make the same offer to you as we have made to all the Noanet members for stock in the new company Lightspeed Networks. Attached is the offer we are extending to Coos Curry Electric.
If you have any questions give me a call.

Martin E. Hansen
Francis Hansen & Martin LLP
1148 N.W. Hill St.
Bend, OR 97701

541-389-5010
fax: 541-382-7068
meh@francishansenmartin.com

EXHIBIT _____ A

_____ 94 _____ OF _53_

Exhibit 3
Page 1 of 17

-----Original Message-----
**From:** Gregory J. Stuman, Esq. [mailto:greg@francishansen.com]
**Sent:** Monday, April 04, 2005 4:38 PM
**To:** wbuehler@cooscurryelectric.com; mgh@hanlonlaw.com
**Cc:** meh@francishansen.com; agonzalez@cec-co.com; galdridge@cedco.net
**Subject:** Lightspeed Networks, Inc. - Securities Offering Term Sheet

Dear Messers. Hanlon & Buehler:

Please find attached to this email a file containing the following documents:

1.  Securities Offering Term Sheet for Lightspeed Networks, Inc.;
2.  Articles of Incorporation;
3.  Bylaws; and
4.  Sample Subscription Agreement.

Please let me know by the close of business tomorrow whether this is an offering to which Coos-Curry wishes to subscribe. If I do not receive an unequivocal reply that Coos-Curry wishes to participate in the offering from Coos-Curry by 5:00 p.m. tomorrow, February 4, 2005, then I will presume that Coos-Curry is not interested and I will finish the organization of Lightspeed Networks, Inc. without Coos-Curry Electric Cooperative's participation.

Please call me if you have any questions.

Sincerely,
FRANCIS HANSEN & MARTIN LLP
Gregory J. Stuman, Esq.

---

1148 NW Hill Street
Bend, Oregon 97701
Tel. (541) 389-5010
Fax (541) 382-7068

EXHIBIT ___*A*___

___*25*___ OF ___*53*___
Exhibit 3
Page 2 of 17

# LIGHTSPEED NETWORKS, INC.
## an Oregon corporation,
### Initial Offering, April 6, 2005

LIGHTSPEED NETWORKS, INC. ("Lightspeed") will be the operating entity for the assets acquired through the foreclosure of a loan on NoaNet Oregon's assets. Lightspeed was formed by Central Electric Cooperative ("CEC") which has loaned Lightspeed $12,525,000 which was used to purchase the secured loan from CFC to NoaNet Oregon. All funds raised from investors will be used exclusively, in conjunction with borrowed funds, to provide required start up costs to commence operations, and to repay the loan from CEC.

The following Term Sheet summary lists the main details of the offering currently proposed by Lightspeed:

## Term Summary

**Issuer:** Lightspeed Networks, Inc., an Oregon corporation formed March 10, 2005 (the "Company")

**Founders:** Central Electric Cooperative.

**Investors:** The prospective investors are: Central Electric Cooperative, Rural Services Company (Umatilla), Hood River Electric Cooperative, West Oregon Electric Cooperative, Douglas Electric Cooperative, Tribal One Broadband Technologies LLC (Cedco), and Coos-Curry Electric Cooperative.

**Type of Security:** 100% of the authorized shares of the common stock of the company shall be issued to the Investors.

**Amount of Offering:** The total offering of common stock shall be on the following basis:

| | |
|---|---|
| Central Electric Cooperative | $5,263,673 |
| Rural Services Company | $2,563,615 |
| Hood River Electric Cooperative | $659,160 |
| West Oregon Electric Cooperative | $1,420,754 |
| Douglas Electric Cooperative | $767,332 |
| Tribal One Broadband Tech. LLC | $933,817 |
| Coos-Curry Electric Cooperative | $933,817 |

**Closing Date:** April 6, 2005 (the "Closing Date").

**Use of Proceeds:** For general Company purposes, including repayment of the loan from CEC to Lightspeed which was used to purchase the CFC loan to NoaNet Oregon.

EXHIBIT _A_

_26_ OF _53_

-1-

Exhibit 3
Page 3 of 17

| | |
|---|---|
| **Corporate Control:** | The Company's Bylaws provide for a 7 person board of directors and the Articles of Incorporation include a cumulative voting provision to ensure minority representation on the board of directors. The Bylaws also include supermajority voting clauses requiring 5 out of 7 directors and 75% of the shareholders to approve large transactions such as selling all of the assets, mergers, or amending the Bylaws or Articles of Incorporation. |
| **Purchase Agreement; Documentation and Structure:** | The investment shall be made pursuant to a Subscription Agreement, Articles of Incorporation, Bylaws, and other customary documentation (collectively, "Transaction Agreements"), which agreements shall contain, among other things, appropriate representations and warranties of the Company, covenants of the Company reflecting the provisions set forth herein and appropriate conditions of closing. |
| **Responsibility/ Disclosure:** | The Company shall provide the Investors all information material to its business and operations that the Investors reasonably request in connection with the closing of the Transaction. |
| **Confidentiality:** | Both the Company and the Investors agree to keep the nature of discussions regarding the Transaction to a minimum level of discussion and disclosure to outside parties. In no event shall the Investors distribute or disclose this Term Sheet to any third party without the written permission of Company, other than to the Investors' professional advisors or legal counsel. |
| **Conditions Precedent:** | Satisfactory completion of due diligence by the Investors. Completion and execution of the Subscription Agreements. |

This Term Sheet is not an offer to sell securities, nor is it contractual in nature. It reflects only the intentions of the parties to proceed toward the negotiation of offers, agreements and, if such agreements are executed, the consummation of the proposed transaction. No party shall have any obligation to any other party hereunder and the parties shall have only those obligations, and shall make only those representations, warranties and covenants as may be set forth in the Transaction Agreements, as signed and delivered. Except as expressly set forth in this Term Sheet, no party shall have any obligation or liability based upon or arising under this Term Sheet to any other party by reason of the fact that a Transaction Agreement is not prepared, authorized, executed or delivered. Construction or interpretation of any of the terms hereof shall be governed by the laws of Oregon without regard to choice of law principles.

EXHIBIT ___*A*___

___*27*___ OF *53*

Exhibit 3
Page 4 of 17

The following additional information and financial reports are provided for your review and comment in evaluation of any potential offer to participate in the ownership of the common stock of the Company:

1. Articles of Incorporation;
2. Bylaws;
3. Sample Subscription Agreement.

EXHIBIT _____ *A*

_____ *28* OF *53*

Exhibit 3
Page 5 of 17

Registry Number:
274346-93
Filed March 10, 2005

## ARTICLES OF INCORPORATION

## OF

## LIGHTSPEED NETWORKS, INC.

**ARTICLE 1. NAME.**

The name of the Corporation: *Lightspeed Networks, Inc.*

**ARTICLE 2. SHARES.**

The aggregate number of shares that the Corporation shall have authority to issue is One-Hundred Thousand (100,000) shares of common stock.

**ARTICLE 3. ASSESSABILITY OF STOCK.**

After the consideration fixed by the Board of Directors has been fully paid in, each share of common stock of the Corporation shall be nonassessable.

**ARTICLE 4. INDEMNIFICATION AND ADVANCEMENT OF EXPENSES.**

4.1 Indemnification. To the fullest extent allowed by Oregon law, the Corporation shall indemnify any Director made a party to a proceeding because the person is or was a Director of the Corporation. However, no indemnification pursuant to this provision shall indemnify any Director because of a breach of the Director's duty of loyalty to the corporation, acts or omissions not in good faith or involving intentional misconduct or a knowing violation of the law, and unlawful distribution under ORS 60.367 or any transaction from which the Director derived an improper personal benefit.

4.2 Advancement of Expenses. The Corporation may pay for or reimburse the reasonable expenses incurred by a Director or officer who is a party to a proceeding in advance of

ARTICLES OF INCORPORATION - 1
104 (3/10/05)

the final disposition of the proceeding.

**ARTICLE 5. LIABILITY OF DIRECTORS.**

No Director shall be personally liable to the Corporation or to shareholders for monetary damages for conduct as a Director. However, this article shall not eliminate the liability of a Director for any act or omission for which such elimination of liability is not permitted under Oregon law.

**ARTICLE 6. ACTION OF SHAREHOLDERS WITHOUT A MEETING**

Action required or permitted by shareholders may be taken without a meeting if the action is taken by shareholders having not less than the minimum number of votes necessary to take such action at a meeting to which all the shareholders entitled to vote on the action were present and voted.

**ARTICLE 7. REGISTERED AGENT.**

The name and address of the initial Registered Agent are:

Gregory J. Stuman, Esq.
FRANCIS HANSEN & MARTIN LLP
1148 NW Hill St.
Bend, OR 97701

**ARTICLE 8. CUMULATIVE VOTING.**

The shareholders are entitled to accumulate their votes for Directors.

**ARTICLE 9. NOTICES.**

The Corporation Division may mail notices to the following address:

Gregory J. Stuman, Esq.
FRANCIS HANSEN & MARTIN LLP
1148 NW Hill St.
Bend, OR 97701

ARTICLES OF INCORPORATION - 2
104 (3/10/05)

**ARTICLE 10. INCORPORATOR.**

The name and address of each incorporator:

Gregory J. Stuman, Esq.
FRANCIS HANSEN & MARTIN LLP
1148 NW Hill St.
Bend, OR 97701

These Articles of Incorporation have been executed on this 8TH day of March 2005.

/s/ _____
Gregory J. Stuman, Incorporator

Person to contact about this filing:

Gregory J. Stuman, Esq.
FRANCIS HANSEN & MARTIN LLP
1148 NW Hill St.
Bend, OR 97701
(541) 389-5010

ARTICLES OF INCORPORATION - 3
104 (3/10/05)

## BYLAWS
## OF
## LIGHTSPEED NETWORKS, INC.

**SECTION 1    PURPOSES AND POWERS**

1.1    Purposes. LIGHTSPEED NETWORKS, INC. (the "Company") may engage in any lawful business unless a more limited purpose is set forth in the Articles of Incorporation.

1.2    General Powers.

(a)    The Company has perpetual duration and succession in its corporate name.

(b)    The Company has the same powers as an individual to do all things necessary or convenient to carry out its business and affairs.

**SECTION 2    OFFICE AND AGENT**

2.1    Registered Office. The Company must continuously maintain in the State of Oregon a registered agent and registered office that may be, but need not be, the same as any of its places of business.

2.2    Registered Agent. The registered agent must be:

(a)    an individual who resides in the State of Oregon and whose business office is identical to the registered office;

(b)    a domestic corporation, domestic limited liability company, domestic professional corporation or domestic nonprofit corporation whose business office is identical to the registered office; or

(c)    a foreign corporation, foreign limited liability company, foreign professional corporation or foreign nonprofit corporation authorized to transact business in the State of Oregon whose business office is identical to the registered office.

**SECTION 3    ISSUANCE OF SHARES**

3.1    Issuance of Shares

(a)    The board of directors may authorize shares to be issued for consideration consisting of any tangible or intangible property or benefit to the Company, including cash, promissory notes, services performed, contracts for services to be performed or other securities of the Company.

1 – LIGHTSPEED NETWORKS, INC. - BYLAWS

EXHIBIT    A

Exhibit 3    OF   53

Page 6 of 17

29

(b) Before the Company issues shares, the board of directors must determine that the consideration received or to be received for the shares is adequate. That determination by the board of directors is conclusive insofar as the adequacy of consideration for the issuance of shares relates to whether the shares are validly issued, fully paid and nonassessable. A record of action by the board of directors authorizing the issuance of shares for a specified consideration may be relied upon in concluding that shares are validly issued, fully paid and nonassessable.

(c) When the Company receives the consideration for which the board of directors authorized the issuance of the shares, the shares issued therefor are fully paid and nonassessable.

(d) The Company may place in escrow shares issued for a contract for future services or benefits or a promissory note or make other arrangements to restrict the transfer of shares, and may credit distributions in respect of the shares against their purchase price, until the services are performed, the note is paid or the benefits are not received. If the services are not performed, the note is not paid or the benefits are not received, the shares placed in escrow or restricted and the distributions credited may be cancelled in whole or in part.

## 3.2    Share Dividends

(a) Shares may be issued pro rata and without consideration to the Company's shareholders or to the shareholders of one or more classes or series. An issuance of shares under this Section 3.2(a) is a share dividend.

(b) If the board of directors does not fix the record date for determining shareholders entitled to a share dividend, the record date is the date the board of directors authorizes the share dividend.

(c) For purposes of this Section 3.2, a share dividend will include a share split, other than a reverse share split.

## 3.3    Share Options

(a) The Company may issue rights, options or warrants for the purchase of shares of the Company. The board of directors will determine the terms upon which the rights, options or warrants are issued. The board will also determine their form and content and the consideration for which the shares are to be issued.

(b) Rights, options or warrants issued to the holders of all shares of any class will not be considered to conflict with the requirement of the Oregon Business Corporation Act that all shares of a class must have preferences, limitations and relative rights identical to those of other shares of the same class if the terms and conditions of the rights, options or warrants include restrictions or conditions that:

2 – LIGHTSPEED NETWORKS, INC. - BYLAWS

(1) preclude or limit the exercise, transfer or receipt of rights, options or warrants by any person owning or offering to acquire a specified number or percentage of the outstanding stock or other securities of the Company or any transferee of the person; or

(2) invalidate or void the rights, options or warrants held by the person or any transferee.

## 3.4    Form and Content of Certificates

(a) All shares will be represented by certificates.

(b) At a minimum, each certificate must state on its face:

(1) the name of the Company and that it is organized under the law of the State of Oregon;

(2) the name of the person to whom the share is issued; and

(3) the number and class of shares and the designation of the series, if any, the certificate represents.

(c) Each share certificate must be signed, either manually or in facsimile, by the president and the secretary or by any two officers otherwise designated by the board of directors.

(d) If the person who signed a share certificate, either manually or in facsimile, no longer holds office when the certificate is issued, the certificate is nevertheless valid.

## 3.5    Restrictions on Transfer of Shares and Other Securities.

(a) The Articles of Incorporation, these Bylaws, agreements among shareholders or agreements between shareholders and the Company may impose restrictions on the transfer or registration of transfer of shares of the Company. A restriction does not affect shares issued before the restriction was adopted unless the holders of the shares are parties to the restriction agreement or voted in favor of the restriction.

(b) A restriction on the transfer or registration of transfer of shares is valid and enforceable against the holder or a transferee of the holder if the restriction is authorized by this Section 3.5 and its existence is noted conspicuously on the front or back of the certificate. Unless so noted, a restriction is not enforceable against a person who has no knowledge of the restriction.

(c) A restriction on the transfer or registration of transfer of shares is authorized:

3 – LIGHTSPEED NETWORKS, INC. - BYLAWS

(1) to maintain the Company's status when it is dependent on the number or identity of its shareholders;

(2) to preserve exemptions under federal or state securities law; or

(3) for any other reasonable purpose.

(d) A restriction on the transfer or registration of transfer of shares may:

(1) obligate the shareholder first to offer to the Company or other persons, separately, consecutively or simultaneously an opportunity to acquire the restricted shares;

(2) obligate the Company or other persons, separately, consecutively or simultaneously to acquire the restricted shares;

(3) require the Company, the holders of any class of its shares or another person to approve the transfer of the restricted shares if the requirement is not manifestly unreasonable; or

(4) prohibit the transfer of the restricted shares to designated persons or classes of persons, if the prohibition is not manifestly unreasonable.

(e) For purposes of this Section 3.5, "shares" includes a security convertible into or carrying a right to subscribe for or acquire shares

## 3.6    Transfer of Shares

(a) If a share certificate in registered form is presented to the Company with a request to register transfer, the Company will register the transfer as requested if:

(1) under the terms of the shares the person seeking registration of transfer is eligible to have the shares registered in its name;

(2) the indorsement is made by the appropriate person or by an agent who has actual authority to act on behalf of the appropriate person;

(3) reasonable assurance is given that the indorsement is genuine and authorized;

(4) any applicable law relating to the collection of taxes has been complied with;

(5) the transfer does not violate any restriction on transfer that is noted conspicuously on the share certificate; and

(6) the transfer otherwise complies with all applicable laws.

4 – LIGHTSPEED NETWORKS, INC. - BYLAWS

(b) If an owner of a share certificate claims that the certificate has been lost, destroyed or wrongfully taken, the Company will issue a new certificate if the owner

(1) so requests before the Company has notice that the certificate has been acquired by a protected purchaser;

(2) files with the Company a sufficient indemnity bond; and

(3) satisfies other reasonable requirements imposed by the Company.

## SECTION 4    SUBSEQUENT ACQUISITION OF SHARES BY SHAREHOLDERS AND THE COMPANY

4.1    No Preemptive Rights of Shareholders.  The Company does not have preemptive rights.

4.2    Company's Acquisition of Its Own Shares.

(a) The Company may acquire its own shares and shares so acquired constitute authorized but unissued shares.

(b) If pursuant to this Section 4.2, the number of authorized shares is reduced, articles of amendment will be adopted by the board of directors which may be without shareholder action and will be delivered to the office of the Secretary of State for filing in accordance with the Oregon Business Corporation Act.

## SECTION 5    DISTRIBUTIONS

5.1    Distributions to Shareholders.  The board of directors may authorize and the Company may make distributions to its shareholders subject to the limitation in Section 5.3.

5.2    Record Date.  If the board of directors does not fix the record date for determining shareholders entitled to a distribution, other than a date involving a purchase, redemption or other acquisition of the Company's shares, it is the date the board of directors authorizes the distribution.

5.3    Limitation on Distributions.

(a) A distribution may be made only if, after giving it effect, in the judgment of the board of directors:

(1) the Company would be able to pay its debts as they become due in the usual course of business; and

(2) the Company's total assets would at least equal the sum of its total liabilities plus, unless the Articles of Incorporation permit otherwise, the

EXHIBIT ____A____

5 – LIGHTSPEED NETWORKS, INC. - BYLAWS

Exhibit 3
Page 7 of 17

30 OF 53

amount that would be needed if the Company were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution

(b) The board of directors may base a determination that a distribution is not prohibited under Section 5.3(a) either on financial statements prepared on the basis of accounting practices and principles that are reasonable in the circumstances or on a fair valuation or other method that is reasonable in the circumstances.

(c) The effect of a distribution under Section 5.3(a) is measured

(1) in the case of distribution by purchase, redemption or other acquisition of the Company's shares, as of the earlier of the date the money or other property is transferred or debt incurred by the Company or the date the shareholder ceases to be a shareholder with respect to the acquired shares;

(2) in the case of any other distribution of indebtedness, as of the date the indebtedness is distributed; and

(3) in all other cases, as of the date a distribution is authorized if the payment occurs within 120 days after the date of authorization or the date the payment is made if it occurs more than 120 days after the date of authorization

(d) The Company's indebtedness to a shareholder incurred by reason of a distribution made in accordance with this Section 5 is at parity with the Company's indebtedness to its general unsecured creditors, unless the shareholder agrees to subordination or the Company grants the shareholder a security interest or other lien against the Company's assets to secure the indebtedness

## SECTION 6    SHAREHOLDERS' MEETINGS

### 6.1    Annual Meeting

(a) The Company will hold an annual meeting of the shareholders at a time fixed by the board of directors

### 6.2    Special Meeting

(a) The Company will hold a special meeting of shareholders

(1) on call of its board of directors, or

(2) if the holders of at least 10 percent of all votes entitled to be cast on any issue proposed to be considered at the proposed special meeting sign, date

and deliver to the Company's secretary one or more written demands for the meeting describing the purpose or purposes for which it is to be held. A written demand for a special meeting may be revoked by a writing to that effect signed by a shareholder who signed the original demand, and received by the Company prior to the receipt by the Company of a demand sufficient to require the holding of a special meeting.

(b) If not otherwise fixed under Section 6.8, the record date for determining shareholders entitled to demand a special meeting is the date the first shareholder signs the demand.

(c) Special shareholders' meetings may be held on or out of the State of Oregon at the Company's principal office or at any other place fixed by the board of directors.

(d) Only business within the purpose or purposes described in the meeting notice required by Section 6.5(c) may be conducted at a special shareholders' meeting.

### 6.3    Meeting Chairpersons; Closing of Polls

(a) At each meeting of shareholders, the president, or if the president is absent then the chairperson of the board of directors, or if no chairperson of the board of directors has been appointed or is present then any vice chairman, or if no vice chairman has been appointed or is present then any individual chosen by shareholders holding a majority of shares present at the meeting, will act as chairperson of the meeting.

(b) Unless the Articles of Incorporation or these Bylaws provide otherwise, the chairperson will determine the order of business and will have the authority to establish rules for the conduct of the meeting.

(c) Any rules adopted for, and the conduct of, the meeting must be fair to shareholders.

(d) The chairperson of the meeting will announce at the meeting when the polls close for each matter voted upon. If no announcement is made, the polls will be considered to have closed upon the final adjournment of the meeting. After the polls close, no ballots, proxies or votes, or any revocations or changes thereto, may be accepted

### 6.4    Action Without Meeting

(a)

(1) Action required or permitted by the Oregon Business Corporation Act to be taken at a shareholders' meeting may be taken without a meeting if the action is taken by all the shareholders entitled to vote on the action.

(2) The action taken under this Section 6.4 must be evidenced by one or more written consents describing the action taken, signed by all the shareholders entitled to vote on the action, and delivered to the Company for inclusion in the minutes or filing with the corporate records.

(3) Action taken under Section 6.4(a)(1) is effective when the last shareholder signs the consent, unless the consent specifies an earlier or later effective date.

(b) If not otherwise determined under Section 6.8, the record date for determining shareholders entitled to take action without a meeting is the date the first shareholder signs a consent under Section 6.4(b).

(c) A consent signed under this Section 6.4 has the effect of a meeting vote and may be described as such in any document.

(d)

(1) If the Oregon Business Corporation Act requires that notice of proposed action be given to nonvoting shareholders and the action is to be taken by unanimous consent of the voting shareholders, the Company must give its nonvoting shareholders written notice of the proposed action at least 10 days before the action is taken

(2) The notice given under this Section 6.4 must contain or be accompanied by the same material that, under the Oregon Business Corporation Act, would have been required to be sent to nonvoting shareholders in a notice of meeting at which the proposed action would have been submitted to the shareholders for action.

### 6.5    Notice of Meeting

(a) The Company must notify shareholders of the date, time and place of each annual and special shareholders' meeting no earlier than 60 days nor less than 10 days before the meeting date. Unless the Oregon Business Corporation Act or the Articles of Incorporation require otherwise, the Company is required to give notice only to shareholders entitled to vote at the meeting

(b) Unless required by the Oregon Business Corporation Act or the Articles of Incorporation, notice of an annual meeting need not include a description of the purpose or purposes for which the meeting is called.

(c) Notice of a special meeting must include a description of the purpose or purposes for which the meeting is called.

(d) If not otherwise fixed under Section 6.8, the record date for determining shareholders entitled to notice of and to vote at an annual or special shareholders' meeting is the day before the first notice is mailed or otherwise transmitted for delivery to shareholders in accordance with Section 15.

(e) Unless these Bylaws require otherwise, if an annual or special shareholders' meeting is adjourned to a different date, time or place, notice need not be given of the new date, time or place if the new date, time or place is announced at the meeting before adjournment. If a new record date for the adjourned meeting is or must be fixed under Section 6.8, however, notice of the adjourned meeting must be given under this Section 6.5 to persons who are shareholders as of the new record date.

### 6.6    Waiver of Notice

(a) A shareholder may at any time waive any notice required by the Oregon Business Corporation Act, the Articles of Incorporation or these Bylaws. The waiver must be in writing, be signed by the shareholder entitled to the notice and be delivered to the Company for inclusion in the minutes for filing with the corporate records.

(b) A shareholder's attendance at a meeting waives objection to:

(1) lack of notice or defective notice of the meeting, unless the shareholder at the beginning of the meeting objects to holding the meeting or transacting business at the meeting; and

(2) consideration of a particular matter at the meeting that is not within the purpose or purposes described in the meeting notice, unless the shareholder objects to considering the matter when it is presented.

### 6.7    Adjournment of Meeting. A majority of votes represented at a meeting of shareholders, whether or not a quorum, may adjourn the meeting from time to time to a different time and place without further notice to any shareholder of any adjournment, except at such notice may be required by Section 6.5. At the adjourned meeting at which a quorum is present, any business may be transacted that might have been transacted at the meeting originally held.

EXHIBIT _A_

Exhibit 3
Page 8 of 17

_31_ OF _53_

**6.8   Record Date**

(a)   The board of directors of the Company may fix a future date, or a later time on the date the board of directors fixes the record date, as the record date for one or more voting groups in order to determine the shareholders entitled to notice of a shareholders' meeting, to demand a special meeting, to vote or to take any other action. The record date must be the same for all voting groups.

(b)   A record date fixed under this Section 6.8 may not be more than 70 days before the meeting or action requiring a determination of shareholders.

(c)   A determination of shareholders entitled to notice of or to vote at a shareholders' meeting is effective for any adjournment of the meeting unless the board of directors fixes a new record date, which it must do if the meeting is adjourned to a date more than 120 days after the date fixed for the original meeting.

**6.9   Participation at Meeting**

(a)   All shareholders may participate in an annual or special meeting by, and all shareholders' meetings may be conducted through, use of any means of communication by which all shareholders participating may simultaneously hear each other. A shareholder participating in a meeting by this means is deemed to be present in person at the meeting.

(b)   The notice of each annual or special meeting of shareholders will state that participation in the manner referred to in Section 6.9(a) is permitted and will describe how any shareholder desiring to participate may notify the Company of the shareholder's desire to be included in the meeting.

**6.10   Meeting Inspectors; Duties**

(a)   The Company may appoint one or more inspectors to act at a meeting of shareholders and make a written report of the inspectors' determinations. Each inspector must take and sign an oath to faithfully execute the duties of the inspector with strict impartiality and according to the best of the inspector's ability.

(b)   The inspectors will

(1)   ascertain the number of shares outstanding and the voting power of each share,

(2)   determine the shares represented at a meeting,

(3)   determine the validity of proxies and ballots,

(4)   count all votes, and

10 – LIGHTSPEED NETWORKS, INC. - BYLAWS

(5)   determine the result.

(c)   An inspector may be an officer or employee of the Company.

**SECTION 7      SHAREHOLDERS' VOTING**

**7.1   Shareholders' List for Meeting**

(a)   After fixing a record date for a meeting, the Company will prepare an alphabetical list of the names of all its shareholders who are entitled to notice of a shareholders' meeting. The list must be arranged by voting group, and within each voting group by class or series of shares and show the address of and number of shares held by each shareholder.

(b)   The shareholders' list must be available for inspection by any shareholder, beginning two business days after notice of the meeting is given for which the list was prepared and continuing through the meeting, at the Company's principal office or at a place identified in the meeting notice in the city where the meeting will be held. A shareholder, the shareholder's agent or attorney is entitled on written demand to inspect and, subject to the requirements of Section 1.4.2(c), to copy the list during regular business hours and at the shareholder's expense during the period it is available for inspection.

(c)   The Company will make the shareholders' list available at the meeting, and any shareholder, the shareholder's agent or attorney is entitled to inspect the list at any time during the meeting or any adjournment.

(d)   Refusal or failure to prepare or make available the shareholders' list does not affect the validity of action taken at the meeting.

**7.2   Voting Entitlement of Shares**

(a)   Except as provided in Section 7.2(b), Section 7.2(c), Section 7.9 and the Oregon Business Corporation Act, each outstanding share is entitled to one vote on each matter voted on at a shareholders' meeting. Only shares are entitled to vote.

(b)   The shares of the Company are not entitled to vote if they are owned, directly or indirectly, by a second domestic or foreign corporation, and the Company owns, directly or indirectly, a majority of the shares entitled to vote for directors of the second corporation.

(c)   Section 7.2(b) does not limit the power of the Company to vote any shares, including its own shares, held by it in a fiduciary capacity.

(d)   Redeemable shares are not entitled to vote after notice of redemption is mailed to the holders and a sum sufficient to redeem the shares has been deposited with a bank, trust company or other financial institution under an irrevocable obligation to pay the holders the redemption price on surrender of the shares.

11 – LIGHTSPEED NETWORKS, INC. - BYLAWS

**7.3   Proxies**

(a)   A shareholder may vote shares in person or by proxy.

(b)   A shareholder may authorize a person or persons to act for the shareholder as proxy in any one of the following manners:

(1)   a shareholder or the shareholder's designated officer, director, employee or agent may execute a writing by

(A)   signing it; or

(B)   causing the shareholder's signature or the signature of the designated officer, director, employee or agent of the shareholder to be affixed to the writing by any reasonable means, including facsimile signature.

(2)   a shareholder may authorize an electronic transmission that:

(A)   may be transmitted to the person who will be the holder of the proxy, the proxy solicitation firm, or a proxy support service organization or similar agency authorized by the person who will be the holder of the proxy to receive the electronic transmission; and

(B)   must contain or be accompanied by information from which it can be determined that the shareholder or the shareholder's designated officer, director, employee or agent authorized the transmission; or

(3)   any other method allowed by law.

(c)   An authorization of a proxy is effective when received by the secretary or other officer or agent authorized to tabulate votes. An authorization is valid for 11 months unless a longer period is expressly provided in the authorization form.

(d)   An authorization of a proxy is revocable by the shareholder unless the authorization conspicuously states that it is irrevocable and the authorization is coupled with an interest. Authorizations coupled with an interest include the authorization of:

(1)   a pledgee;

(2)   a person who purchased or agreed to purchase the shares;

(3)   a creditor of the Company who extended its credit under terms requiring the authorization;

(4)   an employee of the Company whose employment contract requires the authorization; or

12 – LIGHTSPEED NETWORKS, INC. - BYLAWS

(5)   a party to a voting agreement created under ORS 60.257.

(e)   The death or incapacity of the shareholder authorizing a proxy does not affect the right of the Company to accept the proxy's authority unless notice of the death or incapacity is received by the secretary or other officer or agent authorized to tabulate votes before the proxy exercises the proxy's authority under the authorization.

(f)   An authorization made irrevocable under Section 7.3(d) is revoked when the interest with which it is coupled is extinguished.

(g)   A transferee for value of shares subject to an irrevocable authorization may revoke the authorization if the transferee did not know of its existence when the transferee acquired the shares and the existence of the irrevocable authorization was not noted conspicuously on the certificate representing the shares.

(h)   Subject to Section 7.5 and to any express limitation on the proxy's authority appearing on the face of the authorization form or electronic transmission, the Company is entitled to accept the proxy's vote or other action as that of the shareholder making the authorization.

**7.4   Shares Held By Nominees**

(a)   The Company may establish a procedure by which the beneficial owner of shares that are registered in the name of a nominee is recognized by the Company as the shareholder. The extent of this recognition may be determined in the procedure.

(b)   The procedure referred to in Section 7.4(a) may set forth:

(1)   the types of nominees to which it applies;

(2)   the rights or privileges that the Company recognizes in a beneficial owner;

(3)   the manner in which the procedure is selected by the nominee;

(4)   the information that must be provided when the procedure is selected;

(5)   the period for which selection of the procedure is effective; and

(6)   other aspects of the rights and duties created.

**7.5   Company's Acceptance of Votes**

(a)   If the name signed on a vote, consent, waiver or proxy authorization corresponds to the name of a shareholder, the Company, if acting in good faith, is entitled to accept the vote, consent, waiver or proxy authorization and give it effect as the act of the shareholder.

13 – LIGHTSPEED NETWORKS, INC. - BYLAWS

EXHIBIT   A

(b) If the name signed on a vote, consent, waiver or proxy authorization does not correspond to the name of its shareholder, the Company, if acting in good faith, is nevertheless entitled to accept the vote, consent, waiver or proxy authorization and give it effect as the act of the shareholder if

(1) the shareholder is an entity and the name signed purports to be that of an officer or agent of the entity.

(2) the name signed purports to be that of an administrator, executor, guardian or conservator representing the shareholder and, if the Company requests, evidence of fiduciary status acceptable to the Company has been presented with respect to the vote, consent, waiver or proxy authorization.

(3) the name signed purports to be that of a receiver or trustee in bankruptcy of the shareholder and, if the Company requests, evidence of this status acceptable to the Company has been presented with respect to the vote consent, waiver or proxy authorization.

(4) the name signed purports to be that of a pledgee, beneficial owner or attorney-in-fact of the shareholder and, if the Company requests, evidence acceptable to the Company of the signatory's authority to sign for the shareholder has been presented with respect to the vote, consent, waiver or proxy authorization; or

(5) two or more persons are the shareholder as cotenants or fiduciaries and the name signed purports to be the name of at least one of the co-owners and the person signing appears to be acting on behalf of all co-owners.

(c) The Company is entitled to reject a vote, consent, waiver or proxy authorization if the secretary or other officer or agent authorized to tabulate votes, acting in good faith, has reasonable basis for doubt about the validity of the signature on it or about the signatory's authority to sign for the shareholder.

(d) The Company and its officer or agent who accepts or rejects a vote, consent, waiver or proxy authorization in good faith and in accordance with the standards of this Section 7.5 are not liable in damages to the shareholder for the consequences of the acceptance or rejection.

(e) Corporate action based on the acceptance or rejection of a vote, consent, waiver or proxy authorization under this Section 7.5 is valid unless a court of competent jurisdiction determines otherwise.

7.6 **Quorum and Voting Requirements for Voting Groups**.

(a) Shares entitled to vote as a separate voting group may take action on a matter at a meeting only if a quorum of those shares exists with respect to that matter. Unless the Articles of Incorporation or the Oregon Business Corporation Act provide for a lesser or greater number in accordance with Section 7.8, a majority of the votes entitled to be cast on the matter by the voting group constitutes a quorum of that voting group for action on that matter.

(b) Once a share is represented for any purpose at a meeting, it is deemed present for quorum purposes for the remainder of the meeting and for any adjournment of that meeting unless a new record date is or must be set for that adjourned meeting.

(c) If a quorum exists, action on a matter, other than the election of directors, by a voting group is approved if the votes cast within the voting group favoring the action exceed the votes cast opposing the action, unless the Articles of Incorporation or the Oregon Business Corporation Act require a greater number of affirmative votes.

7.7 **Action by Single and Multiple Voting Groups**.

(a) If the Articles of Incorporation or the Oregon Business Corporation Act provide for voting by a single voting group on a matter, action on that matter is taken when voted upon by that voting group as provided in Section 7.6.

(b) If the Articles of Incorporation or the Oregon Business Corporation Act provide for voting by two or more voting groups on a matter, action on that matter is taken only when voted upon by each of those voting groups counted separately as provided in Section 7.6. Action may be taken by one voting group on a matter even though no action is taken by another voting group entitled to vote on the matter.

7.8 **Modification of Quorum or Voting Requirements**.

(a) The Articles of incorporation may provide for a lesser or greater quorum requirement for shareholders, or voting groups of shareholders, than is provided for by the Oregon Business Corporation Act, but in no event will a quorum for shareholders, or any voting group of shareholders, consist of less than one-third of the votes entitled to be cast on any matter by the shareholders, or voting group of shareholders. The Articles of Incorporation may provide for a greater voting requirement for shareholders, or voting group of shareholders, than is provided for by the Oregon Business Corporation Act.

(b) An amendment to the Articles of Incorporation that adds a greater quorum or voting requirement must meet the quorum requirement and be adopted by the vote and voting groups required to take action under the quorum and voting requirements then in effect. An amendment to the Articles of Incorporation that changes or deletes a greater quorum or voting requirement must meet the quorum requirement and be adopted by the vote and voting groups required to take action immediately prior to the change or deletion.

7.9 **Voting for Directors**.

(a) Unless otherwise provided in the Articles of Incorporation, directors are elected by a plurality of the votes cast by the shares entitled to vote in the election at a meeting at which a quorum is present.

(b) Shareholders have a right to cumulate their votes for directors.

(c) Shareholders are entitled to multiply the number of votes they are entitled to cast by the number of directors for whom they are entitled to vote and cast the product for a single candidate or distribute the product among two or more candidates.

SECTION 8 BOARD OF DIRECTORS

8.1 **Duties of Board of Directors**. All corporate powers will be exercised by or under the authority of, and the business and affairs of the Company managed under the direction of, the board of directors, subject to any limitation set forth in the Articles of incorporation or in a shareholder agreement authorized by the Oregon Business Corporation Act.

8.2 **Qualifications of Directors**. The Articles of Incorporation or these Bylaws may prescribe qualifications for directors. A director need not be a resident of the State of Oregon or a shareholder of the Company unless required by the Articles of Incorporation or these Bylaws. No officer or assistant officer of the Company will simultaneously serve as a director of the Company.

8.3 **Number and Election of Directors**

(a) The board of directors must consist of SEVEN (7) individuals. The estate of an incompetent individual or a deceased individual may not be a director.

(b) Directors are elected at the first annual shareholders' meeting and at each annual meeting thereafter.

8.4 **Terms of Directors Generally**

(a) The terms of the initial directors, if any, of the Company expire at the first shareholders' meeting at which directors are elected.

(b) The terms of all other directors will expire at the next annual shareholders' meeting following their election.

(c) A decrease in the number of directors does not shorten an incumbent director's term.

*(d) The term of a director elected by the board of directors to fill a vacancy expires at the next shareholders' meeting at which directors are elected.*

(e) Despite the expiration of a director's term, the director continues to serve until the director's successor is elected and qualifies or until there is a decrease in the number of directors.

8.5 **Resignation of Directors**.

(a) A director may resign at any time by delivering written notice to the board of directors, its chairperson or the Company.

(b) A resignation is effective when the notice is effective under Section 15.5 unless the notice specifies a later effective date.

(c) Once delivered, a notice of resignation is irrevocable unless revocation is permitted by the board of directors.

8.6 **Removal of Directors by Shareholders**.

(a) The shareholders may remove one or more directors with or without cause.

(b) If a director is elected by a voting group of shareholders, only the shareholders of that voting group may participate in the vote to remove the director.

(c) *A director may be removed by the shareholders only at a meeting called for the* purpose of removing the director and the meeting notice must state that the purpose, or one of the purposes, of the meeting is removal of the director.

8.7 **Vacancy on Board**

(a) If a vacancy occurs on the board of directors, including a vacancy resulting from an increase in the number of directors, the shareholders will fill the vacancy.

(b) If the vacant office was held by a director elected by a voting group of shareholders, then only the holders of shares of that voting group are entitled to *vote to fill the vacancy.*

(c) A vacancy that will occur at a specific later date, by reason of a resignation effective at a later date under Section 8.5(b) or otherwise may be filled before the vacancy occurs but the new director may not take office until the vacancy occurs.

8.8 **Compensation of Directors**. Unless the Articles of Incorporation or these Bylaws provide otherwise, the board of directors may fix the compensation of directors.

8.9 **Chairperson of the Board of Directors**.

(a) The board of directors may at any time appoint a director to be the chairperson of the board of directors.

EXHIBIT A

Exhibit 3
33 OF 53 Page 10 of 17

(b)   The chairperson of the board of directors may resign at any time by delivering notice to the board of directors. The board of directors may remove the chairperson at any time with or without cause. The resignation or removal of an individual from the position of chairperson will not, by itself, affect the individual's status as a director.

(c)   The chairperson of the board of directors will preside at all meetings of the board of directors and will perform other duties prescribed by the board of directors.

(d)   The chairperson of the board of directors is not an officer of the Company solely by reason of being the chairperson.

8.10   Vice-Chairperson of the Board of Directors

(a)   The board of directors may at any time appoint a director to be the vice-chairperson of the board of directors.

(b)   The vice-chairperson of the board of directors may resign at any time by delivering notice to the board of directors. The board of directors may remove the vice-chairperson at any time with or without cause. The resignation or removal of an individual from the position of vice-chairperson will not, by itself, affect the individual's status as a director.

(c)   The vice-chairperson of the board of directors will preside at all meetings of the board of directors in the absence of the chairperson and will perform other duties prescribed by the board of directors.

(d)   The vice-chairperson of the board of directors is not an officer of the Company solely by reason of being the vice-chairperson.

SECTION 9   MEETINGS AND ACTION OF BOARD

9.1   Meetings

(a)   The board of directors may hold regular or special meetings in or out of the State of Oregon.

(b)   The board of directors may permit any or all directors to participate in a regular or special meeting by, or conduct the meeting through, use of any means of communication by which all directors participating may simultaneously hear each other during the meeting. A director participating in a meeting by this means is deemed to be present in person at the meeting.

9.2   Action Without Meeting

(a)   Action required or permitted by the Oregon Business Corporation Act to be taken at a board of directors' meeting may be taken without a meeting if the

18 – LIGHTSPEED NETWORKS, INC. - BYLAWS

action is taken by all members of the board. The action must be evidenced by one or more written consents describing the action taken, signed by each director, and included in the minutes or filed with the corporate records reflecting the action taken.

(b)   Action taken under this Section 9.2 is effective when the last director signs the consent, unless the consent specifies an earlier or later effective date.

(c)   A consent signed under this Section 9.2 has the effect of a meeting vote and may be described as such in any document.

9.3   Notice of Meeting

(a)   Regular meetings of the board of directors may be held without notice of the date, time, place or purpose of the meeting.

(b)   Special meetings of the board of directors must be preceded by at least two days' notice of the date, time and place of the meeting. The notice need not describe the purpose of the special meeting unless required by the Articles of Incorporation or these Bylaws.

9.4   Waiver of Notice

(a)   A director may at any time waive any notice required by the Oregon Business Corporation Act, the Articles of Incorporation or these Bylaws. Except as provided in Section 9.4(b), the waiver must be in writing, must be signed by the director entitled to the notice, must specify the meeting for which notice is waived and must be filed with the minutes or corporate records.

(b)   A director's attendance at or participation in a meeting waives any required notice to the director of the meeting unless the director at the beginning of the meeting, or promptly upon the director's arrival, objects to holding the meeting or transacting business at the meeting and does not thereafter vote for or assent to action taken at the meeting.

9.5   Quorum and Voting

(a)   Except for those matters which these Bylaws require a greater number as authorized under Section 9.6, a quorum of the board of directors consists of a majority of the fixed number of directors.

(b)   If a quorum is present when a vote is taken, the affirmative vote of a majority of directors present is the act of the board of directors unless the Articles of Incorporation or these Bylaws require the vote of a greater number of directors.

(c)   A director who is present at a meeting of the board of directors or a committee of the board of directors when corporate action is taken is deemed to have assented to the action taken unless:

19 – LIGHTSPEED NETWORKS, INC. - BYLAWS

(1)   the director objects at the beginning of the meeting, or promptly upon the director's arrival, to holding the meeting or transacting business at the meeting;

(2)   the director's dissent or abstention from the action taken is entered in the minutes of the meeting; or

(3)   the director delivers written notice of dissent or abstention to the presiding officer of the meeting before its adjournment or to the Company immediately after adjournment of the meeting. The right of dissent or abstention is not available to a director who votes in favor of the action taken.

9.6   Actions Requiring a Supermajority.

The following actions must be approved by a vote of at least FIVE (5) of the directors:

(a)   Pledging, encumbering, leasing or granting of any interest in any corporate assets to another entity to secure financing, with the exception of purchase money transactions.

(b)   Issuing additional stock of the Company;

(c)   Amending the Articles of Incorporation or these Bylaws in a manner not prohibited by Section 13(b).

(d)   Approving the sale of all or substantially all of the assets of the Company;

(e)   Approving any borrowing by the Company, other than (i) borrowing from a shareholder, (ii) a purchase money transaction and (iii) incurring trade debt in the ordinary course of the Company's business;

(f)   Approving the conversion of the Company to a different form of entity; and

(g)   Approving the sale or merger of the Company

9.7   Committees; Powers; Limitations

(a)   The board of directors may create one or more committees and appoint one or more members of the board of directors to serve on each committee.

(b)   The creation of a committee and appointment of members to it must be approved by the greater of:

(1)   a majority of all the directors in office when the action is taken; or

(2)   the number of directors required by the Articles of Incorporation or these Bylaws to take action under Section 9.5.

20 – LIGHTSPEED NETWORKS, INC. - BYLAWS

(c)   The provisions of this Section 9 apply both to committees of the board and to members of the committees.

(d)   Except as provided in Section 9.7(e), to the extent specified by the board of directors or in the Articles of Incorporation or these Bylaws, each committee may exercise the powers of the board of directors under Section 8.1.

(e)   A committee may not:

(1)   authorize or approve distributions, except according to a formula or method, or within limits, prescribed by the board of directors;

(2)   approve or propose to shareholders action that the Oregon Business Corporation Act requires be approved by shareholders;

(3)   fill vacancies on the board of directors or, subject to Section 9.7(g), on any of its committees;

(4)   take any action described in Section 9.6; or

(5)   adopt, amend or repeal these Bylaws.

(f)   The creation, delegation of authority to, or action by a committee does not alone constitute compliance by a director with the standards of conduct described in Section 10.1.

(g)   The board of directors may appoint one or more directors as alternate members of any committee to replace any absent or disqualified member during the member's absence or disqualification. Unless the Articles of Incorporation, these Bylaws or the resolution creating the committee provide otherwise, in the event of the absence or disqualification of a member of a committee, the member or members present at any meeting and not disqualified from voting, unanimously, may appoint a director to act in place of the absent or disqualified member.

SECTION 10   STANDARDS OF CONDUCT FOR DIRECTORS

10.1   General Standards for Directors

(a)   A director must discharge the duties of a director, including the duties as a member of a committee, in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances and in a manner the director reasonably believes to be in the best interests of the Company.

(b)   In discharging the duties of a director, a director is entitled to rely on information, opinions, reports or statements including financial statements and other financial data, prepared or presented by:

EXHIBIT A

21 – LIGHTSPEED NETWORKS, INC. - BYLAWS

Exhibit 3
Page 11 of 17
34 OF 53

(1)  one or more officers or employees of the Company whom the director reasonably believes to be reliable and competent in the matters presented;

(2)  legal counsel, public accountants or other person as to matters the director reasonably believes are within the person's professional or expert competence; or

(3)  a committee of the board of directors of which the director is not a member if the director reasonably believes the committee merits confidence.

(c)  A director is not acting in good faith if the director has knowledge concerning the matter in question that makes reliance otherwise permitted by Section 10.1(b) unwarranted.

(d)  A director is not liable for any action taken as a director, or any failure to take any action, if the director performed the duties of the director's office in compliance with this Section 10.1.

**10.2  Conflict of Interest**

(a)  A conflict of interest transaction is a transaction with the Company in which a director of the Company has a direct or indirect interest. A conflict of interest transaction is not voidable by the Company solely because of the director's interest in the transaction if any one of the following is true:

(1)  the material facts of the transaction and the director's interest were disclosed or known to the board of directors or a committee of the board of directors and the board of directors or committee authorized, approved or ratified the transaction;

(2)  the material facts of the transaction and the director's interest were disclosed or known to the shareholders entitled to vote and they authorized, approved or ratified the transaction; or

(3)  the transaction was fair to the Company.

(b)  For purposes of this Section 10.2, a director of the Company has an indirect interest in a transaction if:

(1)  another entity in which the director has a material financial interest or in which the director is a general partner is a party to the transaction; or

(2)  another entity of which the director is a director, officer or trustee is a party to the transaction and the transaction is or should be considered by the board of directors of the Company.

(c)  For purposes of Section 10.2(a)(1), a conflict of interest transaction is authorized, approved or ratified if it receives the affirmative vote of a majority of the directors on the board of directors, or on the committee, who have no direct or indirect interest in the transaction. A transaction may not be authorized, approved or ratified under this Section 10.2 by a single director. If a majority of the directors who have no direct or indirect interest in the transaction vote to authorize, approve or ratify the transaction, a quorum is present for the purpose of taking action under this Section 10.2. The presence of, or a vote cast by, a director with a direct or indirect interest in the transaction does not affect the validity of any action taken under Section 10.2(a)(1) if the transaction is otherwise authorized, approved or ratified as provided in Section 10.2(a).

(d)  For purposes of Section 10.2(a)(2), a conflict of interest transaction is authorized, approved or ratified if it receives the vote of a majority of the shares entitled to be counted under this Section 10.2(d), voting as a single voting group. Shares owned by or voted under the control of a director who has a direct or indirect interest in the transaction, and shares owned by or voted under the control of an entity described in Section 10.2(b)(1) may be counted in a vote of shareholders to determine whether to authorize, approve or ratify a conflict of interest transaction under Section 10.2(a)(2). A majority of shares, whether or not present, that are entitled to be counted in a vote on the transaction under this Section 10.2(d) constitutes a quorum for the purpose of taking action under this Section 10.2.

**10.3  Loans to Directors**

The Company may not lend money to or guarantee the obligation of a director of the Company.

**SECTION 11    OFFICERS**

**11.1  Required Officers**

(a)  The Company must have a President and a Secretary, and will have any other officers or assistant officers appointed by the board of directors.

(b)  A duly appointed officer may appoint one or more officers or assistant officers if the appointment is authorized by these Bylaws or the board of directors.

(c)  The same individual may simultaneously hold more than one office in the Company.

**11.2**  Duties of Officers. Each officer has the authority and will perform the duties set forth in these Bylaws or, to the extent consistent with these Bylaws, the duties prescribed by the board of directors or by direction of an officer authorized by the board of directors to prescribe the duties of other officers.

22 – LIGHTSPEED NETWORKS, INC. - BYLAWS

23 – LIGHTSPEED NETWORKS, INC. - BYLAWS

**11.3  Standard of Conduct for Officers**

(a)  An officer with discretionary authority must discharge the duties of an officer under that authority:

(1)  in good faith;

(2)  with the care an ordinarily prudent person in a like position would exercise under similar circumstances; and

(3)  in a manner the officer reasonably believes to be in the best interests of the Company.

(b)  In discharging the duties of an officer, an officer is entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, if prepared or presented by:

(1)  one or more officers or employees of the Company whom the officer reasonably believes to be reliable and competent in the matters presented; or

(2)  legal counsel, public accountants or other persons as to matters the officer reasonably believes are within the person's professional or expert competence.

(c)  An officer is not acting in good faith if the officer has knowledge concerning the matter in question that makes reliance otherwise permitted by Section 11.3(b) unwarranted.

(d)  An officer is not liable for any action taken as an officer, or any failure to take any action, if the officer performed the duties of the officer in compliance with this Section 11.3.

**11.4**  Resignation and Removal of Officers.

(a)  An officer may resign at any time by delivering notice to the Company. A resignation is effective when the notice is effective under Section 15.5 unless the notice specifies a later effective time. If a resignation is made effective at a later time and the Company accepts the future effective time, the board of directors or the appointing officer may fill the pending vacancy before the effective time if the board of directors or the appointing officer provides that the successor does not take office until the effective time.

(b)  An officer may be removed at any time with or without cause by:

(1)  the board of directors;

(2)  the appointing officer, unless otherwise provided by these Bylaws or the board of directors; or

(3)  any other officer if authorized by these Bylaws or the board of directors.

(c)  Once delivered, a notice of resignation is irrevocable unless revocation is permitted by the board of directors.

(d)  As used in this Section 11.4, "appointing officer" means the officer or any successor to that officer who appointed the officer resigning or being removed.

**11.5  Contract Right of Officers**

(a)  The appointment of an officer does not itself create contract rights.

(b)  Removal or resignation of an officer does not affect the contract rights, if any, of the Company or the officer.

**11.6**  President / CEO. The President shall be the Chief Executive Officer of the Company and will supervise, direct, and control the business and affairs of the Company. The President also will perform all duties commonly incident to the office of President and/or CEO and other duties prescribed by the board of directors.

**11.7**  Vice Presidents. The board of directors may appoint one or more vice presidents. If appointed, the vice president – or the vice president designated by the board of directors if more than one vice president is appointed – will perform the duties of the president if the president dies or becomes incapacitated. Each vice president also will perform all duties commonly incident to the office of vice president and other duties prescribed by the board of directors or an authorized officer.

**11.8**  Treasurer. The board of directors may appoint a treasurer. If appointed, the treasurer will:

(a)  have general charge of and be responsible for all funds and securities of the Company;

(b)  receive and give receipts for monies due and payable to the Company from any source and deposit the monies in the name of the Company in banks, trust companies, or other depositories selected by the board of directors or an authorized officer; and

(c)  perform all duties commonly incident to the office of treasurer and other duties prescribed by the board of directors or an authorized officer.

**11.9**  Secretary. The secretary will:

(a)  prepare minutes of the directors' and shareholders' meetings and authenticate records of the Company;

EXHIBIT **A**

24 – LIGHTSPEED NETWORKS, INC. - BYLAWS

25 – LIGHTSPEED NETWORKS, INC. - BYLAWS

Exhibit 3
Page 12 of 17



35  OF  53

(b) ensure that all notices by the Company under the Oregon Business Corporation Act, the Articles of incorporation or these bylaws are given;

(c) keep and maintain the records of the Company specified in Section 14.1(a) and Section 14.1(c);

(d) have general charge of the share transfer books of the Company;

(e) have general charge of the record of shareholders specified in Section 14.1(c); and

(f) perform all duties commonly incident to the office of secretary and other duties prescribed by the board of directors or an authorized officer.

### SECTION 12    INDEMNIFICATION

12.1 **Definitions.** As used in this Section 12:

(a) "Director" means an individual who is or was a director of the Company or an individual who, while a director of the Company, is or was serving at the Company's request as a director, officer, partner, trustee, employee or agent of another foreign or domestic corporation, partnership, joint venture, trust, employee benefit plan or other enterprise. A director is considered to be serving an employee benefit plan at the Company's request if the director's duties to the Company also impose duties on or otherwise involve services by the director to the plan or to participants in or beneficiaries of the plan. "Director" includes, unless the context requires otherwise, the estate or personal representative of a director.

(b) "Expenses" include counsel fees.

(c) "Liability" means the obligation to pay a judgment, settlement, penalty, fine, including an excise tax assessed with respect to an employee benefit plan or reasonable expenses incurred with respect to a proceeding.

(d) "Officer" means an individual who is or was an officer of the Company or an individual who, while an officer of the Company, is or was serving at the Company's request as a director, officer, partner, trustee, employee or agent of another foreign or domestic corporation, partnership, joint venture, trust, employee benefit plan or other enterprise. An officer is considered to be serving an employee benefit plan at the Company's request if the officer's duties to the Company also impose duties on or include services by the officer to the employee benefit plan or to participants in or beneficiaries of the plan. "Officer" includes, unless the context requires otherwise, the estate or personal representative of an officer.

(e) "Party" includes an individual who was, is or is threatened to be made a named defendant or respondent in a proceeding.

(f) "Proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative and whether formal or informal

12.2 **Indemnification of Directors.**

(a) Except as provided in Section 12.2(d), the Company will indemnify an individual made a party to a proceeding because the individual is or was a director against liability incurred in the proceeding if:

(1) the conduct of the individual was in good faith;

(2) the individual reasonably believed that the individual's conduct was in the best interests of the Company, or at least not opposed to its best interests; and

(3) in the case of any criminal proceeding, the individual had no reasonable cause to believe the individual's conduct was unlawful.

(b) A director's conduct with respect to an employee benefit plan for a purpose the director reasonably believed to be in the interests of the participants in and beneficiaries of the plan is conduct that satisfies the requirement of Section 12.2(a)(2).

(c) The termination of a proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent is not, of itself, determinative that the director did not meet the standard of conduct described in this Section 12.2.

(d) The Company may not indemnify a director under this Section 12.2:

(1) in connection with a proceeding by or in the right of the Company in which the director was adjudged liable to the Company; or

(2) in connection with any other proceeding charging improper personal benefit to the director in which the director was adjudged liable on the basis that personal benefit was improperly received by the director.

(e) Indemnification permitted under this Section 12.2 in connection with a proceeding by or in the right of the Company is limited to reasonable expenses incurred in connection with the proceeding.

12.3 **Mandatory Indemnification.** Unless limited by the Articles of incorporation, the Company must indemnify a director who was wholly successful, on the merits or otherwise, in the defense of any proceeding to which the director was a party because

of being a director of the Company against reasonable expenses incurred by the director in connection with the proceeding.

12.4 **Advance for Expenses.**

(a) The Company will pay for or reimburse the reasonable expenses incurred by a director who is a party to a proceeding because the individual is or was a director of the Company in advance of final disposition of the proceeding if:

(1) the director furnishes the Company a written affirmation of the director's good faith belief that the director has met the standard of conduct described in Section 12.2; and

(2) the director furnishes the Company a written undertaking, executed personally or on the director's behalf, to repay the advance if it is ultimately determined that the director did not meet the standard of conduct.

(b) The undertaking required by Section 12.4(a)(2) must be an unlimited general obligation of the director but need not be secured and may be accepted without reference to financial ability to make repayment.

(c) Any authorization of payments under this Section 12.4 may be made by provision in the Articles of incorporation or these Bylaws, by a resolution of shareholders or board of directors or by contract.

12.5 **Determination and Authorization of Indemnification.**

(a) The Company may not indemnify a director under Section 12.2 unless authorized in the specific case after a determination has been made that indemnification of the director is permissible in the circumstances because the director has met the standard of conduct set forth in Section 12.2.

(b) A determination that indemnification of a director is permissible must be made:

(1) by the board of directors by majority vote of a quorum consisting of directors not at the time parties to the proceeding;

(2) if a quorum cannot be obtained under Section 12.5(b)(1), by a majority vote of a committee duly designated by the board of directors consisting solely of two or more directors not at the time parties to the proceeding; however, directors who are parties to the proceeding may participate in designation of the committee;

(3) by special legal counsel selected by the board of directors or its committee in the manner prescribed in Section 12.5(b)(1) or Section 12.5(b)(2) or, if a quorum of the board of directors cannot be obtained under Section 12.5(b)(1) and a committee cannot be designated under

Section 12.5(b)(2), the special legal counsel will be selected by majority vote of the full board of directors, including directors who are parties to the proceeding; or

(4) by the shareholders.

(c) Authorization of indemnification and evaluation as to reasonableness of expenses will be made in the same manner as the determination that indemnification is permissible, except that if the determination is made by special legal counsel, authorization of indemnification and evaluation as to reasonableness of expenses will be made by those entitled under Section 12.5(b)(3) to select counsel.

12.6 **Indemnification of Officers, Employees and Agents.** Unless the Articles of Incorporation provide otherwise:

(a) an officer of the Company is entitled to mandatory indemnification under Section 12.3 to the same extent as a director; and

(b) the Company may indemnify and advance expenses under this Section 12 to an officer, employee or agent of the Company to the same extent as to a director.

12.7 **Non-Exclusivity of Rights.** The indemnification and provisions for advancement of expenses provided in this Section 12 will not be deemed exclusive of any other rights to which directors, officers, employees or agents may be entitled under the Articles of Incorporation or these Bylaws, any agreement, general or specific action of the board of directors, vote of shareholders or otherwise, and will continue as to a person who has ceased to be a director, officer, employee or agent and will inure to the benefit of the heirs, executors and administrators of such a person.

12.8 **Reports to Shareholders of Indemnification.** If the Company indemnifies or advances expenses to a director under this Section 12 in connection with a proceeding by or in the right of the Company, the Company will report the indemnification or advance in writing to the shareholders with or before the notice of the next shareholders' meeting.

### SECTION 13    AMENDMENT OF ARTICLES AND BYLAWS

13.1 **Amendment by Board of Directors.**

(a) The Board of Directors may amend these Bylaws only upon a supermajority vote as required by Section 9.6.

(b) **Amendment by the Shareholders.** The Shareholders may repeal, amend or restate the Articles or Incorporation or the Bylaws at any time upon the vote of Shareholders owning at least 75% of the outstanding shares.



Exhibit 3
Page 13 of 17

36  OF  53

## SECTION 14   RECORDS

### 14.1   *Corporate Records*

(a)   The Company must keep as permanent records minutes of all meetings of its shareholders and board of directors, a record of all actions taken by the shareholders or board of directors without a meeting and a record of all actions taken by a committee of the board of directors in place of the board of directors on behalf of the Company.

(b)   The Company must maintain appropriate accounting records.

(c)   The Company or its agent must maintain a record of its shareholders, in a form that permits preparation of a list of the names and addresses of all shareholders in alphabetical order by class of shares showing the number and class of shares held by each.

(d)   The Company must maintain its records in written form or in another form capable of conversion into written form within a reasonable time.

(e)   The Company must keep a copy of the following records at its principal office or registered office:

(1)   the Articles of Incorporation or restated articles of incorporation and all amendments to them currently in effect;

(2)   these Bylaws or restated bylaws and all amendments to them currently in effect.

(3)   resolutions adopted by the board of directors creating one or more classes or series of shares and fixing their relative rights, preferences and limitations, if shares issued pursuant to those resolutions are outstanding;

(4)   the minutes of all shareholders' meetings and records of all action taken by shareholders without a meeting, for the past three years;

(5)   all written communications to shareholders generally within the past three years;

(6)   a list of the names and business addresses of its current directors and officers; and

(7)   its most recent annual report delivered to the Secretary of State under ORS 60.787.

### 14.2   Inspection of Records by Shareholders

(a)   Subject to Section 14.3(c), a shareholder of the Company is entitled to inspect and copy, during regular business hours at the Company's principal office, any of the records of the Company described in Section 14.1(e) if the shareholder gives the Company written notice of the shareholder's demand at least five business days before the date on which the shareholder wishes to inspect and copy.

(b)   A shareholder of the Company is entitled to inspect and copy, during regular business hours at a reasonable location specified by the Company, any of the following records of the Company if the shareholder meets the requirements of Section 14.2(c) and gives the Company written notice of the shareholder's demand at least five business days before the date on which the shareholder wishes to inspect and copy:

(1)   excerpts from minutes of any meeting of the board of directors, records of any action of a committee of the board of directors while acting in place of the board of directors on behalf of the Company, minutes of any meeting of the shareholders and records of action taken by the shareholders or board of directors without a meeting, to the extent not subject to inspection under Section 14.2(a);

(2)   accounting records of the Company, including tax returns; and

(3)   the record of shareholders.

(c)   A shareholder may inspect and copy the records identified in Section 14.2(b) only if:

(1)   the shareholder's demand is made in good faith and for a proper purpose;

(2)   the shareholder described with reasonable particularity the shareholder's purpose and the records the shareholder desires to inspect; and

(3)   the records are directly connected with the shareholder's purpose.

(d)   This Section 14.2 does not affect the right of a shareholder to inspect records under Section 7.1.

(e)   For purposes of this Section 14.2, "shareholder" includes a beneficial owner whose shares are held in a voting trust or by a nominee on behalf of the beneficial owner.

### 14.3   Scope of Inspection Right.

(a)   A shareholder's agent or attorney has the same inspection and copying rights as the shareholder.

(b)   The right to copy records under Section 14.2 includes, if reasonable, the right to receive copies made by photographic, xerographic or other means.

(c)   The Company may impose a reasonable charge, covering the costs of labor and material, for copies of any documents provided to the shareholder. The charge may not exceed the estimated cost of production or reproduction of the records.

(d)   The Company may comply with a shareholder's demand to inspect the record of shareholders under Section 14.2(b)(3) by providing the shareholder with a list of its shareholders that was compiled no earlier than the date of the shareholder's demand.

## SECTION 15   NOTICE

### 15.1   Written Notice. Except as provided in Section 15.3, notice under the Oregon Business Corporation Act or these Bylaws must be in writing. Notice by electronic transmission, other than voice mail, is written notice.

### 15.2   Methods of Notice.

(a)   Notice may be communicated in person, by mail or other method of delivery or by telephone or other electronic transmission, other than voice mail.

(b)   If a form of notice described in Section 15.2(a) is impracticable, notice may be communicated by a newspaper of general circulation in the area where published, or by radio, television or other form of public broadcast communication.

### 15.3   Notice by the Company to Shareholders and Directors. All notices required by the Oregon Business Corporation Act or these Bylaws by the Company to its shareholders must be in writing. Written notice by the Company to a shareholder or director, if in a comprehensible form, is effective:

(a)   upon deposit in the United States mail if it is mailed postpaid and is correctly addressed to the shareholder's address shown in the Company's current record of shareholders or the director's address shown in the Company's records.

(b)   when electronically transmitted to the shareholder in a manner authorized in writing by the shareholder; or

(c)   when electronically transmitted to the director in a manner authorized by the director.

### 15.4   Notice to the Company. Written notice to the Company or any other domestic or foreign corporation authorized to transact business in the State of Oregon may be addressed to its registered agent at its registered office or to the Company or the

domestic or foreign corporation or its president or secretary at its principal office or mailing address as shown in the records of the office of the Secretary of State.

### 15.5   When Notice is Effective. Except as otherwise provided in Section 15.3, written notice, if in a comprehensible form, is effective at the earliest of the following:

(a)   when received;

(b)   five days after its deposit in the United States mail, as evidenced by the postmark, if mailed postpaid and correctly addressed; or

(c)   on the date shown on the return receipt, if sent by registered or certified mail, return receipt requested and the receipt is signed by or on behalf of the addressee.

## SECTION 16   DEFINITIONS

All terms used in these Bylaws that are defined in the Oregon Business Corporation Act will have the meanings ascribed to them in the Oregon Business Corporation Act.

ADOPTED BY INCORPORATOR 3/21/05

EXHIBIT ____*A*____

**37** OF **53**

Exhibit 3
Page 14 of 17

## SUBSCRIPTION AGREEMENT

This Subscription Agreement ("Agreement") is agreed to by [SAMPLE] ("Subscriber") to subscribe for shares of LIGHTSPEED NETWORKS, INC., an Oregon corporation (the "Company").

### SECTION 1    DEFINITION

"Shares" means [PRO-RATED] shares of the Company's common stock.

### SECTION 2    SUBSCRIPTION

2.1    Revocation of Former Subscription Agreements. This Agreement expressly revokes the offer to sell shares in the Company under any former Subscription Agreement.

2.2    Offer to Buy Shares. Subscriber offers to buy the Shares from the Company.

2.3    Purchase Price. The purchase price for the Shares is [AMOUNT].

2.4    Payment. Subscriber will pay the purchase price for the Shares by:

(a)    delivering to the Company a certified check in the amount of [SAMPLE] upon the call of the Company which shall constitute full satisfaction of Subscriber's guarantee of the loan from CFC to NoaNet Oregon of which Company is now the holder.

(b)    transferring to the Company the personal property set forth on Schedule 2.4 upon the call of the Company;

2.5    Offer Irrevocable. Subscriber acknowledges and agrees that:

(a)    this Agreement is an irrevocable offer by Subscriber to purchase the Shares effective on the date of this Agreement; and

(b)    the Company is obligated to accept this Agreement on the condition that Subscriber qualifies as an investor and accepts form of the Articles of Incorporation and Bylaws of the Company.

2.6    Use of Proceeds. Subscriber acknowledges and agrees that:

(a)    All cash received by Company under this Agreement shall be used immediately to repay the loan from Central Electric Cooperative in the amount of $12,523,000.00 the proceeds of which were used to purchase the NoaNet Oregon / CFC loan and security agreements

1 – SUBSCRIPTION AGREEMENT

### SECTION 3.    REPRESENTATIONS, WARRANTIES, AND COVENANTS OF SUBSCRIBER

Subscriber represents, warrants, and covenants to the Company as follows:

3.1    Organization. Subscriber is a cooperative corporation duly organized and validly existing under the laws of the State of Oregon.

3.2    Authority. Subscriber has full power and authority to sign and deliver this Agreement and to perform all of Subscriber's obligations under this Agreement.

3.3    Binding Obligation. This Agreement is the legal, valid, and binding obligation of Subscriber, enforceable against Subscriber in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, or other similar laws of general application or by general principles of equity.

3.4    No Conflicts. The signing and delivery of this Agreement by Subscriber and the performance by Subscriber of all of Subscriber's obligations under this Agreement will not:

(a)    conflict with Subscriber's articles of incorporation or bylaws;

(b)    breach any agreement to which Subscriber is a party, or give any person the right to accelerate any obligation of Subscriber;

(c)    violate any law, judgment, or order to which Subscriber is subject; or

(d)    require the consent, authorization, or approval of any person, including but not limited to any governmental body.

3.5    Accredited Investor. Subscriber is an "accredited investor" as defined in Regulation D under the Securities Act of 1933. Subscriber comes within the categories set forth on Schedule 3.5.

3.6    Documents. Subscriber has received a copy of, has had a reasonable time to review, and has reviewed each document listed on Schedule 3.6.

3.7    Speculative Investment. Subscriber understands that:

(a)    the Shares are a speculative investment and involve a high degree of risk of loss of Subscriber's investment; and

(b)    Subscriber may be unable to liquidate Subscriber's investment in the Shares because the Shares are subject to substantial transfer restrictions and because no public market exists for the Shares.

2 – SUBSCRIPTION AGREEMENT

3.8    Sophistication.

(a)    Subscriber has the knowledge and experience in financial and business matters necessary to make Subscriber capable of evaluating the merits and risks of an investment in the Shares.

(b)    Subscriber has had the opportunity to ask questions and receive answers concerning the Company and the terms and conditions of the purchase of the Shares, and to obtain any additional information deemed necessary by Subscriber to evaluate the merits and risks of an investment in the Shares. Subscriber has obtained all of the information desired in connection with the Shares.

3.9    Investment Intent.

(a)    Subscriber is acquiring the Shares solely for Subscriber's own account, for investment, and not with a view to or for resale in connection with any distribution of the Shares.

(b)    Subscriber has no oral or written agreement or plan to sell, transfer, or pledge or otherwise dispose of the Shares to any person.

(c)    Subscriber understands that Subscriber must bear the economic risk of owning the Shares for an indefinite period of time.

3.10    Transfer Restrictions

(a)    Subscriber understands that the Shares have not been registered under the Securities Act of 1933 or any state securities laws and that the Company is not obligated to register the Shares.

(b)    Subscriber will not offer, sell, transfer, pledge, or otherwise dispose of the Shares unless pursuant to an effective registration statement filed under the Securities Act of 1933 and applicable state securities laws, or unless the Company receives an opinion of counsel, in form and from counsel acceptable to the Company, that the offer, sale, transfer, pledge, or other disposition is exempt from the registration requirements of the Securities Act of 1933 and applicable state securities laws.

3.11    Legends. Subscriber understands that the certificate representing the Shares will be imprinted with the following legends:

The shares represented by this certificate have not been registered under the Securities Act of 1933 or any state securities laws. No offer, sale, transfer, pledge, or other disposition of the shares represented by this certificate may be made unless pursuant to an effective registration statement filed under the Securities Act of 1933 and applicable state securities laws, or unless the

3 – SUBSCRIPTION AGREEMENT

Company receives an opinion of counsel, in form and from counsel acceptable to the Company, that the offer, sale, transfer, pledge, or other disposition is exempt from the registration requirements of the Securities Act of 1933 and applicable state securities laws.

3.12    No Assignment. Subscriber will not assign or delegate any of Subscriber's rights or obligations under this Agreement to any person.

### SECTION 4.    RELEASE AND INDEMNIFICATION

Subscriber understands that the Company is relying on Subscriber's representations, warranties, and covenants in this Agreement to issue the Shares pursuant to one or more exemptions from the registration and qualification requirements of the Securities Act of 1933 and applicable state securities laws. Subscriber releases and will defend and indemnify the Company and each present and future shareholder, director, officer, and authorized representative of the Company for, from, and against any and all claims, actions, proceedings, damages, liabilities, and expenses of every kind, whether known or unknown, including but not limited to reasonable attorney's fees, resulting from or arising out of a breach by Subscriber of any representation, warranty, or covenant in this Agreement.

### SECTION 5.    GENERAL

5.1    Amendment. This Agreement may be amended only by a written document signed by the party against whom enforcement is sought.

5.2    Waiver. No waiver will be binding on a party unless it is in writing and signed by the party making the waiver. A party's waiver of a breach of a provision of this Agreement will not be a waiver of any other provision or a waiver of a subsequent breach of the same provision.

5.3    Severability. If a provision of this Agreement is determined to be unenforceable in any respect, the enforceability of the provision in any other respect and of the remaining provisions of this Agreement will not be impaired.

5.4    Further Assurances. The parties will sign other documents and take other actions reasonably necessary to further effect and evidence this Agreement.

5.5    Attachments. Any exhibits, schedules, and other attachments referenced in this agreement are part of this Agreement.

5.6    Governing Law. This Agreement is governed by the laws of the State of Oregon, without giving effect to any conflict-of-law principle that would result in the laws of any other jurisdiction governing this Agreement.

5.7    Venue. Any action or proceeding arising out of this Agreement will be litigated in courts located in Deschutes County, Oregon. Each party consents and submits to the jurisdiction of any local, state, or federal court located in Deschutes County, Oregon.

EXHIBIT    A

4 – SUBSCRIPTION AGREEMENT

38    OF    53

Exhibit 3
Page 15 of 17

5.8   Attorney's Fees  If any arbitration or litigation is instituted to interpret, enforce, or rescind this Agreement, including but not limited to any proceeding brought under the United States Bankruptcy Code, the prevailing party on a claim will be entitled to recover with respect to the claim, in addition to any other relief awarded, the prevailing party's reasonable attorney's fees and other fees, costs, and expenses of every kind, including but not limited to the costs and disbursements specified in ORCP 68 A(2), incurred in connection with the arbitration, the litigation, any appeal or petition for review, the collection of any award, or the enforcement of any order, as determined by the arbitrator or court.

5.9   Entire Agreement  This Agreement contains the entire understanding of the parties regarding the subject matter of this Agreement, and supersedes all prior and contemporaneous negotiations and agreements, whether written or oral, between the parties with respect to the subject matter of this Agreement.

5.10  Signatures.  This Agreement may be signed in counterparts.  A fax transmission of a signature page will be considered an original signature page.  At the request of a party, a party will confirm a fax-transmitted signature page by delivering an original signature page to the requesting party.

5.11  Termination of Subscription Agreement.  This offer to sell shares of common stock in the Company shall automatically terminate on Wednesday, April 6, 2005, at 5:00 p.m. PST unless accepted before that time by signing and faxing this agreement to Francis Hansen & Martin LLP at (541) 382-7068.

[Signature Page Follows]

Dated effective  April 2, 2005

*Subscriber:*

[SAMPLE]

By:_____

ADDRESS

State of organization  Oregon

Employer ID number:  _____

Accepted by: LIGHTSPEED NETWORKS, INC.
on _____, 2005

By:_____
    Al Gonzalez, Chairman of the Board

5 – SUBSCRIPTION AGREEMENT

6 – SUBSCRIPTION AGREEMENT

SCHEDULE 2.4

Payment

Personal Property

Assignment of all subrogation rights against NoaNet Oregon which arise out of payment of the guarantee of the loan agreement between NoaNet Oregon and CFC which is now held by Lightspeed Networks, Inc.

SCHEDULE 3.5

Accredited Investor

1.   A corporation with total assets in excess of $5,000,000.

1 – SCHEDULE 2.4  PAYMENT

1 – SCHEDULE 3.5  ACCREDITED INVESTOR

EXHIBIT ___A___

Exhibit 3
Page 16 of 17

_39_ OF _53_

SCHEDULE 3.6

Documents

1   Articles of Incorporation of the Company, dated March 16, 2005, to be filed with the
     Oregon Secretary of State

2   Bylaws of the Company adopted by incorporator on March 21, 2005

1 – SCHEDULE 3.6  DOCUMENTS

EXHIBIT   _A_

_40_  OF  _53_   Exhibit 3
                  Page 17 of 17

-----Original Message-----
**From:** Gregory J. Stuman, Esq. [mailto:greg@francishansen.com]
**Sent:** Monday, April 04, 2005 1:26 PM
**To:** agonzalez@cec-co.com; steve.eldrige@ueinet.com; johng@hrec.coop; dsabala@douglaselectric.com; robert@vannattabros.com; galdridge@cedco.net; bshreve@cedco.net; wbuehler@cooscurryelectric.com
**Cc:** meh@francishansenmartin.com; kkennedy@orcacomm.com; lorenzen@corey-byler.com; v_and_a@earthlink.net; pnilsen@douglascountylaw.com; greg@francishansen.com; mgh@hanlonlaw.com
**Subject:** Lightspeed Networks, Inc. - Demand for Payment in Full of NoaNet Loan

Al Gonzalez - Central Electric Cooperative & Counsel
Steve Eldrige - Umatilla Electric Cooperative & Counsel
Dave Sabala - Douglas Electric Cooperative & Counsel
John Gerstenberger - Hood River Electric Cooperative & Counsel
Greg Aldridge - Coquille Economic Development Corporation & Counsel
Robert VanNatta - Western Oregon Electric Cooperative & Counsel
Werner Buehler - Coos Curry Electric Cooperative & Counsel

Gentlemen,

Please find enclosed with this email a package containing the following documents:

1.  Demand for Payment of NoaNet Loan to Lightspeed;
2.  Bill of Sale transferring NoaNet assets to Lightspeed;
3.  Assignment of Contracts to Lightspeed;
4.  Board Resolution authorizing transfer of assets to Lightspeed; and
5.  Minutes of Member Meeting approving transfer of assets to Lightspeed.

If you have any questions regarding this matter please contact Martin Hansen via email at meh@francishansen.com or at the numbers listed below.

Sincerely,
FRANCIS HANSEN & MARTIN LLP
Gregory J. Stuman, Esq.

_____

1148 NW Hill Street
Bend, Oregon 97701
Tel. (541) 389-5010
Fax (541) 382-7068

EXHIBIT _____ *A*

_____ *4/* _ OF _ *53* _____   Exhibit 4
                                Page 1 of 11

# FRANCIS HANSEN & MARTIN, LLP

C. E. "Win" Francis
Martin E. Hansen*
Gerald A. Martin

Attorneys at Law
1148 NW Hill Street
Bend, Oregon 97701-1914

Michael H. McGean
Gregory J. Stuman †

Tel (541) 389-5010
Fax (541) 382-7068

*Admitted in Oregon and Washington          www.francishansenmartin.com          † Admitted in Oregon and California

April 4, 2005

## Via Federal Express and Regular Mail
## Facsimile and E-mail

Northwest Open Access Network
Attn: Jim Arntz
777 13th Street SE, Ste. 120
Salem, OR 97301

Umatilla Electric Cooperative, Inc.
Attn: M. Steve Eldrige
750 W. Elm Avenue
Hermiston, OR 97838

Hood River Electric Cooperative
Attn: John Gerstenberger
204 East 4th Street
The Dalles, OR 97058

Douglas Electric Cooperative, Inc.
Attn: Dave Sabala, General Manager
1981 NE Stephens Road
Roseburg, OR 97470

West Oregon Electric Cooperative, Inc.
Attn: Robert VanNatta
715 Maple Street
Vernonia, OR 97064

Central Electric Cooperative
Attn: Al Gonzalez
2097 North Hwy. 97
Redmond, OR 97756

Coos-Curry Electric Cooperative, Inc.
Attn: Werner Buehler
43050 Highway 101
Port Orford, OR 97465

Re:    Notice of Default and Demand for Payment

Dear Borrower and Guarantors:

Our office represents Central Electric Cooperative, Inc.  CEC is currently the sole owner and shareholder in a corporation known as Lightspeed Networks, Inc.  On March 25, 2005, Lightspeed Networks, Inc., purchased all right, title and interest in that certain loan agreement formerly owned by National Rural Utilities Cooperative Finance Corporation (CFC) dated February 7, 2002.  Lightspeed

EXHIBIT    *A*

*42* OF *53*

Exhibit 4
Page 2 of 11

Re: Notice of Default and Demand for Payment
April 4, 2005
Page 2

Networks, Inc. owns not only the loan instrument but all security and collateral instruments together with all guarantees executed as part of that loan agreement.

The CFC loan agreement now owned by Lightspeed Networks, Inc., became due and payable on April 1, 2005. That loan was not paid as required at that time and the purpose of this letter is to notify Northwest Open Access Network Oregon and all of its guarantors that this loan is hereby declared in default and is now fully due and payable to Lightspeed Networks, Inc.

The balance owing on this loan agreement as of Wednesday, April 6, 2005, is $12,538,770.33. Lightspeed Networks, Inc., hereby issues demand that this loan be paid in full by no later than 5:00 p.m. April 6, 2005.

Under the loan instrument and security agreements, demand is hereby made that Northwest Open Access Network Oregon transfer all right, title and interest in all of its corporate assets to Lightspeed Networks, Inc., by no later than Wednesday, April 6, 2005. Enclosed with this letter is a bill of sale and assignment agreement to be executed by NoaNet Oregon and each of its members to transfer all of NoaNet's assets to Lightspeed Networks, Inc. Also enclosed you will find a resolution for execution by the Board of NoaNet Oregon authorizing the transfer of these assets to Lightspeed Networks, Inc., and an approval by the members of NoaNet Oregon.

Upon our receipt of the fully executed documents enclosed herein, NoaNet's loan will be credited $2,507,754.00. This will leave outstanding a deficiency balance of $10,031,016.00 to be paid by the guarantors.

This letter serves as formal demand that each of the guarantors listed below pay Lightspeed Networks, Inc., each of their guarantees in accordance with the terms of those guarantees. Demand is hereby made that each of the guarantors pay the amounts covered in this guaranty to Lightspeed Networks, Inc., by no later than April 6, 2005.

Should the transfer of assets and payment of guarantees not be fulfilled by 5:00 p.m. Wednesday, April 6, 2005 as hereby demanded, this letter serves as formal notice that Lightspeed Networks, Inc., will immediately commence foreclosure actions against NoaNet Oregon and each of its guarantors for payment of this loan under the terms of the loan instrument. You should be aware that each of you will be assessed the cost and expenses, including reasonable attorneys fees incurred, in that foreclosure.

-2-

EXHIBIT    *A*

*43* OF *53*    Exhibit 4
Page 3 of 11

Re:  Notice of Default and Demand for Payment
April 4, 2005
Page 3

If any of you have a question concerning this matter, you should have your
attorney contact me directly.

Sincerely,


MARTIN E. HANSEN

MEH:ph

enclosures / Bill of Sale
             Resolution
             Assignment Agreement
             Approval of Transfer


G/CEC-Lightspeed/NtcDefaultDmdLtr 4.4.05

-3-

EXHIBIT  *A*

*44* OF *53*

Exhibit 4
Page 4 of 11

## BILL OF SALE

1. **Transfer.** NORTHWEST OPEN ACCESS NETWORK OREGON, an Oregon cooperative corporation ("NoaNet") transfers and assigns to LIGHTSPEED NETWORKS, INC., an Oregon corporation ("Lightspeed") all right, title and interest in the assets set forth on the attached Schedule 1 (the "Assets").

2. **Consideration.** NoaNet makes this transfer in consideration of Lightspeed foregoing the foreclosure on all of NoaNet's assets pursuant to the loan and security agreements which are currently in default. Lightspeed accepts the transfer of all NoaNet assets at a value of $2,507,758.00 and will credit the NoaNet loan in that amount.

3. **Warranty.** NoaNet warrants to Lightspeed that NoaNet has good title to the Assets, and that NoaNet conveys the Assets to Lightspeed free from any restriction or condition, and free from any encumbrance, including but not limited to any security interest or lien, other than the security interests and liens of Lightspeed. NoaNet will defend title to the Assets against the rightful claim of any person. NoaNet warrants to Lightspeed that the Assets are free from material defects and are in good operating condition and repair, reasonable wear and tear excepted.

4. **Attachments.** Any exhibits, schedules, or other attachments referenced in this Bill of Sale are part of this Bill of Sale.

5. **Governing Law.** This Bill of Sale is governed by the laws of the State of Oregon, without giving effect to any conflict-of-law principle that would result in the laws of any other jurisdiction governing this Bill of Sale.

6. **Venue.** Any action or proceeding arising out of this Bill of Sale will be litigated in courts located in Deschutes County, Oregon. Each party consents and submits to the jurisdiction of any court located in Deschutes County, Oregon.

7. **Attorney's Fees.** If any arbitration or litigation is instituted to interpret, enforce, or rescind this Bill of Sale, including but not limited to any proceeding brought under the United States Bankruptcy Code, the prevailing party on a claim will be entitled to recover with respect to the claim, in addition to any other relief awarded, the prevailing party's reasonable attorney's fees and other fees, costs, and expenses of every kind, including but not limited to the costs and disbursements specified in ORCP 68 A(2), incurred in connection with the arbitration, the litigation, any appeal or petition for review, the collection of any award, or the enforcement of any order, as determined by the arbitrator or court.

8. **Further Assurances.** NoaNet covenants that at any time and from time to time, on written request by Lightspeed, NoaNet will execute and deliver to Lightspeed any new or confirmatory instruments or documents that Lightspeed may reasonably request in order to fully give effect to this Agreement, and to protect Lightspeed's right, title, and interest in and to the Assets or to otherwise realize or enjoy such rights in and to the Assets,

including providing Lightspeed with a full inventory of all Assets within 7 days of the execution of this Bill of Sale.

9. **Lightspeed's Acceptance.** Lightspeed accepts the Assets subject to the terms and conditions in this Bill of Sale.

Dated effective: April 4, 2005

**NoaNet Oregon:**

NORTHWEST OPEN ACCESS NETWORK, OREGON

By: _____
Its: _____

**Lightspeed:**

LIGHTSPEED NETWORKS, INC.

By: Al Gonzalez
Its: President

EXHIBIT A

45 OF 53

Exhibit 4
Page 5 of 11

# SCHEDULE 1

## Assets

1. All right, title and interest of the NoaNet Oregon in and in all assets, plants and facilities now owned by the NoaNet Oregon, or hereafter constructed or acquired by the NoaNet Oregon, wherever located, then in and in all extensions and improvements thereof and additions thereto, including any and all other property of every kind, nature and description, used, useful or required from its use by the NoaNet Oregon in connection with the NoaNet Oregon's business.

2. All right, title and interest of the NoaNet Oregon in, to and under any and all grants, privileges, rights of way and easements now owned, held, leased, enjoyed or exercised, or which may hereafter be owned, held, leased, required, enjoyed or exercised, by the NoaNet Oregon for the purposes of, or in connection with, the construction or operation by or on behalf of the NoaNet Oregon of its facilities or business wherever located.

3. All right, title and interest of the NoaNet Oregon in, to and under any and all licenses, franchises, ordinances, privileges and permits heretofore granted, issued or executed by the United States of America, or by any state, or by any county, township, municipality, village or other political subdivision thereof, or by any agency, board, commission or department of any of the foregoing, authorizing the construction, acquisition or operation of the NoaNet Oregon's facilities or business, insofar as the same may by law be assigned, granted, bargained, sold, conveyed, transferred, mortgaged or pledged.

4. All right, title and interest of the NoaNet Oregon in, to and under all personal and fixture property of every kind and nature including without limitation, all goods (including inventory, equipment and any accessions thereto), instruments (including promissory Note), documents, accounts, chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, supporting obligations, any other contract rights or rights to the payment of money, insurance claims and proceeds, tort claims, and all general intangibles including, without limitation, all payment intangibles, patents, patent applications, trademarks, trademark applications, trade names, copyrights, copyright applications, software, engineering drawings, service marks, service mark applications, customer lists, goodwill, trade secrets, tax refunds and tax refund claims, monies due or recoverable from pension funds, and all licenses, permits, agreements of any kind or nature pursuant to which the NoaNet Oregon possesses, uses or has authority to possess or use property (whether tangible or intangible) of others or others possess, use or have authority to possess or use property (whether tangible or intangible) of the NoaNet Oregon, and all recorded data of any kind or nature, regardless of the medium of recording including, without limitation, all software, writings, plans, specifications and schematics (as such terms are defined in the applicable Uniform Commercial Code provided, however, that the term "instrument"

ASSETS – SCHEDULE 1 – 1

shall be such term as defined in Article 9 of the applicable Uniform Commercial Code rather than Article 3).

5. All right, title and interest of the NoaNet Oregon in, to and under all stock, bonds, Note, debentures, commercial paper, securities, obligations of any corporation, association, partnership, limited liability company, joint venture, trust, government or any agency or department thereof of any other entity of any kind, and all equity or beneficial interests in, to and under any of the foregoing described entities.

6. All right, title and interest of the NoaNet Oregon in, to and under any and all agreements, leases or contracts heretofore or hereafter executed by and between the NoaNet Oregon and any person, firm or corporation relating to the Assets (including leasing contracts for the lease, occupancy or sale of the Assets, or any portion thereof).

7. All right, title and interest of the NoaNet Oregon in, to and under any and all books, records, and correspondence relating to the Assets, including, but not limited to, all records, ledgers, leases and computer and automatic machinery software and programs, including without limitation, programs, databases, disc or tape files and automatic machinery, print outs, runs and other computer prepared information including, summarizing, evidencing or otherwise necessary or helpful in the collection of or realization on the Assets.

8. Together with all rents, income, revenues, profits, cash, proceeds and benefits at any time derived, received or had from any and all of the above-described property or business operations of the NoaNet Oregon, to the fullest extent permitted by law.

ASSETS – SCHEDULE 1 – 2

EXHIBIT A   46 OF 53

Exhibit 4
Page 6 of 11

# ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement ("Agreement") is between NORTHWEST OPEN ACCESS NETWORK OREGON, an Oregon cooperative corporation ("NoaNet Oregon") and LIGHTSPEED NETWORKS, INC., an Oregon corporation ("Lightspeed").

## RECITALS

A. NoaNet Oregon has rights and obligations under certain contracts.

B. NoaNet Oregon desires to transfer all of its assets to Lightspeed in lieu of foreclosure by Lightspeed.

C. NoaNet Oregon desires to assign NoaNet Oregon's rights under the contracts to Lightspeed, and Lightspeed desires to assume NoaNet Oregon's obligations under the contracts.

## AGREEMENT

### SECTION 1    DEFINITION

"Contracts" means the contracts listed on Schedule 1.

"Knowledge" means, with respect to NoaNet Oregon, the actual knowledge of NoaNet Oregon, and any knowledge that NoaNet Oregon would have obtained if NoaNet Oregon had conducted a reasonably comprehensive investigation of the relevant matter.

"Third Party" means any person other than NoaNet Oregon that is a party to any Contract.

### SECTION 2    ASSIGNMENT AND ASSUMPTION

2.1  **Assignment**  NoaNet Oregon assigns and transfers to Lightspeed all of NoaNet Oregon's rights under each Contract.

2.2  **Assumption**  Lightspeed assumes all of NoaNet Oregon's obligations under each Contract arising after the date of this Agreement.

2.3  **Consideration.**  NoaNet Oregon makes this transfer in consideration of Lightspeed foregoing the foreclosure on all of NoaNet Oregon's assets pursuant to the loan and security agreements which are currently in default. Lightspeed accepts the transfer of all NoaNet assets at a value of $2,507,754.00 and will credit the NoaNet loan in that amount.

EXHIBIT ___A___

___47___ OF ___53___

Exhibit 4
Page 7 of 11

1 – ASSIGNMENT AND ASSUMPTION AGREEMENT

---

## SECTION 3    REPRESENTATIONS AND WARRANTIES OF NOANET OREGON

NoaNet Oregon represents and warrants to Lightspeed as follows:

3.1  **Contracts.**  NoaNet Oregon has delivered to Lightspeed a complete and accurate copy of each Contract, including all amendments and assignments. No other written or oral agreement related to any Contract exists between NoaNet Oregon and any other person.

3.2  **Title.**  NoaNet Oregon has good title to NoaNet Oregon's rights under each Contract, free from all liens, mortgages, pledges, security interests, and other encumbrances.

3.3  **Full Force and Effect.**  To NoaNet Oregon's Knowledge, each Contract is in full force and effect and no Contract has become invalid or unenforceable.

3.4  **Performance of Obligations.**

(a)  NoaNet Oregon has performed all of NoaNet Oregon's obligations under each Contract;

(b)  no event has occurred or circumstances exist that will likely:

    (1)  result in NoaNet Oregon's failure to perform any obligation of NoaNet Oregon under any Contract, or

    (2)  give any Third Party the right to terminate the Third Party's Contract or accelerate any obligation of NoaNet Oregon under the Third Party's Contract;

(c)  NoaNet Oregon has not received any notice from any Third Party regarding any actual, alleged, or potential failure by NoaNet Oregon to perform any obligation of NoaNet Oregon under the Third Party's Contract;

(d)  to NoaNet Oregon's Knowledge:

    (1)  each Third Party has performed all of the Third Party's obligations under the Third Party's Contract; and

    (2)  no event has occurred or circumstances exist that will likely result in any Third Party's failure to perform any obligation of the Third Party under the Third Party's Contract; and

(e)  NoaNet Oregon's rights under each Contract are assignable by NoaNet Oregon to Lightspeed without the consent of any person.

3.5  **No Waiver.**  NoaNet Oregon has not waived any right or remedy available to NoaNet Oregon under any Contract.

3.6 **Payments**

(a) Each Third Party has made all payments required to be made by the Third Party under the Third Party's Contract through the date of this Agreement.

3.7 **Offsets** No Third Party is entitled to any refund, deduction, or offset against any payment required to be made by the Third Party under the Third Party's Contract.

**SECTION 4     INDEMNIFICATION**

4.1 **NoaNet Oregon's Indemnification** NoaNet Oregon will defend and indemnify Lightspeed for, from, and against any and all claims, actions, proceedings, damages, liabilities, and expenses of every kind, whether known or unknown, including but not limited to reasonable attorney's fees, resulting from or arising out of:

(a) NoaNet Oregon's breach of any representation or warranty in this Agreement; or

(b) NoaNet Oregon's obligations under the Contracts arising on or before the date of this Agreement.

**SECTION 5     GENERAL**

5.1 **Binding Effect** This Agreement will be binding on the parties and their respective heirs, personal representatives, successors, and permitted assigns, and will inure to their benefit.

5.2 **Severability** If a provision of this Agreement is determined to be unenforceable in any respect, the enforceability of the provision in any other respect and of the remaining provisions of this Agreement will not be impaired.

5.3 **Further Assurances** The parties will sign other documents and take other actions reasonably necessary to further effect and evidence this Agreement.

5.4 **Attachments** Any exhibits, schedules, and other attachments referenced in this Agreement are part of this Agreement.

5.5 **Governing Law** This Agreement is governed by the laws of the State of Oregon, without giving effect to any conflict-of-law principle that would result in the laws of any other jurisdiction governing this Agreement.

5.6 **Venue** Any action or proceeding arising out of this Agreement will be litigated in courts located in Deschutes County, Oregon. Each party consents and submits to the jurisdiction of any court located in Deschutes County, Oregon.

5.7 **Attorney's Fees** If any arbitration or litigation is instituted to interpret, enforce, or rescind this Agreement, including but not limited to any proceeding brought under

the United States Bankruptcy Code, the prevailing party on a claim will be entitled to recover with respect to the claim, in addition to any other relief awarded, the prevailing party's reasonable attorney's fees and other fees, costs, and expenses of every kind, including but not limited to the costs and disbursements specified in ORCP 68 A(2), incurred in connection with the arbitration, the litigation, any appeal or petition for review, the collection of any award, or the enforcement of any order, as determined by the arbitrator or court.

5.8 **Entire Agreement** This Agreement, the Bill of Sale, and the Foreclosure Agreement contain the entire understanding of the parties regarding the subject matter of this Agreement, the Bill of Sale and the Purchase Agreement and supersede all prior and contemporaneous representations and agreements, whether written or oral, between the parties with respect to the subject matter of this Agreement and the Purchase Agreement.

5.9 **Signatures** This Agreement may be signed in counterparts. A fax transmission of a signature page will be considered an original signature page. At the request of a party, the other party will confirm a fax-transmitted signature page by delivering an original signature page to the requesting party.

Dated effective: April 1, 2005

**NoaNet Oregon:**

NORTHWEST OPEN ACCESS NETWORK OREGON

By: _____
Its: _____

**Lightspeed:**

LIGHTSPEED NETWORKS, INC.

By: Al Gonzalez
Its: President

3 - ASSIGNMENT AND ASSUMPTION AGREEMENT

4 - ASSIGNMENT AND ASSUMPTION AGREEMENT

EXHIBIT A

48 OF 53

Exhibit 4
Page 8 of 11

## MINUTES OF SPECIAL MEETING
### AND RESOLUTION OF
### BOARD OF DIRECTORS OF
### NORTHWEST OPEN ACCESS NETWORK OREGON

A special meeting of the board of directors of Northwest Open Access Network, Oregon ("NoaNet"), an Oregon cooperative corporation, was held at 6:00 p.m. on April 4, 2005, at Portland, Oregon.

The following directors were present at the meeting:

**Steve Eldridge of Umatilla Electric Cooperative**
**Robert VanSanten of West Oregon Electric Cooperative**
**John Gerstenberger of Hood River Electric Cooperative**
**Dave Sabala of Douglas Electric Cooperative**
**Greg Aldridge of Coquille Economic Development Corporation**

The following directors were absent from the meeting.

**NONE.**

The following individuals also were present at the meeting:

**Warren Miller, President of NoaNet**

The chair noted that Al Gonzalez of Central Electric Cooperative has resigned from his seat on the board, effective April 4, 2005, at 9:00 a.m.

The chair announced that notice of this meeting was given of the regularly scheduled meeting of the NoaNet board of directors which was held on April 1, 2005. A motion was made to accept the notice of the meeting which was seconded, and unanimously carried, and is made a part of these minutes.

It was then moved, seconded, and resolved to dispense with the reading of the minutes of the last meeting.

### Transfer of Assets in Lieu of Foreclosure

The chair then introduced the matter of the NoaNet secured loan from CFC. The chair informed the board that Lightspeed Networks, Inc. had purchased the loan from CFC and that demand had been made for payment of the full balance of the loan in the amount of $12,538,770.13. The chair also explained that NoaNet was unable to repay this obligation. The chair further explained that Lightspeed was willing to forego foreclosing on all assets of NoaNet in consideration of NoaNet transferring its assets to Lightspeed at a value of $2,807,754.00. On motion duly made,

-1-

---

## SCHEDULE 1

### Contracts

1. NoaNet Oregon License Agreement with Bonneville Power Administration dated February 7, 2002.
2. NoaNet Oregon Agreement for Communication Transport Services with Central Electric Cooperative, Inc.
3. NoaNet Oregon Agreement for Communication Transport Services with Douglas Services, Inc.
4. NoaNet Oregon Agreement for Communication Transport Services with Hood River Electric Cooperative.
5. NoaNet Oregon Agreement for Communication Transport Services with South Coast Satellite Cooperative, Inc.
6. Agreement for Communication Transport Services with Tribal One Broadband Technologies, LLC.
7. NoaNet Oregon Agreement for Communication Transport Services with West Oregon Electric Cooperative.
8. NoaNet Oregon Agreement for Communication Transport Services with Umatilla Electric Cooperative Association.
9. NoaNet Oregon Non-member Participation Agreement with Frontier TeleNet.
10. Assignment of NoaNet Oregon Non-member Participation Agreement with City of Monmouth, Oregon.

1 – SCHEDULE 1 CONTRACTS

EXHIBIT *A*

49 OF 53

Exhibit 4
Page 9 of 11

MINUTES OF SPECIAL MEETING
OF THE MEMBERS OF
NORTHWEST OPEN ACCESS NETWORK OREGON
APPROVING TRANSFER OF ASSETS

A special meeting of the members of Northwest Open Access Network Oregon, an Oregon cooperative corporation ("NoaNet"), was held on April 4, 2005, at Portland, Oregon.

The following members were present at the meeting, in person or by telephone conference call, representing the full membership of the cooperative:

**Central Electric Cooperative by Al Gonzalez, President**
**Umatilla Electric Cooperative by Steve Eldridge, President**
**West Oregon Electric Cooperative by Robert VanNatta, Vice-President**
**Hood River Electric Cooperative by John Gerstenberger, Manager**
**Douglas Electric Cooperative by Dave Sabala, Manager**
**Coquille Economic Development Corporation by Greg Aldridge, Vice President**

The Chairman of NoaNet called the meeting to order and announced that a quorum was present and that the meeting was held pursuant to a waiver of notice under Section 2.3(a) of the Bylaws by the unanimous consent of the members at a meeting on April 1, 2005.

It was then moved, seconded, and unanimously resolved to dispense with the reading of the minutes of the last meeting.

**Transfer of Assets in Lieu of Foreclosure**

The Chairman then announced that the next order of business was approval by the shareholders of the deeding assets to Lightspeed Networks, Inc. in lieu of foreclosure on all NoaNet Assets.

The Chairman informed the members that Lightspeed Networks, Inc. has purchased the loan from CFC to NoaNet, including all security agreements, that the loan is due in full in the amount of $12,538,770.33 and that NoaNet is unable to repay this loan.  The Chairman also informed the members Lightspeed is willing to forego the foreclosure process on NoaNet's assets in consideration of deeding all of NoaNet's assets and contracts to Lightspeed at a valuation of $2,507,754.00.

-1-

---

seconded, and carried, the board adopted the following resolutions:

WHEREAS the board has reviewed and considered the terms and conditions of the offer of Lightspeed Networks, Inc. to accept transfer of all of NoaNet's assets in lieu of foreclosure and at a value of $2,507,754.00; and

WHEREAS the board believes that the approval of the Lightspeed Networks, Inc. offer to accept transfer of assets in lieu of foreclosure is in the best interests of the corporation, and that the valuation of the assets of NoaNet of $2,507,754.00 is reasonable.

In view of the above, it is

RESOLVED that the offer of Lightspeed Networks, Inc. to forego foreclosure and to accept transfer of all of NoaNet's assets at a valuation of $2,507,754.00 is approved

RESOLVED FURTHER that the officers of the corporation are authorized to execute the Bill of Sale and Assignment of Contracts forms provided by Lightspeed Networks, Inc., which transfers all of the assets of NoaNet to Lightspeed Networks, Inc.  The Secretary is directed to file a copy of the executed employment agreement in the minute book of the corporation immediately following the adoption of the minutes of this meeting.

There being no further business to come before the meeting, the meeting was duly adjourned

DATED: _____

_____
Secretary

-2-

EXHIBIT    _A_

_60_ - 0↑ - _53_

Exhibit 4
Page 10 of 11

After discussion, the members approved the transfer of all NeoNet assets to Lightspeed Networks, Inc. at a valuation of $2,507,754.00, by the following vote:

| YES | NO | MEMBER |
|-----|-----|--------|
| [X] | — | Central Electric Cooperative |
| — | — | Umatilla Electric Cooperative |
| — | — | West Oregon Electric Cooperative |
| — | — | Hood River Electric Cooperative |
| — | — | Douglas Electric Cooperative |
| — | — | Coquille Economic Development Corporation |

There being no further business to come before the meeting, on motion duly made, seconded, and adopted, the meeting was adjourned.

DATED: _____

_____
Secretary

-2-

EXHIBIT _A_

51 OF 53

Exhibit 4
Page 11 of 11

# FRANCIS HANSEN & MARTIN, LLP

C. E. "Win" Francis
Martin E. Hansen*
Gerald A. Martin

Attorneys at Law
1148 NW Hill Street
Bend, Oregon 97701-1914

Michael H. McGean
Gregory J. Sturman †

Tel (541) 389-5010
Fax (541) 382-7068

*Admitted in Oregon and Washington          www.francishansenmartin.com          † Admitted in Oregon and California

April 8, 2005

## VIA FACSIMILE and OVERNIGHT MAIL

Coos-Curry Electric Cooperative, Inc.
c/o Michael Hanlon, Attorney at Law
1300 Congress Center
1001 SW 5th Avenue
Portland, OR 97204

RE:    Lightspeed Networks, Inc. v. Coos-Curry Electric Cooperative Inc.
       Our File No. 05-186

Dear Mr. Hanlon:

Our office represents Lightspeed Networks, Inc., who is the owner of the Loan
and Guarantee obligation Coos-Curry Electric Cooperative, Inc. formerly had with
CFC.

As you know from prior correspondence, the CFC loan matured and was not
paid. When the loan was matured and left unpaid, the Guarantee Agreement of
Coos-Curry Electric Cooperative, Inc. became immediately due and payable.

The purpose of this letter is to demand full payment from Coos-Curry Electric,
Inc. for the amount covered by its Guarantee Agreement dated February 7, 2002.
There is now due and payable from Coos-Curry Electric, Inc. to Lightspeed
Networks, Inc. the sum of $1,495,098.23 together with interest thereon from
Friday, April 8, 2005 until paid. The per diem accruing on this Guarantee is
$210.13.

Unless this Guarantee is paid in full by no later than Tuesday, April 12, 2005, suit
will be instituted against Coos-Curry Electric Cooperative, Inc. for payment of this
amount and

EXHIBIT    *A*

*52* OF *53*
Exhibit 5
Page 1 of 2

Coos-Curry Electric Cooperative, Inc.
c/o Michael Hanlon, Attorney at Law
RE:    Lightspeed Networks, Inc. v. Coos-Curry Electric Cooperative Inc.
April 8, 2005
Page Two

all accrued interest. You should be aware that your client will be assessed all
costs, expenses and attorney fees incurred in that collection action.

If you have any questions concerning this, contact me directly.

Sincerely,

MARTIN E. HANSEN

MEH/lko

cc:    Al Gonzalez

EXHIBIT    _A_

**FORM D**

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Expires: | May 31, 2005 |
| Estimated average burden hours per response......16.00 | |

# FORM D

## NOTICE OF SALE OF SECURITIES PURSUANT TO REGULATION D, SECTION 4(6), AND/OR UNIFORM LIMITED OFFERING EXEMPTION

| SEC USE ONLY | |
|---|---|
| Prefix | Serial |
| DATE RECEIVED | |

Name of Offering    ( ☐ check if this is an amendment and name has changed, and indicate change.)
LIGHTSPEED NETWORKS, INC., INITIAL PRIVATE OFFERING

Filing Under (Check box(es) that apply).    ☐ Rule 504    ☐ Rule 505    ☑ Rule 506    ☐ Section 4(6)    ☐ ULOE

Type of Filing:    ☑ New Filing    ☐ Amendment

---

### A. BASIC IDENTIFICATION DATA

1.    Enter the information requested about the issuer

Name of Issuer    ( ☐ check if this is an amendment and name has changed, and indicate change.)
LIGHTSPEED NETWORKS, INC.

| Address of Executive Offices    (Number and Street, City, State, Zip Code) | Telephone Number (Including Area Code) |
|---|---|
| 777 13TH Street SE, Suite 120, Salem, OR 97301 | (503) 566-6602 |
| Address of Principal Business Operations    (Number and Street, City, State, Zip Code) (if different from Executive Offices) | Telephone Number (Including Area Code) |
| N/A | |

Brief Description of Business
Telecommunications - Internet Backbone

Type of Business Organization
☑ corporation    ☐ limited partnership, already formed    ☐ other (please specify):
☐ business trust    ☐ limited partnership, to be formed

Actual or Estimated Date of Incorporation or Organization:   Month [0 3]   Year [0 5]   ☑ Actual   ☐ Estimated

Jurisdiction of Incorporation or Organization: (Enter two-letter U.S. Postal Service abbreviation for State;
CN for Canada; FN for other foreign jurisdiction)    [O R]

### GENERAL INSTRUCTIONS

**Federal:**

*Who Must File:* All issuers making an offering of securities in reliance on an exemption under Regulation D or Section 4(6), 17 CFR 230.501 et seq. or 15 U.S.C. 77d(6).

*When To File:* A notice must be filed no later than 15 days after the first sale of securities in the offering. A notice is deemed filed with the U.S. Securities and Exchange Commission (SEC) on the earlier of the date it is received by the SEC at the address given below or, if received at that address after the date on which it is due, on the date it was mailed by United States registered or certified mail to that address.

*Where To File:* U.S. Securities and Exchange Commission, 450 Fifth Street, N.W., Washington, D.C. 20549.

*Copies Required:* Five (5) copies of this notice must be filed with the SEC, one of which must be manually signed. Any copies not manually signed must be photocopies of the manually signed copy or bear typed or printed signatures.

*Information Required:* A new filing must contain all information requested. Amendments need only report the name of the issuer and offering, any changes thereto, the information requested in Part C, and any material changes from the information previously supplied in Parts A and B. Part E and the Appendix need not be filed with the SEC.

*Filing Fee:* There is no federal filing fee.

**State:**

This notice shall be used to indicate reliance on the Uniform Limited Offering Exemption (ULOE) for sales of securities in those states that have adopted ULOE and that have adopted this form. Issuers relying on ULOE must file a separate notice with the Securities Administrator in each state where sales are to be, or have been made. If a state requires the payment of a fee as a precondition to the claim for the exemption, a fee in the proper amount shall accompany this form. This notice shall be filed in the appropriate states in accordance with state law. The Appendix to the notice constitutes a part of this notice and must be completed.

─── **ATTENTION** ───

**Failure to file notice in the appropriate states will not result in a loss of the federal exemption. Conversely, failure to file the appropriate federal notice will not result in a loss of an available state exemption unless such exemption is predicated on the filing of a federal notice.**

EXHIBIT B

| A. BASIC IDENTIFICATION DATA |
|---|

2.   Enter the information requested for the following:

- Each promoter of the issuer, if the issuer has been organized within the past five years;
- Each beneficial owner having the power to vote or dispose, or direct the vote or disposition of, 10% or more of a class of equity securities of the issuer.
- Each executive officer and director of corporate issuers and of corporate general and managing partners of partnership issuers; and
- Each general and managing partner of partnership issuers.

| Check Box(es) that Apply: | ☑ Promoter | ☑ Beneficial Owner | ☐ Executive Officer | ☐ Director | ☐ General and/or Managing Partner |
|---|---|---|---|---|---|

Full Name (Last name first, if individual)
Central Electric Cooperative

Business or Residence Address    (Number and Street, City, State, Zip Code)
P.O. Box 846, Redmond, OR 97756

| Check Box(es) that Apply: | ☐ Promoter | ☑ Beneficial Owner | ☐ Executive Officer | ☐ Director | ☐ General and/or Managing Partner |
|---|---|---|---|---|---|

Full Name (Last name first, if individual)
Rural Services Company

Business or Residence Address    (Number and Street, City, State, Zip Code)
P.O. Box 1148, Hermiston, OR 97838

| Check Box(es) that Apply: | ☐ Promoter | ☑ Beneficial Owner | ☐ Executive Officer | ☐ Director | ☐ General and/or Managing Partner |
|---|---|---|---|---|---|

Full Name (Last name first, if individual)
West Oregon Electric Cooperative

Business or Residence Address    (Number and Street, City, State, Zip Code)
715 Maple St., Vernonia, OR 97064

| Check Box(es) that Apply: | ☐ Promoter | ☐ Beneficial Owner | ☑ Executive Officer | ☐ Director | ☐ General and/or Managing Partner |
|---|---|---|---|---|---|

Full Name (Last name first, if individual)
Warren Miller, CEO

Business or Residence Address    (Number and Street, City, State, Zip Code)
777 13th Street SE, Suite 120, Salem, OR 97301

| Check Box(es) that Apply: | ☐ Promoter | ☐ Beneficial Owner | ☐ Executive Officer | ☑ Director | ☐ General and/or Managing Partner |
|---|---|---|---|---|---|

Full Name (Last name first, if individual)
Al Gonzalez

Business or Residence Address    (Number and Street, City, State, Zip Code)
P.O. Box 846, Redmond, OR 97756

| Check Box(es) that Apply: | ☐ Promoter | ☐ Beneficial Owner | ☐ Executive Officer | ☑ Director | ☐ General and/or Managing Partner |
|---|---|---|---|---|---|

Full Name (Last name first, if individual)
Steve Eldrige

Business or Residence Address    (Number and Street, City, State, Zip Code)
P.O. Box 1148, Hermiston, OR 97838

| Check Box(es) that Apply: | ☐ Promoter | ☐ Beneficial Owner | ☐ Executive Officer | ☑ Director | ☐ General and/or Managing Partner |
|---|---|---|---|---|---|

Full Name (Last name first, if individual)
Robert VanNatta

Business or Residence Address    (Number and Street, City, State, Zip Code)
715 Maple St., Vernonia, OR 97064

EXHIBIT   *B*

(Use blank sheet, or copy and use additional copies of this sheet, as necessary)

## A. BASIC IDENTIFICATION DATA

2.  Enter the information requested for the following:

- Each promoter of the issuer, if the issuer has been organized within the past five years;
- Each beneficial owner having the power to vote or dispose, or direct the vote or disposition of, 10% or more of a class of equity securities of the issuer.
- Each executive officer and director of corporate issuers and of corporate general and managing partners of partnership issuers; and
- Each general and managing partner of partnership issuers.

| Check Box(es) that Apply: | ☐ Promoter | ☐ Beneficial Owner | ☐ Executive Officer | ☑ Director | ☐ General and/or Managing Partner |

Full Name (Last name first, if individual)
Mark Holden

Business or Residence Address    (Number and Street, City, State, Zip Code)
P.O. Box 846, Redmond, OR 97756

| Check Box(es) that Apply: | ☐ Promoter | ☐ Beneficial Owner | ☐ Executive Officer | ☑ Director | ☐ General and/or Managing Partner |

Full Name (Last name first, if individual)
Greg Aldrige

Business or Residence Address    (Number and Street, City, State, Zip Code)
3201 Tremont Avenue, North Bend, OR 97459

| Check Box(es) that Apply: | ☐ Promoter | ☐ Beneficial Owner | ☐ Executive Officer | ☑ Director | ☐ General and/or Managing Partner |

Full Name (Last name first, if individual)
Dave Sabala

Business or Residence Address    (Number and Street, City, State, Zip Code)
P.O. Box 1327, Roseburg, OR 97470

| Check Box(es) that Apply: | ☐ Promoter | ☐ Beneficial Owner | ☐ Executive Officer | ☑ Director | ☐ General and/or Managing Partner |

Full Name (Last name first, if individual)
John Gerstenberger

Business or Residence Address    (Number and Street, City, State, Zip Code)
204 East 4th Street, The Dalles, OR 97058

| Check Box(es) that Apply: | ☐ Promoter | ☐ Beneficial Owner | ☐ Executive Officer | ☐ Director | ☐ General and/or Managing Partner |

Full Name (Last name first, if individual)


Business or Residence Address    (Number and Street, City, State, Zip Code)


| Check Box(es) that Apply: | ☐ Promoter | ☐ Beneficial Owner | ☐ Executive Officer | ☐ Director | ☐ General and/or Managing Partner |

Full Name (Last name first, if individual)


Business or Residence Address    (Number and Street, City, State, Zip Code)


| Check Box(es) that Apply: | ☐ Promoter | ☐ Beneficial Owner | ☐ Executive Officer | ☐ Director | ☐ General and/or Managing Partner |

Full Name (Last name first, if individual)


Business or Residence Address    (Number and Street, City, State, Zip Code)


(Use blank sheet, or copy and use additional copies of this sheet, as necessary)

EXHIBIT _B_

3 of 10

3 OF 10

| B. INFORMATION ABOUT OFFERING | | |
|---|---|---|

| | Yes | No |
|---|---|---|
| 1. Has the issuer sold, or does the issuer intend to sell, to non-accredited investors in this offering?........................... | ☐ | ☒ |

Answer also in Appendix, Column 2, if filing under ULOE.

2. What is the minimum investment that will be accepted from any individual?.................................................... $ 757,000.00

| | Yes | No |
|---|---|---|
| 3. Does the offering permit joint ownership of a single unit?.............................................................. | ● | ☒ |

4. Enter the information requested for each person who has been or will be paid or given, directly or indirectly, any commission or similar remuneration for solicitation of purchasers in connection with sales of securities in the offering. If a person to be listed is an associated person or agent of a broker or dealer registered with the SEC and/or with a state or states, list the name of the broker or dealer. If more than five (5) persons are to be listed are associated persons of such a broker or dealer, you may set forth the information for that broker or dealer only.

Full Name (Last name first, if individual)
NONE

Business or Residence Address (Number and Street, City, State, Zip Code)

Name of Associated Broker or Dealer

States in Which Person Listed Has Solicited or Intends to Solicit Purchasers

(Check "All States" or check individual States) ............................................................. ☐ All States

| AL | AK | AZ | AR | CA | CO | CT | DE | DC | FL | GA | HI | ID |
|----|----|----|----|----|----|----|----|----|----|----|----|----|
| IL | IN | IA | KS | KY | LA | ME | MD | MA | MI | MN | MS | MO |
| MT | NE | NV | NH | NJ | NM | NY | NC | ND | OH | OK | OR | PA |
| RI | SC | SD | TN | TX | UT | VT | VA | WA | WV | WI | WY | PR |

Full Name (Last name first, if individual)
NONE

Business or Residence Address (Number and Street, City, State, Zip Code)

Name of Associated Broker or Dealer

States in Which Person Listed Has Solicited or Intends to Solicit Purchasers

(Check "All States" or check individual States) ............................................................. ☐ All States

| AL | AK | AZ | AR | CA | CO | CT | DE | DC | FL | GA | HI | ID |
|----|----|----|----|----|----|----|----|----|----|----|----|----|
| IL | IN | IA | KS | KY | LA | ME | MD | MA | MI | MN | MS | MO |
| MT | NE | NV | NH | NJ | NM | NY | NC | ND | OH | OK | OR | PA |
| RI | SC | SD | TN | TX | UT | VT | VA | WA | WV | WI | WY | PR |

Full Name (Last name first, if individual)
NONE

Business or Residence Address (Number and Street, City, State, Zip Code)

Name of Associated Broker or Dealer

States in Which Person Listed Has Solicited or Intends to Solicit Purchasers

(Check "All States" or check individual States) ............................................................. ☐ All States

| AL | AK | AZ | AR | CA | CO | CT | DE | DC | FL | GA | HI | ID |
|----|----|----|----|----|----|----|----|----|----|----|----|----|
| IL | IN | IA | KS | KY | LA | ME | MD | MA | MI | MN | MS | MO |
| MT | NE | NV | NH | NJ | NM | NY | NC | ND | OH | OK | OR | PA |
| RI | SC | SD | TN | TX | UT | VT | VA | WA | WV | WI | WY | PR |

(Use blank sheet, or copy and use additional copies of this sheet, as necessary.)

EXHIBIT B

4 OF 10

## C. OFFERING PRICE, NUMBER OF INVESTORS, EXPENSES AND USE OF PROCEEDS

1.  Enter the aggregate offering price of securities included in this offering and the total amount already sold. Enter "0" if the answer is "none" or "zero." If the transaction is an exchange offering, check this box ☐ and indicate in the columns below the amounts of the securities offered for exchange and already exchanged.

| Type of Security | Aggregate Offering Price | Amount Already Sold |
|---|---|---|
| Debt | $ 0.00 | $ 0.00 |
| Equity | $ 11,476,540.00 | $ 11,476,540.00 |
| ☑Common  ☐Preferred | | |
| Convertible Securities (including warrants) | $ 0.00 | $ 0.00 |
| Partnership Interests | $ 0.00 | $ 0.00 |
| Other (Specify _____) | $ 0.00 | $ 0.00 |
| Total | $ 11,476,540.00 | $ 11,476,540.00 |

Answer also in Appendix, Column 3, if filing under ULOE.

2.  Enter the number of accredited and non-accredited investors who have purchased securities in this offering and the aggregate dollar amounts of their purchases. For offerings under Rule 504, indicate the number of persons who have purchased securities and the aggregate dollar amount of their purchases on the total lines. Enter "0" if answer is "none" or "zero."

| | Number Investors | Aggregate Dollar Amount of Purchases |
|---|---|---|
| Accredited Investors | 6 | $ 11,476,540.00 |
| Non-accredited Investors | 0 | $ 0.00 |
| Total (for filings under Rule 504 only) | 6 | $ 11,476,540.00 |

Answer also in Appendix, Column 4, if filing under ULOE.

3.  If this filing is for an offering under Rule 504 or 505, enter the information requested for all securities sold by the issuer, to date, in offerings of the types indicated, in the twelve (12) months prior to the first sale of securities in this offering. Classify securities by type listed in Part C — Question 1.

| Type of Offering | Type of Security | Dollar Amount Sold |
|---|---|---|
| Rule 505 | 0 | $ 0.00 |
| Regulation A | 0 | $ 0.00 |
| Rule 504 | 0 | $ 0.00 |
| Total | | $ 0.00 |

4  a.  Furnish a statement of all expenses in connection with the issuance and distribution of the securities in this offering. Exclude amounts relating solely to organization expenses of the insurer. The information may be given as subject to future contingencies. If the amount of an expenditure is not known, furnish an estimate and check the box to the left of the estimate.

| | | |
|---|---|---|
| Transfer Agent's Fees | ☐ | $ 0.00 |
| Printing and Engraving Costs | ☑ | $ 0.00 |
| Legal Fees | ● | $ 25,000.00 |
| Accounting Fees | ☑ | $ 10,000.00 |
| Engineering Fees | ☐ | $ 0.00 |
| Sales Commissions (specify finders' fees separately) | ☐ | $ 0.00 |
| Other Expenses (identify) _____ | ☐ | $ 0.00 |
| Total | ☑ | $ 35,000.00 |

EXHIBIT ___*B*___

___5___ OF ___10___

| **C. OFFERING PRICE, NUMBER OF INVESTORS, EXPENSES AND USE OF PROCEEDS** |
|---|

b.   Enter the difference between the aggregate offering price given in response to Part C — Question 1 and total expenses furnished in response to Part C — Question 4.a.  This difference is the "adjusted gross proceeds to the issuer." ..........................................................................................................................   $ __11,441,540.00__

5.   Indicate below the amount of the adjusted gross proceed to the issuer used or proposed to be used for each of the purposes shown.  If the amount for any purpose is not known, furnish an estimate and check the box to the left of the estimate.  The total of the payments listed must equal the adjusted gross proceeds to the issuer set forth in response to Part C — Question 4.b above.

|  | Payments to Officers, Directors, & Affiliates | Payments to Others |
|---|---|---|
| Salaries and fees ...................................................................................... | ☐ $_____ | ☐ $_____ |
| Purchase of real estate ............................................................................ | ☐ $_____ | ☐ $_____ |
| Purchase, rental or leasing and installation of machinery and equipment ............................................................................................. | ☐ $_____ | ☐ $_____ |
| Construction or leasing of plant buildings and facilities ....................... | ☐ $_____ | ☐ $_____ |
| Acquisition of other businesses (including the value of securities involved in this offering that may be used in exchange for the assets or securities of another issuer pursuant to a merger) ................................................................ | ☐ $_____ | ☐ $_____ |
| Repayment of indebtedness ...................................................................... | ☑ $ 11,441,540. | ☐ $_____ |
| Working capital ........................................................................................ | ☐ $_____ | ☐ $_____ |
| Other  (specify): _____ | ☐ $_____ | ☐ $_____ |
| _____ | | |
| _____ ............. | ☐ $_____ | ☐ $_____ |
| Column Totals ......................................................................................... | ☐ $ 11,441,540.0 | ☐ $ 0.00 |
| Total Payments Listed (column totals added) ........................................... | | ☐ $ 11,441,540.00 |

| **D. FEDERAL SIGNATURE** |
|---|

The issuer has duly caused this notice to be signed by the undersigned duly authorized person.  If this notice is filed under Rule 505, the following signature constitutes an undertaking by the issuer to furnish to the U.S. Securities and Exchange Commission, upon written request of its staff, the information furnished by the issuer to any non-accredited investor pursuant to paragraph (b)(2) of Rule 502.

| Issuer (Print or Type) LIGHTSPEED NETWORKS, INC. | Signature | Date 4/19/2005 |
|---|---|---|
| Name of Signer (Print or Type) Gregory J. Stuman, Esq, | Title of Signer (Print or Type) Attorney at Law | |

---

## ATTENTION

| Intentional misstatements or omissions of fact constitute federal criminal violations.  (See 18 U.S.C. 1001.) |
|---|

EXHIBIT __B__

6 OF 10

## E. STATE SIGNATURE

1.  Is any party described in 17 CFR 230.262 presently subject to any of the disqualification                                          Yes        No
    provisions of such rule? ................................................................................................................................    ☐         ☒

<div align="center">See Appendix, Column 5, for state response.</div>

2.  The undersigned issuer hereby undertakes to furnish to any state administrator of any state in which this notice is filed a notice on Form
    D (17 CFR 239.500) at such times as required by state law.

3.  The undersigned issuer hereby undertakes to furnish to the state administrators, upon written request, information furnished by the
    issuer to offerees.

4.  The undersigned issuer represents that the issuer is familiar with the conditions that must be satisfied to be entitled to the Uniform
    limited Offering Exemption (ULOE) of the state in which this notice is filed and understands that the issuer claiming the availability
    of this exemption has the burden of establishing that these conditions have been satisfied.

The issuer has read this notification and knows the contents to be true and has duly caused this notice to be signed on its behalf by the undersigned
duly authorized person.

| Issuer (Print or Type) | Signature | Date |
|---|---|---|
| LIGHTSPEED NETWORKS, INC. | | 4/19/2005 |
| Name (Print or Type) | Title (Print or Type) | |
| Gregory J. Stuman, Esq, | Attorney at Law | |

*Instruction:*
Print the name and title of the signing representative under his signature for the state portion of this form.  One copy of every notice on Form
D must be manually signed.  Any copies not manually signed must be photocopies of the manually signed copy or bear typed or printed
signatures.

EXHIBIT     *B*

_____7_____ OF __10__

## APPENDIX

| 1 State | 2 Intend to sell to non-accredited investors in State (Part B-Item 1) Yes | No | 3 Type of security and aggregate offering price offered in state (Part C-Item 1) | 4 Type of investor and amount purchased in State (Part C-Item 2) Number of Accredited Investors | Amount | Number of Non-Accredited Investors | Amount | 5 Disqualification under State ULOE (if yes, attach explanation of waiver granted) (Part E-Item 1) Yes | No |
|---|---|---|---|---|---|---|---|---|---|
| AL | | X | | | | | | | |
| AK | | X | | | | | | | |
| AZ | | X | | | | | | | |
| AR | | X | | | | | | | |
| CA | | X | | | | | | | |
| CO | | X | | | | | | | |
| CT | | X | | | | | | | |
| DE | | X | | | | | | | |
| DC | | X | | | | | | | |
| FL | | X | | | | | | | |
| GA | | X | | | | | | | |
| HI | | X | | | | | | | |
| ID | | X | | | | | | | |
| IL | | X | | | | | | | |
| IN | | X | | | | | | | |
| IA | | X | | | | | | | |
| KS | | X | | | | | | | |
| KY | | X | | | | | | | |
| LA | | X | | | | | | | |
| ME | | X | | | | | | | |
| MD | | X | | | | | | | |
| MA | | X | | | | | | | |
| MI | | X | | | | | | | |
| MN | | X | | | | | | | |
| MS | | X | | | | | | | |

EXHIBIT B

8 OF 10

| | APPENDIX | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 2 | | 3 | 4 | | | | 5 | |
| | Intend to sell to non-accredited investors in State (Part B-Item 1) | | Type of security and aggregate offering price offered in state (Part C-Item 1) | Type of investor and amount purchased in State (Part C-Item 2) | | | | Disqualification under State ULOE (if yes, attach explanation of waiver granted) (Part E-Item 1) | |
| State | Yes | No | | Number of Accredited Investors | Amount | Number of Non-Accredited Investors | Amount | Yes | No |
| MO | | X | | | | | | | |
| MT | | X | | | | | | | |
| NE | | X | | | | | | | |
| NV | | X | | | | | | | |
| NH | | X | | | | | | | |
| NJ | | X | | | | | | | |
| NM | | X | | | | | | | |
| NY | | X | | | | | | | |
| NC | | X | | | | | | | |
| ND | | X | | | | | | | |
| OH | | X | | | | | | | |
| OK | | X | | | | | | | |
| OR | | X | Stock $11,476,540 | 6 | 11476540.00 | 0 | $0.00 | | X |
| PA | | X | | | | | | | |
| RI | | X | | | | | | | |
| SC | | X | | | | | | | |
| SD | | X | | | | | | | |
| TN | | X | | | | | | | |
| TX | | X | | | | | | | |
| UT | | X | | | | | | | |
| VT | | X | | | | | | | |
| VA | | X | | | | | | | |
| WA | | X | | | | | | | |
| WV | | X | | | | | | | |
| WI | | X | | | | | | | |

9 of 10

EXHIBIT     B

9 OF 10

| | APPENDIX | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|

| 1 | 2 | | 3 | 4 | | | | 5 | |
|---|---|---|---|---|---|---|---|---|---|
| | Intend to sell to non-accredited investors in State (Part B-Item 1) | | Type of security and aggregate offering price offered in state (Part C-Item 1) | Type of investor and amount purchased in State (Part C-Item 2) | | | | Disqualification under State ULOE (if yes, attach explanation of waiver granted) (Part E-Item 1) | |
| State | Yes | No | | Number of Accredited Investors | Amount | Number of Non-Accredited Investors | Amount | Yes | No |
| WY | | ✕ | | | | | | | |
| PR | | ✕ | | | | | | | |

EXHIBIT _____ *B* _____

_10_ OF _10_

## CERTIFICATE OF TRUE COPY

I hereby certify that the foregoing **NOTICE OF REMOVAL** is a true, exact and full copy of the original thereof.

DATED this _____ day of April, 2005.

FRANCIS HANSEN & MARTIN, LLP

_____
Martin E. Hansen, OSB #80052
Of Attorneys for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **NOTICE OF REMOVAL** to:

Michael G. Hanlon, PC
1001 SW Fifth Avenue, Suite 1300
Portland, OR 97204

Trial Court Administrator
Circuit Court of Oregon, Curry County
P.O. Box 810
Gold Beach, OR 97444

by causing a full, true, and correct copy thereof to be sent by the following indicated method or methods, on the date set forth below:

☒    by mailing in a sealed, first-class postage-prepaid envelope, addressed to the last-known office address of the party, and deposited with the United States Postal Service at Bend, Oregon.

☐    by faxing to the party at the fax number that is the last-known fax number for the party's office.

DATED this 20th day of April, 2005.

FRANCIS HANSEN & MARTIN, LLP

_____
Martin E. Hansen, OSB #80052
Of Attorneys for Defendant

Francis Hansen & Martin, LLP
1148 N.W. Hill Street • Bend, Oregon 97701-1914
(541) 389-5010

CERTIFICATE OF SERVICE/TRUE COPY